# Gasior Declaration

# Exhibit G

Doc ID:   Type: COU
Kind: ARTICLE 78
Recorded: 08/07/2019 at 02:11:00 PM
Fee Amt: $210.00 Page 1 of 0
Rockland County, NY
Paul Piperato County Clerk

SU-2019-001044

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

-------------------------------------------------X

TASHA OSTLER and SCOTT MAIONE
(and on behalf of their infant children),

               Petitioners,

Index No.:

     v.

THE NEW YORK STATE DEPARTMENT
OF HEALTH, and DR. HOWARD ZUCKER,
ON BEHALF OF THE NEW YORK STATE OF
DEPARTMENT OF HEALTH

**VERIFIED PETITION**

               Respondents.

For a Judgment Pursuant to Article 78
of the Civil Practice Law and Rules
-------------------------------------------------X

## **PRELIMINARY STATEMENT**

This Petition ("Petition") is brought pursuant to Article 78 of the Civil Practice

Law and Rules of New York ("CPLR"), by Scott Maione and Tasha Ostler, and their

infant children, J, M, and S ("Petitioners"), *inter alia*, seeking the overturning of, and

challenging a number of administrative agency determinations rendered by Fair Hearing

("Fair Hearing") decisions ("Decisions") issued by the New York State Department of

Health ("DOH"), by and through Administrative Law Judge Christopher Gallagher ("ALJ

Gallagher") and Darlene Oto ("ALJ Oto"), which Decisions were arbitrary and

capricious, against the weight of established law, and essentially not supported by a

rational basis, inter alia, in that ALJ Gallagher actually conceded that the Commissioner

of the DOH was not in a position to interpret the law which applied to the reimbursement

of medical transportation related expenses to the duly entitled, and qualified Medicaid recipients, thereby abrogating his promulgated duties as a Hearing Officer and those of the DOH in administering Medicaid assistance to New York State residents. CPLR §§ 7803(3) and 7803(4).

Petitioners also seek reimbursement of the expenses which are incidental to the relief sought hereunder as these types of expenses will be ongoing to the Petitioners' children needs and will continue to be incurred *in future* in addition to depriving other recipients of these benefits. It is necessary, therefore, for Petitioners to establish the erroneous position taken by DOH in connection with this matter so that other ALJ's do not come to the same wrong conclusions. The damages are incidental to the DOH's requirement to comply with the law CPLR 7806.

The Petitioners, individually and together are seeking reimbursement of private medical insurance premiums (only for Scott Maione), co-pays, deductibles and additional medical expenses (travel, over the counter medications, medically necessary durable medical equipment and supplies, etc.), from the Respondent, beginning in **January of 2011 through even date,** as entitled and verified Medicaid recipients.

Petitioners have three children, two of whom are clinically disabled. M is an eight years old girl; she has a twin brother, J. From birth, they have both faced various cognitive and physical challenges and delays and will continue to do so. Upon their birth, Petitioners needed to turn to social services for the first time. The County Agencies (both Social Services and the Department of Health) have a reputation for challenging recipient entitlements, having made things difficult on Petitioners (they are probably not alone), requiring them to go through unnecessary hearings in the past, one for SNAP

benefits and another because the DOH decided that M (Petitioner's infant daughter) no longer needed early intervention physical therapy because "many children walk on their toes" was their answer.  M was later diagnosed with cerebral palsy.  Needless to say, Petitioners were victorious at both fair hearings.  Then, Petitioners were awarded reimbursement at Fair Hearing number **#6223734H**.  Following that, the Office of Temporary and Disability Assistance, Office of Administrative Hearings ("OTDA-OAH") (and Rockland County it appears) as well as the DOH quickly decided that the Petitioners would no longer be successful at any fair Hearings and made the necessary adjustments to ensure that (such as removing the same Administrative Law Judge-ALJ Mariani- that presided over the awarded hearing, and replacing her with a designated ALJ of their choosing).  Since, hearing #6223734H, Petitioners have sat for no less then 16 hearings (with the same ALJ's and the OTDA/DOH refused to consolidate) and have lost them all.

Abundant medical testimony and evidence, clinical letters, prescriptions and studies have been submitted to the Rockland County Department of Social Services ("RCDSS") and submitted on the Record at the various fair Hearings over the years. Petitioners are not re-submitting these voluminous documents as exhibits before your Honor (unless the Court requests so of course) as the issue of "medical necessity" has not been challenged by the Agency or State and has been well established at the prior fair hearing over the same exact issues (#6223734H, decided 11/13/14 before Administrative Law Judge, Sarah Mariani, see **exhibit A8**).  In other words, not a single expense has ever been denied by the Agency or the State because they found that is was not medically

necessary. In fact, every expense that we have purchased has been medically necessary and has been medically substantiated.

Two minor but extreme examples- in that they wouldn't seem medical -are infant cutlery and sunscreen. In 2015, the Agency/State determined that neither item is covered by Medicaid (as is their typical rejection), yet M's occupational therapist prescribed the specific cutlery for feeding therapy during sessions. And the sunscreen is prescribed for M because she has neurofibromatosis and has to protect her skin from the sun at all times. The State is aware of the prescriptions but denied anyway as "not covered by Medicaid." The problem is that these expenses, are but two examples of many that were previously reimbursed following fair Hearing decision #6223734H by ALJ Mariani in 2014 and specifically because of medical necessity. The State never challenged that they weren't medically necessary, only that they weren't covered under Medicaid/EPSDT no matter what. And they were wrong (for the record, many prescription medications that is covered by Petitioner's primary has been denied by Medicaid-New York State Medicaid denies often for no good reason).

However, after Petitioners continued with their receipt submissions as directed, they were then rejected (in 2015) for the same expenses that they had been awarded only one year earlier ALJ Mariani in 2014.

Thus, there is no need to revisit each single item as the redundancy of different expenses but the same rejection would easily consume the entire Petition. The bottom line is the County and State has only denied us coverage and reimbursement for two reasons: for expenses purchased after receipt of the Medicaid card and/or the expense is not covered by Medicaid. Our argument then, as again, no challenge was made at the fair

hearings regarding the children's' medical need for the given expense (the State concedes that as Barbara Barbash, County DSS attorney, said on the record at the Hearing, "we are not challenging medical necessity"); only that the expense wasn't covered regardless of medical need, is to show this Court and your Honor, why medical necessity is enough reason that these expenses should have in fact been covered, and most certainly, then, reimbursed. For some background as to the medical history and need of expenses, **see exhibits A4 and A5**, Petitioner opposition to State Attorney, Jane McCloskey, who represented the State at fair Hearing #6223734H.

On April 1, 2019, APRIL 4, 2019, April 10, 2019 and April 12, 2019, ALJ Gallagher and ALJ Oto issued decisions (see **exhibit A7-all decisions**) on Hearing ## *7152305N, 7152352Q, 7152341Q, 6567056Z, 7152329P, 7151879Q, and 6500902Z*

## BACKGROUND

The fair Hearings were held on June 3rd and 20th, 2018 and continued on October 3rd and 5th, 2018. The first of the decisions were rendered on April 1, 2019. It was postmarked internally by the Office of Temporary and Disability Assistance ("OTDA") on Thursday, April 4, 2019. Petitioners received the first of the decisions on Thursday, April 10th, 2019.

While most of the transportation Hearings (12 to be precise) were held on March 15, of 2018, ALJ Gallagher refused to consolidate one last Medical Answering Service ("MAS") transportation hearing (involving the State's third party vendor's improper reimbursement on medical trips -**#6500902Z**- because the Office of Temporary and Disability Assistance-Office of Administrative Hearings ("OTDA-OAH) a separate issue was attached to the hearing number. It so happens that hearings #6500902Z and

#7151879Q involve both transportation claims as well as "all other" medical reimbursement for infants, M and J Maione. While it was perfectly within ALJ Gallagher's purview to separate the transportation issue from that one number and consolidate it with other hearings of similar transportation issues, ALJ Gallagher opted not to, and thus add to the due process insanity that has plagued the Petitioners for years now. Claimants, like these Petitioners, are forced to request hearings although the issues have already been well resolved in a previous hearing.

    * Hearing # 6500902Z, contained herein, is identical to the MAS transportation article 78, specifically, #6500974Y, that currently stands before Judge Paul Marx. The exact (exact, meaning outstanding transportation for the same time period on the same ledger, owed to the family for the same reasons; it used to logically be under one hearing number, but for some reason, the OAH turned it into two hearing numbers.

    **Hearing # **7151879Q** (M Maione) and **#7152305N** (J Maione) contained herein, which used to be strictly medical reimbursement issues (supplies, co-pays, DME, etc.) and contain the lion's share of outstanding reimbursement and are interrelated, have now attached to them, a distinct, unrelated early- intervention County transportation issue from 2014. In their inadvertent and last minute attempt to clean up the mess they have created, the OTDA/OAH has made the Petitioners' case even more difficult to present; they have done away with the original hearing numbers of the early intervention issue and attached them to to medical reimbursement issues simply because the Petitioner is the same person.[1] However, these issues would have been much better served to be heard

---

[1] See **exhibit L3**, where Ms. Gerber (head of OAH scheduling) explains combining hearings, and in doing so, mistakenly conflated a transportation hearing (MAS) with a non transportation issue, which is how one MAS hearing is still with us.

with the other MAS transportation issues because at the very least, the are about transportation reimbursement.

Due to the fact that ALJ Gallagher refused to consolidate the like issues here (medical reimbursement after receipt of the CBIC card) and disparate matters (transportation), as well as applying prior hearing decision (#6223734H) to the issues before him, Petitioners are compelled to address all seven hearing numbers within this one article 78 because, while challenging, to not do so, would cause even more confusion, delay, overlap, and misuse of Petitioners' and the Court's time, money, and resources.

Secondly, Gallagher/Oto's astounding disregard of the evidence presented at the Fair Hearings displayed an undermining of the law.  Again, unfortunately, due to Gallagher's refusal to consolidate, Petitioners are compelled to list each specific Hearing and briefly mention where each decision is in violation of the law.

To be sure, while it all reads like a confusing melodrama, Petitioners want to make the Court aware that they tried for years to avoid this very situation- different hearing numbers with the same issues and other numbers with tangential issues-by requesting time and time again for the OAH to consolidate same issue hearings, but they refused (Petitioners have NINE transportation hearings before judge Marx that should be under one number).

### RELIEF SOUGHT

1. Reversal of the Decisions in question which were arbitrary and capricious, without regard to Medicaid Law, and in abrogation of his duties.

2. Reimbursement for monetary damages incidental to that reversal, including

reimbursement for Durable Medical Equipment, ("DME"), over-the-counter medications and supplies ("OTC"), co-pays, deductibles, etc. and premiums for Scott Maione (the other family members were previously reimbursed for premiums as a result of fair hearing #6223734H).

3. Reimbursement for monetary damages incidental to that reversal, including reimbursement for all transportation related expenses, including appropriate mileage, parking, tolls, meals, and tips.

## JURISDICTION AND VENUE

4. The Supreme Court of New York State has jurisdiction under Section 7801, *et seq.* of the CPLR to review the decisions made by Respondents.

5. Venue is proper in Rockland County.

## STATEMENT OF FACTS: PROCEDURAL HISTORY

## FAIR HEARING #7152305N (JACKSON MAIONE):

6. The lion's share of outstanding reimbursement, as it belongs to J Maione, who had the greatest need of care between birth and 2015-more ongoing.

7. He had a prior fair hearing on these issues, which Petitioner won (**hearing #6223734H, see Exhibit A8**). The Agency/State reimbursed Petitioner only for the submitted receipts which ran from birth until May 2012. Identical expenses that were not submitted at the request of the Agency-even if they were purchased PRIOR to the decision, were NOT reimbursed solely because they were not submitted, although again at the request of the Agency to defer submission until the hearings was resolved.

8. Petitioners argue that all other reimbursement for the other four

household/family members, must be made according to the same guidelines and regulations that required the State to reimburse J.  *(The second and less important issue attached to this hearing number is a transportation issue, and has nothing to do with the major issues before the Court.  It should never have been connected to this hearing, but was mistakenly attached by the OTDA.  Again, ALJ Gallagher had the opportunity to separate it and consolidate it with other transportation hearings, but refused.  Therefore, we will be responding to it separately at a later point within this Petition)*:

9.      On April 10th, 2019, Administrative Law Judges Gallagher/Oto determined in their decision that disabled infant Petitioner, J Maione was reimbursed adequately, as a result of a prior fair hearing, from birth (January 23, 2011) to December 1, 2011.

10.      The problem is that the Fair Hearing was not about whether J was owed reimbursement prior to December, 2011, as fair hearing #6223734H resolved this issue in 2014 in favor of the Petitioners.

11.      It appears that either ALJ Gallagher failed to understand what the hearing was about, which is dubious considering how many hours and documents were shared discussing these issues with palpable specificity (moreover, the ENTIRE record from #6223734H was resubmitted at this hearing by Petitioners so Gallagher/Oto could have the same information that Administrative Law Judge Sarah Mariani ("ALJ Mariani", who presided over and ruled on Petitioner's Fair Hearing #6223734H, decided on 11/13/14) based her decision upon).  And the hearing transcripts will certainly reflect this. **See exhibit F**, which reflects the number for which the submissions totaled for J and were subsequently reimbursed, but ALSO on the same page, where it states, "ongoing

expenses", meaning Mariani, as well as the State was well aware that Petitioners had more submissions.  In fact, Mariani wrote on page two of her Decision under "*findings of fact #1." …..the appellant……with numerous medical complications requiring intensive hospital care residence for approximately one month and ongoing medical bills to date,*" *Please note the word "ONGOING", signifying that we were not dealing with a finite time period, as the infant is clinically disabled.

12.     ALJ Oto presided over all of Petitioners' hearings, although Petitioners had requested she not be assigned to any further Petitioner hearings for bias (**See Exhibit C**).

13.     Before noting concerns with ALJ Oto, in 2014, immediately following hearing decision #6223734H, which awarded the Petitioner $32,515.98 in medical reimbursement, **it appears that Rockland County Commissioner of the Department of Social Services, Susan Sherwood, instructed the OTDA-OAH to have ALJ Mariani pulled off the remainder of Petitioner hearings (see Exhibit B2), although she was already scheduled**.  Ms. Sherwood's initials ("SAS") appear on the transcript as instructing the OTDA to do so.  If that is indeed the case, that is very concerning as Ms. Sherwood should have nothing to do with State fair hearing scheduling; in fact, ALJ assignment to specific hearings is supposed to be random, to avoid just the very possibility of bias.

14.     In 2016, ALJ Oto arbitrarily and capriciously changed Petitioners' hearing decision, by which it awarded reimbursement.  (She issued a "corrected decision" based upon an error of the law, yet shockingly, never stated the putative error (**see Exhibit B**).

15.     ALJ Oto's intemperate action, resulting in harm to the infant Petitioner only was short-circuited because Mariani refused to go along with Oto's actions and alter the final decision, correctly citing the unlawfulness of the proposed changes.

16.     Two years later, in 2018, during the hearings at issue, ALJ Oto intercepted documents mailed specifically to ALJ Gallagher for the fair hearing but failed to present the documents to ALJ Gallagher.

17.     When Petitioners inquired as to receipt of the pertinent records at the reconvened hearing with ALJ Gallagher in October of 2018, he plainly stated that he had **never received them and knew nothing about being sent documents by us**. Petitioners sent such documents certified mail to ALJ Gallagher but he never received them.

18.     Conversely, ALJ Oto wrote the Petitioners disallowing the documents without any knowledge as to their importance nor ALJ Gallagher's expectation of receiving them.

19.     Following this palpably unethical action, Petitioners requested that ALJ Oto not preside over further hearings, as is their right if they can point to bias or prejudice; yet, she continued to preside over ALL of the hearings, and returned decisions which clearly illustrate that the person authoring those decisions has no knowledge of the issues.

20.     The transcripts and the Record will show that this hearing was called because while the County/State reimbursed J in 2014 for medical expenses from birth through April of 2013, the County/State ceased reimbursement for the SAME EXACT expenses from an arbitrary point in time (May, 2013), simply because the Agency

requested of the Petitioner's family that they cease submission (on the Record) of further receipts until the conclusion of hearing #6223734H.

21.     In fact, it was County attorney Lew Jefferies ("Jefferies")- present at an early convening of hearing #6223734H –on May 17, 2013- that requested the Petitioners cease ongoing submissions (it was complicating the hearing process) as the decision "**will offer guidance and clarity**" as "**to what is and is not covered**" were his words verbatim **(the hearing recording contains this on the Record)** as to how to proceed with ongoing receipts. That means that Mr. Jefferies well understood the concept of res judicata as it applies to fair hearings[2]. (Petitioners shouldn't even have had to attend another fair hearing. The Agency and State should have been able to review the ongoing expenses and designation for medical necessity and barring disagreement as to the continued necessity, should have simply reimbursed again. Why else would the Petitioners have continued to purchase the same expenses if they don't need them? The inconsistency of the fair hearing system if not respected, turns it from a "final and binding" forum to a fleeting, ephemeral, arbitrary event that holds no weight or carries no significance.)

---

[2] "Parties also have a right to an opinion that is consistent with past Agency decisions, or explains the reasons for departing from precedent." "An opinion that is inexplicably contrary to other decisions reached on similar facts is a due process violation. " (Charles A. Field Delivery Service v. Roberts, 66 N.Y.2d 516 (1985). See also Greenstein by Horowitz v. Bane, 833 F. Supp. 1054, 1070, 1076-1077 (S.D.N.Y. 1993) ("If redress is not adequate, plaintiffs have been deprived of property without due process."). "Patently inconsistent application of agency standards to similar situations lacks rationality and is arbitrary.'" Vargas v. I.N.S., 938 F.2d 358, 362 (2d Cir.1991) (quoting Contractors Transport Corp. v. United States, 537 F.2d 1160, 1162 (4th Cir.1976)).

     "Courts owe less deference to an agency interpretation of a regulation that is inconsistent with earlier and later pronouncements it has made, because "the [agency's] expertise ... to which we normally defer becomes dubious when the expert cannot make up its own mind." New York City Health and Hosp. Corp. v. Perales, 954 F.2d at 861-62; see also Catholic Medical Ctr., Inc. v. N.L.R.B., 589 F.2d 1166, 1174 (2d Cir.1978) (agency's unexplained decision in deviating from precedent "is archetypical of arbitrary and capricious behavior").

22.     So, while Administrative Law Judge Mariani granted the County's wish that Petitioners suspend receipt submission until the seminal issue of entitlement was or was not established, Petitioners in turn trusted the process and held onto the receipts and invoices until the end of the hearing process.

23.     Upon prevailing at the Hearing on November,13, 2014 (#6223734H), and being reimbursed in total for **EVERY** dollar of submission up until the agreed upon date, the Petitioners then submitted the ongoing receipts up until the current date, which was April 2015.  So, receipts incurred DURING ALJ Mariani's deliberation period (2013) until (2015) for the very same expenses were then submitted to the County for reimbursement.

24.     Amazingly, about six months later, in September of 2015, the Petitioners received a denial letter with corresponding expenses listed, and their reasons for denial hand written on a ledger **(see exhibit M).**

25.     What was so "amazing" about this fact is that the Petitioners were rejected for the **SAME exact items** for which they properly had just been reimbursed for, not one year earlier.  And even more amazing, was the fact, that denial was for the SAME reasons they were initially denied for and by the same representative ("Nancy Murphy"), despite ALJ Mariani having already decided that the reasons for denial were unlawful **(see exhibit M, first rejections overturned by Mariani and compare to second rejections, exhibit M1).**

26.     Oto makes the same exact glaring error in this decision as the Agency (Murphy) did in theirs: they neglect the required medical deference in determining what is and what is not "covered by Medicaid," which can only be determined by a medical

13

professional if the expense is declared "medically necessary." **18 NYCRR § 513.7 (a) (b), 513.5 and 513.6** *"The determination must be based upon a professional review by DOH personnel or clinical information and opinion…." And if there is no clinical information or documentation conflicting with the opinion of the treating practitioner….the DOH* **must approve the request as submitted**." See *S.D. ex. Rel. Dickson v Hood*, 391 F.3d 581 (5th Cir. 2004).

27.     None of this occurred-no review- between the date of invoice submission by Petitioners and rejection by Murphy EIGHT months later (and this was after, and in light of, the first decision by Mariani!).

28.     First, neither the County or the State denied reimbursement because a particular expense was not "medically necessary." <u>In fact, Murphy never uses this rationale or words to that effect once as a reason to deny any particular expense.</u>

29.     A fair hearing where **opposition is made based upon medical necessity must be reviewed and disagreed upon by a medical professional secured by The New York State Department of Health ("DOH")**.

30.     The Agency and the DOH are not new to this principle well aware that any challenge over the medical necessity over a specific expense must be made by a licensed, medical practitioner (i.e. a doctor) contending, on a medically sound basis, why a particular expense would be deemed necessary for a specific child.

31.     A proffer by the DOH that an item is "not covered" under Medicaid or EPSDT is an unlawful challenge, as no item or supply or expenses is specifically NOT covered under Medicaid (see **exhibit Q1, OHIP, ADM-1, 2008**).

32.     Medicaid is not insurance with strict boundaries and limitations of coverage, but rather, a health regimen, molded to the specific recipient and based on his or her fluid and fluctuating needs at a given time.

33.     The Agency and the Department of Health should have known this. *"The agency may provide for ANY other medical or remedial care specified in part 440 of this subchapter (42 CFR), even if the agency does not otherwise provide for these services to other recipients or provide for these services to other recipients or provides for them in a lesser amount, duration or scope."* (Also see **42 CFR 441.57**). Furthermore, EPSDT requires States provide all necessary services and supplies *"whether or not such services are covered under the State plan"*. 42 U.S.C. 1396d (a) and 1396d(r)(5).

34.     Why then did Oto unilaterally and arbitrarily then contradict Mariani's decision? **One reason might be that Mariani's determination on premium reimbursement would be a hazardous precedent for the State, as they would now have to reimburse premiums to applicants and recipients (A/R)**. A "final and binding" decision was made and Oto had no evidence (again see ALJ Manual 71-72, *"Parties also have a right to an opinion that is consistent with past agency decisions, or explains, the reasons for departing from precedent. An opinion that is inexplicable contrary to other agency decisions……is a due process violation* (See <u>Charles A Field Delivery Service v Roberts, 66 NY 2d 516 (1985)</u>.

35.     Turning to the "discussion" portion of Oto's decision, where it is not filled with hyperbole, it is filled with omission, and where it is not filled with omission, it is filled with glaring error.

36.     The first paragraph of the "discussion" on page 10 is just dead wrong. What is "at issue" is not what WAS reimbursed, but what <u>WAS NOT</u> reimbursed.  And this amount for J is in excess (through only 2015, to date, more) of $60,000 (**see exhibit A1, hearing brief submitted by Petitioners again, exhibit A6, Murphy's ledger, exhibit M**).

37.     For some reason, Oto failed to discuss the ledger, the receipt packet, and brief, exchanged and discussed at length at the hearing between the Agency representatives ("Lynne Davidson" and "Social Services Attorney Carol Barbash") and the Petitioners.  Certainly, the Record and Transcript will reveal what Oto is trying to ignore.

38.     At no point did the Agency argue against the medical necessity of any cost or expense, nor did they argue that they never received the receipts and invoices for every expense they denied.

39.     The two reasons upon which Murphy relied in denying reimbursement were the same as those advanced 2012: either "items not covered under Medicaid" or "failed to use the CBIC card."

40.     Both of these reasons are illegitimate for the following reasons (also discussed at length at the hearing) and were specifically addressed in AJL Mariani's 13-page decision, when she refers to "medical necessity".

41.     First and foremost, these same expenses have already been reimbursed as decided by ALJ Mariani (and some of the unreimbursed expenses and purchases were made BEFORE and DURING ALJ Mariani's deliberation; therefore, the argument that some items may have not been necessary following the decision and thus, not reimbursed

before another hearing, is erroneous. ALJ Mariani deliberated for one full year following the December 2012 convening before making a decision and the Agency requested a halt in receipt submission in May of 2012 at a prior convening; so, that makes one year and a half of accumulation of receipts, most of which for the SAME EXACT items that ended up being reimbursed (including hypoallergenic wipes, diapers, medications, therapy supplies, etc.! The date of card receipt had nothing to do with their reimbursement; they were purchased well after receipt of the card and both the agency and State must be aware of it as they are the ones that reimbursed the Petitioner. They were reimbursed, in case they have forgotten, due to "medical necessity" (prescriptions and letters from various practitioners.)

42.      Oto absurdly tries to minimize this incontrovertible fact in ¶ 2 on page 11 of her decision, where she actually states, hearing #6223734H "*did not specifically direct the Agency to provide reimbursement....but to evaluate such requests.*" If we must argue grade-school semantics, Mariani's decision was simple and to the point (to anyone not looking for a reason to abrogate the decision), "***the determination to deny the Appellants' request for medical assistance reimbursement was not correct......These determinations are reversed.***" Because nobody then found the decision vague or confusing five years ago, what did the Agency do as a consequence of this decision? They reimbursed the Petitioners the TOTAL amount submitted (which was previously denied 99% by the Agency and Ms. Murphy). Who and why Oto is trying to convince that the Petitioners did not prevail the fair hearing is anybody's guess but it is patently wrong and misleading, if not unethical.

43.     Another major error that Oto mimics of the Agency is that reimbursement cannot be made after receipt of the CBIC card.  First and foremost, 75 percent of the reimbursement ordered by ALJ Mariani was for expenses incurred AFTER J's receipt of the CBIC or Medicaid card (again, see dates of Murphy's denials and original denials, which were subsequently reimbursed by Mariani).  So that argument is moot.

44.     And how can this be?  Because J (and the household) are members of the Third Party Insurance Unit, which is governed by the Family Health Plus division, and under this program, the Medicaid recipient MUST go the doctor under their primary Plan, which is a private insurer, and one who does not accept "regular Medicaid" (**see exhibit QI on Family Health Plus Provisions and Requirements**).

45.     In contradiction to Oto's false narrative on page 11, the Petitioners never argued that they were "forced" onto the third party platform; rather, that the State preferred it as it saves the State money (in their own words, they find it "cost-effective" because in reality, the local managed care Medicaid HMO's (there are five to choose from) that the State pays directly as opposed to reimbursing the recipients directly, charge the State more for disabled children, while private insurers do not charge private citizens more.  (See more about this under Scott Maione's premium reimbursement hearing later.)  And often, the Third party recipient prefers to stay with their private insurance, as vulnerable SSI recipients (and beneficiaries of Early Periodic Screening and Periodic Diagnostics or "EPSDT", which is essentially Medicaid for children), prefer to stay with the comfort and familiarity of the specialists and hospitals that have been treating them since their birth.  To not reimburse these specific recipients but cover managed care recipients is to marginalize certain Medicaid patients over others, which is

unconstitutional according to <u>Greenstein by Horowitz v. Bane, 833 F. Supp. 1054</u>
<u>(S.D.N.Y. 1993).</u>

46.     Anyway, the consequence of being a member of the Family Plus Program,
where Medicaid reimburses the Petitioners monthly for the private premium, is that while
still under Medicaid auspice, the Petitioner must see doctors in their private network.
And if a copay remains to be paid, Medicaid/EPSDT, per their contract, must pay the
copay. "*Medicaid is prohibited from imposing co-payments, deductibles, co-insurance,*
*and other fees on services for children*" ..."   And, *adults living under 100% of the FPL*
*cannot pay any cost-sharing expenses. 42 CFR § 447.53.54; Social Security Law 1902*
(see **N.Y. S.O.S. Law 367-a regarding exemptions from copay responsibility, 42**
**U.S.C. 1396e-1, and 1396o and 42 CFR, Section 447.52 through 447.5, and see**
**exhibit JJ**)  However, in Petitioner's case, Medicaid has not been paying the copays,
citing that the recipient must see a Medicaid doctor.

47.     Oto seems hung up on whether or not the Petitioners were "forced" onto
the third party "policy" as she refers to it.  Is Oto seriously proffering that because the
Petitioner opted for this avenue of Medicaid which is supported by the State that
somehow, they have given up their federal and State Medicaid rights? With all due
respect, that is absurd.  Please see **New York State Administrative Directive 08**
**OHIP/ADM-1, 1/25/2008 (exhibit Q, Q1, Q2)**, which describes in detail how to treat the
Family Health Plus recipient (again, in which Petitioner and family are members through
the third party premium assistance program) must be treated with regard to co-pays,
deductibles, premiums, etc.

48.     In short, expenses must be reimbursed to the recipient regardless of whether the provider is a Medicaid provider or not. (Being a member of the third party unit means that most likely the provider will NOT be a Medicaid provider.  The State should be infinitely aware of this, as it is their program, as they designed it to benefit themselves as a more "cost-effective" option that directly paying a member's Medicaid managed care provider's premium.  One must remember, ALL OF THIS is a system created by the DOH; in this case, the Petitioners are being taken advantage of simply because the State wants to have its cake and it it too: paying less for premiums, while at the same time, not having to reimburse (cover) the costs of co-pays, deductibles, and other medical expenses.

49.     The simple fact is that **18 NYCRR 360-7.5(a)(3) is an old regulation, and applies to recipients with "regular" Medicaid as a primary, to which there are none left in New York as far as we know (all on either managed care all third party like Petitioners**.  The mantra that reimbursement is rarely made to recipients (only in cases of Agency error and delay, which by the way, is what Petitioner's case is-one unwinding, never-ending string of it!) is is not applicable today, specifically to the Petitioners who are being reimbursed for their premiums on a monthly basis and for transportation expenses via Medical Answering Services ("MAS") for transportation.  Once New York stepped into the realm of third party vendors such as private insurance, they forfeited their "it is never cost effective to reimburse" posture.  First, it was probably always unconstitutional but it was never an issue as long as a recipient had somewhere and someone to turn to for pre-approval and coverage; and this was accomplished before third parties became involved.

37.     Now, the State wants the benefits of keeping costs down via third party avenues (again, Petitioners private premiums are cheaper than that of managed Medicaid care), but they also want to refuse reimbursement when they can, which is in violation of federal Medicaid law and in fact, are in jeopardy of losing federal financial participation.

38.     Another prevarication (the transcript will reveal this) is that the Petitioners call for reimbursement in perpetuity without need for a hearing. Not true.

39.     What the Petitioners do claim is that they should have been reimbursed for the same expenses that were already granted alla Mariani, especially for the same time period, like the year and a half deliberation period, where receipts were not submitted by Petitioners at the Agency's request (by Lew Jefferies) during the Hearings.

40.     Furthermore, with respect to other periods of time, if a medical condition has not changed, why should a fair hearing be necessary to authorize reimbursement of the same expense? "*An opinion that is inexplicably contrary to other agency decisions reached on similar facts is a due process violation*" (**from the Manual for Administrative Law Judges and Hearing Officers, pg. 72**, citing Charles A. Field Delivery Service v Roberts, 66 N. Y. 2d 516 (1985). However, expenses such as co-pays, deductibles, OTC's, should continue in perpetuity as long as the recipient is Medicaid eligible.

41.     And even if the Agency should put forth the argument that they need to assess whether a given expense is still necessary, then a fair hearing is not the appropriate forum, at least not the way Rockland has been conducting theirs. (Not one medical professional has ever been present, nor one medical document submitted by the State or

Agency to contradict any of the litany of letters of necessity and prescriptions written by the Petitioner's doctor, specialists and therapists.

42.     Neither an ALJ nor an Agency attorney is in an authorized position to determine whether an expense, supply, or equipment is medically necessary, particularly for a given disability. Aside from zero training or expertise in the area, the law forbids it.

43.     So, when ALJ Oto proffers in the second paragraph on page eleven that *"each future reimbursement beyond the scope of that fair hearing must be reviewed but the agency and evaluated individually to determine if all eligibility requirements have been met"*, one has to query what this person is talking about? The agency did evaluate the reimbursements. In 2015. Just as in 2012. And they denied EVERY expense because they were purchased after the CBIC card arrived. Which is unlawful in that it totally disregards "medical necessity".

44.     Once and for all, NOBODY in the Agency is qualified to evaluate whether or not any item is or is not "covered under Medicaid" and every expense was incurred after receipt of the card <u>as the Petitioners were denied coverage of every item both BEFORE (when they attempted to secure authorization) and after purchase.</u> Before purchase, the answer was "it is not covered under Medicaid" an after purchase the answer was "it is not covered under Medicaid."

45.     Again, what Oto fails to understand is just as with co-pays, when a recipient has managed care (which has now been operating in New York State for the past ten years or so), the managed care intake unit submits the request of a given supply or item to their medical department who reviews the necessity of the supply and condition and needs of the specific patient. There is no rigid definition of what is and is

not covered under Medicaid IN SPITE of the necessity of the given supply; thus, the prior approval process.

46.     With "regular" Medicaid, when a recipient requires a particular supply or over the counter medicine, they are simply denied by the Agency under the auspice of "it is not a covered item". So what is a parent to do? Not purchase what they KNOW will help their child? In 2012, the Petitioners first submitted a list of items they needed and were instructed to purchase them and send in the receipts. They were subsequently denied for 99% of the expenses. This was the entire basis of the first hearing with ALJ Mariani, who, discussed "medical necessity" and how it fits into the general purpose and mission of Medicaid. For some reason, Oto and the Agency, both at the local and State levels, just don't get it. So we are here for round two, right where we were in 2012, with the SAME EXACT ISSUES.

47.     **Oto neither mentions "medical necessity" nor the supporting testimony and documents (letters of necessity and prescriptions from doctors and therapists) submitted before ALJ Gallagher.**

48.     J's disabilities had NO bearing on Otto's decision because to her, it is not a medical decision; it is a procedural one, and her false interpretation of Medicaid is one with strict boundaries of coverage, and with definitive limitations, even with documented medical evidence proving such services and/or supplies are preventative and helpful.

49.     In the last paragraph of Page eleven, Otto proffers that the parents do not know how much is owed them. To the contrary, the Petitioners submitted a precise ledge, all receipts, and a brief, detailing and explaining all outstanding reimbursements. And it so happens, there is a hand-written ledger (though it was supposed to be formally

on a State transmittal form and then sent to the State, but apparently, this never happened), created by Nancy Murphy that reflects EXACTLY what was submitted AND the fact that she denied it all.

50. What is true is that at one point, during review of the ledger and receipts (for some reason, Ms. Barbash wanted to see the receipt packet again even though she brought her own packet, submitted by Petitioners three years prior, to the Hearing) there was some debate between Barbash and the Petitioners over whether or not a few of the items reviewed by a different intake representative (a Ms. Dalisera) were already reimbursed.

51. Rather than going down a road of taking another two days (they had already sat for two full days and the Petitioners, who have small children at home, were confident enough to submit on the papers alone but were rebuffed and forced to sit for two days, while the Agency purposefully went through one receipt after another, even though they rejected coverage for ALL of them three years prior), the Petitioners proposed that rather than sit there for another 8 to 16 hours, the ALJ first determine the merits of reimbursement under the law. At that point, the Petitioners and Agency could review or exchange documents to correct any minor financial differences. This sounded, and still sounds like a logical, constructive proposal.

52. Instead, we find Oto in her decision, finding against J Maione, under absurd commentary. Her last sentence on page 11 states, "the Appellant's parents must establish that the Agency's denial of assistance or benefits was not correct…" She then goes on to state how much the Appellant has already received in reimbursement, as if that is an issue here, which it is not. What is Oto trying to say? That because the Petitioner was

24

reimbursed once, six years ago, that he is not entitled to reimbursement again in his life.

53.     The bottom line is this is yet another false narrative advanced by Oto and the transcript and Record reveal this. There was and is no doubt that the Petitioner submitted in excess of $60,000 dollars of expenses to be reimbursed. The Agency doesn't deny it; the State doesn't deny it! The Agency and State both created ledgers reflecting it in fact-they just don't think they are responsible for it but there is no question, or never was until, ALJ Oto, who clearly never reviewed the Record, issued this absurd decision!

54.     Finally, Oto concludes her decision with two more incorrect statements. In the first paragraph on page 12, she writes that the "the Appellant's parents also allege that the Agency…...have lost receipts…submitted in connection with the prior fair hearing (#6223724H) held in 2014." First, it was held in 2013. But more importantly, Oto has the children mixed up. The packet of receipts that were lost were M's, J's twin sister, and the State, in submitted exhibits, admitted to losing them in exchange with the Agency, who failed to complete the proper transmittal forms.

55.     Secondly, Oto proffers that the Petitioners "*allege that the presiding Administrative Law Judge and the Agency's attorney representative…...advised…..to stop submitting receipts pending the issuance of the hearing decision, which ultimately took one year.*"

56.     First, it was not the Agency's attorney representative, rather, it was Lew Jefferies, the attorney of Record. Secondly, the allegation is an indisputable fact which could easily be ascertained if Oto had simply listened to the transcript submitted by the Petitioners at the fair hearing in October of 2018.

57.     Secondly, any of this information could be further corroborated if the Agency or State DOH had simply consulted, one, attorney Lew Jefferies, two, ALJ Mariani, or three, Lynn Davidson, attorney representative present at the fair hearing year in 2013.  But they haven't!

58.     And lastly, it is an indisputable fact that the State (OTDA), although they are supposed to (according to ALJ Gallagher when questioned) scan each document from the hearing record to preserve in perpetuity, yet somehow, the ENTIRE record from the Mariani hearings submitted by the Petitioners was lost.  On three separate occasions, the Petitioners consulted Lynn Davidson (County legal rep.) to request a copy of the Record from 12/16/2013, and she reported back to the Petitioners that she did not have one and when she consulted the State, they could not produce one (see exhibit L2.)  The bottom line is, while misplacing pertinent documents may be the habit of the local and State agencies involved for whatever reason, these "allegations" that Oto refers to could easily be established as fact or fiction if they only **wanted** to know the truth.

59.     Even the decision on page 13 fails to address the Record and issues at hand.  The Petitioners sat in a conference room for two full days and explained at nauseum why the stack of receipts sitting before each attendee and ledger created by the Agency's own Nancy Murphy was outstanding reimbursement owed to J Maione (and/or his parents).  This ledger and receipts and invoices covered the period of time from 2012 (during Mariani's deliberation period) through 2015.

60.     How and why Oto is pretending that that the issue before us was an eleventh month period when J was in an infant is incredulous and astounding.  J is owed in excess of $60,000 through 2015 and ongoing expenses are outstanding as well. The

local Agency and DOH had every opportunity to proceed appropriately under the law: if they contested the expense being "a covered item under Medicaid", then what they are doing (even if they weren't aware of the law) I questioning the medical necessity of the expense.

61.    They therefore had the obligation to submit the expenses before their own doctor, who's testimony will then and only then be considered before a fair hearing where the petitioner's medical testimony can be evaluated alongside that of the State doctor. However, to date, neither the Agency nor the DOH has ever challenged any of he expenses as "not medically necessary," which could be the **ONLY** legitimate reason for denial. Period.

62.    And because of this fact alone, Agency delay persists as the letters of denial from 2015 are inadequate, which alone is reason enough to grant the Petitioners reimbursement of the expenses that J needed. Clearly, one can see, neither the Agency nor the State cares one speck for their legal responsibility for the medical care and recovery of the Petitioners' child. They only want to reject, reject, reject, until one just gets to tired to continue fighting. Unfortunately, the Petitioners need this reimbursement to continue the medical regiment their children need but that which the State provides is sorely inadequate. The Petitioners have exhausted loans, credit and the reimbursement made to them long ago on the continued medical care of their children.

**FAIR HEARING ##6500902Z and 7151879Q (M MAIONE): Held on 6/20/18, 10/3/18; Decided on 4/10/19 and 4/12/19**

27

63.     M, J's twin sister, suffers from various developmental delays and some disabilities, some the same as her brother and others unique to her.

64.     In 2012, four different convening's of hearing #6223734H were held for J Maione.  It was well understood by every party in attendance that whatever determination were made for L would likely apply to M (considering co-pays and medically necessary expenses).

65.     M, Like J, become Medicaid eligible retroactively to birth, when she initially qualified for disability (SSI).  Therefore, all receipts and invoices for co-pays, over the counter medications, supplies, etc. became reimbursable until receipt of her CBIC card-both sides agree on that and about $3,200 was in fact reimbursed to Madison (although not without a fight).

66.     The issue, as it existed with J, began, following receipt of the Medicaid card.  When Petitioners inquired from Nancy Murphy (locally) and Tom Grestini (the State) about coverage for various "medically necessary" supplies such as sun lotion to protect her skin (she suffers from neurofibromatosis), shoes for her walking therapy (diagnosed with cerebral palsy), to name a few, they were informed that these were not items "covered under Medicaid" despite submitting doctor prescriptions and letters of necessity.  This is not a legitimate basis for denial.  **Moreover, Gallagher/Oto did not respond in the decision whatsoever to reimbursement of medical expenses, only transportation.  That is yet another due process violation!**

67.     *The second issue attached to this hearing number (as it is with Jackson) is the early intervention transportation issue that the OTDA attached to this number but should not have.  It used to have its own number but the OTDA, acting on its own accord,

<u>decided to attach it to this number, simply because it is the same person's name.</u>
<u>It will be answered separately, towards the end of this Petition in conjunction with J's.</u>

68.     As Petitioners purchased these supplies anyway as they were so vital

towards M/s improvement and protection, they also continued to see doctors, specialists

and therapists and were forced to submit co-pays upon the visit, but were not reimbursed

by Medicaid, although again, under the law, they must be as they are under Family

Health Plus coverage though they are Medicaid recipients. (again, see **exhibit Q1**).

69.     Just as in Jackson's case, the State made the CHOICE to cover M's private

insurance, which compels her to visit doctors and therapists within her network.  If any

fees remain, Medicaid is legally responsible for it.  Period.  Medicaid is already

benefitting from reduced premiums which is why they opted to cover and reimburse the

Petitioner's premiums in the first place, but again, they want to have their cake and eat it

too, by putting the additional costs onto the recipients.

70.     Returning to the decisions, Oto's discussion mimics that of J's in that she

proffers what M has been paid to date and that Petitioners allegedly have not proved that

are owed more and that Petitioners claim receipts were lost by the Agency/State, which is

a "self-serving attempt to circumvent the burden of proof standard."   In fact, in number 5

of page 2 of #7151879Q (under "Findings of Fact"), Oto proffers that $9,603.66

reimbursed to J was actually attributable to M (as if she was previously reimbursed).

This is wrong (**see exhibit OO-Oto is also wrong that Petitioners have been**

**reimbursed $32,515.98; in fact the number is $31,793.70 for J's hearing, a difference**

**of $722.20, proving Oto's accounting is off as well in trying to show that Petitioners**

**have been reimbursed enough I guess and not deserving of more, even though they**

**are reimbursed expenses**).  Melanie Welch, Medicaid Financial Management representative ("MFM") changes her tune from one letter to the next and moreover, **exhibit T**, submitted at the Mariani hearings, summarized and totaled Jackson's reimbursement to the cent and he was reimbursed that exact amount to the cent (minus tax).  All of those expenses were for J.  The expenses (and the Agency cannot show it because it never happened) were J's only.  Expenses specific to Madison (shoes, sun lotions, a sun umbrella, eye patches, her own co-pays, etc.) were never reimbursed to Jackson.  The amount owed to M through May 31, 2013 is $9,094.97 (**see exhibit A6**) and has never been reimbursed and certainly not to Jackson.  The only notices we ever received for M's reimbursement was a denial notice related to M was from July 31, 2013 from a "Ms. Dalisera" (there was one for Jackson and one from M).  In 2015, we received a second notice with a reimbursement check for M for approximately $3,000 (as testified to at the hearings) but never received the proper reimbursement from her birth through 2013 which again, was $9,094.97.  The Agency/State consistently point to either Petitioners not submitting receipts, or being reimbursed when we were not.  Clearly, we know much better than the State what was and was not reimbursed and they are totally unwilling to listen to us.  Instead, they simply deny they are responsible for even owing it to us under the law now.

71.     On the contrary, this age old tactic of making the victim into the criminal ("the rape victim dressed provocatively"), is not surprising of the State as they would like to discuss ANYTHING but the the actual Record, to which they never refer.

72.     Does Oto mention that both Barbash and the Petitioners spent considerable time exchanging, photocopying, and assessing whether the receipt packet submitted in 2015 and again at the hearing was in fact the same and consistent?  No.

73.     Does Oto mention that the Agency (neither Barbash nor Davidson) did not contest the receipt packet or contest that they were the same packet that Murphy and Dalisera reviewed and denied for "not being covered under Medicaid" or "bought after receipt of CBIC card."  No?

74.     Does Oto, when trying to spin the blame of lost receipts to point at the Petitioners mention that the fact that receipts lost **by** the Agency is given serious credence considering the dysfunction in communication and sharing between the State and the local Agency, see **exhibits G and J and K.**  Furthermore, does she mention that Mariani, in her decision on page 11, proffers that *"none of the OHIP's waiver packet determinations are supported with notices served on the Appellant" and that "The Rockland County Agency's notices are not supported by the record or consistent with the conclusions by OHIP"*?  Of course not.  It is far easier to simply claim that the Petitioners are now making up lost receipts than to argue the actual merits of the case! And what's even more important (aside from the State's slanderous accusations) are that it doesn't matter anyway; the receipts were eventually re-sent again by Petitioners and reviewed in total by the Agency and State nonetheless and still rejected for unlawful reasons.

75.     Moreover, it was the Agency/State that lost Petitioner's receipts submitted in April, 2013.  The discussion is on the record from 12/16/2013 if anyone can just secure the audio Record at this point.  The State won't send Petitioner a copy, claiming they have already sent two.  One was submitted to ALJ Gallagher (who promised to return it

but did not) and the other was an e-mail audio file which is totally inaudible (it is in fast

motion or something).  On all of the Mariani hearings (convened four times in 2013),

ALJ apologies profusely for the State adjourning the hearings four times before it was

finally heard, and the loss of submitted receipts is discussed at length.  For Oto to pretend

as though this inability for the State to maintain records is a creation of the Petitioners is

simply false.

76.     Oto brings up the point to obfuscate the true merits of the case; the

salience of it is that it captures the cluttered, disorganized, beaurocratic process that is

representative here of the entire process of expense review.  It is representative of the

point that the Petitioners had to wait in excess of SIX MONTHS to have their receipts

(that they painstakingly organized for the benefit of the Agency) assessed, and returned in

a ledger where ALL expenses were rejected; and the second time was for the SAME

expenses as the first time, regardless of the fact that a hearing decision had previously

decided in favor of reimbursement.  Finally, County attorney Thomas Mascola

("Mascola") wrote the Petitioners in 2015 that they would not be paid on any more

submissions.  Thus, further submissions that were sent in to the Agency were never and

never will be tallied, addressed, or rejected, to allow for further hearings (**see exhibit

HH).**  How's that for due process?  The bottom line is that the Agency and DOH

operated in an autocratic vacuum when they want to deny responsibility.

77.     The bottom line is this: since the exponential spread of managed care

throughout the State over the last ten years, "regular Medicaid" has been relegated to an

afterthought, with no single department responsible for pre-authorization of a specific

expense or oversight ensuring its recipients are receiving the care they need.  The State

Medicaid hotline (as does the local Agency) will alert the recipient to whether or not an expense is "covered under Medicaid" but that as we know is unlawful (and they often get it wrong as **exhibit Y** shows, rejecting diapers unlawfully and a nebulizer for M, who was having a severe asthmatic attack in the evening-Medicaid rejected coverage). Medicaid is not an insurance program with strict boundaries and limits on coverage regardless of the specific needs of the patient, yet that is how it operates in New York.

78.     When a patient contacts their managed care (whether it be Fidelis, or Affinity or one of the other outfits participating in Rockland County) they are referred to prior authorization, where federal Medicaid law is followed, and a prior authorization department (comprised of medical professional(s)) review the  prescription or letter of medical necessity from the practitioner that is within their network and unless they have direct information to contradict the medical opinion, the expense is authorized.  Now, Oto knows this.  She knows this is the law as does the local Agency, as does every DOH representative involved including Dr. Zucker himself (State Commissioner of the Department of Health who did not reach out to Petitioners after they contacted his office four years ago for help having their medically necessary expenses approved.  It is astonishing that the DOH thinks (and Oto supports) that a simple Agency representative with no medical knowledge whatsoever is making medical opinions such as "not covered under Medicaid."

79.     Finally, it is critical to remember that neither the Agency or DOH challenged whether there were indeed outstanding expenses and that proof of which was provided (the proof of which is in the handwritten rejections of Nancy Murphy).  So, it is anyone's guess why Oto develops a defense (albeit a false one) on behalf of State.  Oto

literally denies reimbursement (see page 11 paragraph 3 of her decisions) because she claims the Petitioners did not prove HOW MUCH reimbursement is outstanding. So, she denies their entire claim because the amount is in dispute (and only with her by the way-the numbers are clear)?

80.      Oto has no justification in denying a claim based on a numbers differential. This is not a dispute over numbers; the Petitioners are not claiming they are owed ten thousand and the State claims five. And it matters not that M was already reimbursed $13,000 (which she was not by the way; this is another example of Oto's prevaricating and exaggeration; that number represents the amount the FAMILY was reimbursed for their medical premiums-and only after being ordered by ALJ Mariani under the law); what matters is that M was rejected for coverage and reimbursement for two different reasons and neither the Agency attorney, Carol Barbash nor Oto (who should not be taking sides, but deciding who made their case) can defend the Agency and State's unlawful rejections, through error and delay and in defiance of federal and State law. In fact, Barbash routinely states on the record that the Agency NEVER argued medical necessity. Now, if that is true-and it is-how then can Nancy Murphy decide that a specific expense is or is not covered by Medicaid? The answer is, she cannot. The only legitimate reason to deny a medical expense under Medicaid is if it is not medically necessary.

### FAIR HEARING #7152329P (INFANT, S MAIONE)

81.      The issues associated with S, while pale in comparison to her brother and sister, are a shining example of ALJ Oto simply not knowing the law. On page 7, Oto writes, *"the Appellant failed to establish how the breast pump...might qualify as a*

*comprehensive and preventative health care service....who by all accounts is not
disabled*."

82.     Whether or not S is disabled, is irrelevant, as EPSDT pertains to children
under the age of eighteen.

83.     Secondly, a breast pump is not considered a service, but a DME, and is
indeed listed as a covered item under Medicaid AND was reimbursed under M years ago
under a Krieger v Perales (**exhibit K**-which translates to reimbursed ABOVE the
Medicaid rate due to Agency error in denying it in the first place-yet they did it again!).

84.     Finally, just as with J and M, Oto ignores all other submitted costs for
Sienna such as doctor co-pays (**see exhibit M),** over-the-counter medications (which in
theory are supposed to be covered when you show your CBIC card because they are
NEEDED at that moment) however, each time the Petitioner would try to purchase baby
Tylenol for example, the card would simply deny.  (And of course most times OTC's are
necessary at night, when children are run down and the doctor's office is closed band
either the pharmacy would be closed or worse, they would be open but the Medicaid
hotline would either not answer or not approve the request by the pharmacist

**FAIR HEARING #7152352Q (Tasha Ostler)**

85.     This fair hearing number involves Petitioner Tasha Ostler and outstanding
expenses arising from co-pays, contact lens expenses, over the counter medications and
DME.

86.     The same coverage qualifiers apply to Tasha, while although she doesn't qualify for EPSDT, she is a member of a "categorically needy" household defined as a family member that cannot be responsible for ANY cost-sharing expense.

87.     Likewise, her responsibility is to her primary insurer first, so she must see doctors within her own network first and foremost, and Medicaid must pickup the co-pays and any other additional expenses.

88.     All expenses were sent to and received by the Agency in 2015 and were rejected (**see exhibit M**).  Expenses were re-submitted on 10.3.15 and were accepted by the Agency without contest.


**FAIR HEARING #7152341Q (Scott Maione)**

89.     This fair hearing number involves Petitioner Scott Maione and outstanding expenses arising from co-pays and additional expenses (OTC's, DME, etc.).

90.     The same coverage qualifiers that apply to J, M, S and Tasha, apply to Scott, while although he doesn't qualify for EPSDT, he is a member of a "categorically needy" household defined as a family member that cannot be responsible for ANY cost-sharing expense.

91.     Likewise, his responsibility is to her primary insurer first, so he must see doctors within her own network first and foremost, and Medicaid must pickup the co-pays and any other additional expenses.

92.     All expenses were sent to and received by the Agency in 2015 and were rejected.  Expenses were re-submitted on 10.3.15 and were accepted by the Agency without contest.

**FAIR HEARING #6567056Z (Scott Maione Premiums and Medical Expenses)**

93.     Just as with other cost-sharing expenses, by sheer fact that the "household" is considered ONE entity for qualification purposes (see **42 CFR 447.56**), Petitioner's financial status of "categorical eligibility" (household being under 100% of the FPL) precludes him from any expense, **Social Service Law 367-a (b), as well as Section 360-7.5 (3)(i)(b) and 360-7.5(3)(i)(ii) and (iii).** And "*if such payment*" (referring to payment for premiums) *"…reduces the individual's net available income below the appropriate income eligibility standard, the local social service district must pay or reimburse the recipient for the health insurance premium if it has been determined to be cost effective*" (**State Medicaid Reference Guide, pg. 428**) as one of the mission of Medicaid is to keep as much of the limited resources in the household as possible for benefit of the children.

94.     This is the specific purpose of *Administrative Directive 87 ADM-40, 10.8.87* **(see exhibit 2N)**; to investigate when J became Medicaid eligible, so that the State could locate (see **exhibit 2C**, State HIPP identification letter for premium reimbursement), which arrived **two YEARS late**) which families needed help and were paying expenses they needn't be paying.  This is explained in depth on **page 4, "required action", TPR (third party detection responsibility, see exhibit 2N, 2O).**

95.     Therefore, first and foremost, the Agency should have sought an alternative for the entire family as soon as J became Medicaid eligible, rather than having the household pay TWO different premiums.  While one was subsidized and reimbursed by the State because it was more "cost-effective" than one of their managed care options ( through infant J, the County/State reimbursed Tasha for her Empire "parent/child plan"

for her and the children), Scott was forced to pay out of pocket because he could not

benefit from the "parent/child plan" because he and Tasha were not married (this rule has

since been decided unlawful and the whole family is now on a plan together-but they

could have been then too had the Agency (Mr. Koch- as head of the third party unit-

should have located a plan where all members could have been covered under one plan,

again, as they are now, or, reimburse Scott for his premiums –partially at least- see **N.Y.**

**SOS Law § 367-a 1. (b))**.

96.     However, at the time, the Agency had little motive to search for such a

plan because they were reimbursing Tasha and the children a mere $800 per month (for

FOUR family members), compared to the County's own managed care plans which were

almost three times costlier (**see exhibit 2F**).  The only catch again, is that Scott could not

be under that plan as they were unmarried; so it was in the Agency/State's best interests

to have Scott continue to pay for his own health premiums.

97.     Now, within Oto's decision, she makes three glaring errors.  First, she

completely ignores the fact that Petitioner applied for coverage along with his daughter

M under a parent/child plan, just as Tasha had and was simultaneously being reimbursed.

So, at the Hearing, when the calculation is being discussed, it is the calculation for Scott

and never considers M at all; so it is impossible to determine "cost-effectiveness" by

leaving a disabled child off the calculator.  This alone should have resulted (and still

should) in "Agency Error and Delay," which by law must result in reimbursement and

reimbursement above the Medicaid rate in fact!  To this day, the proper calculator was

never run for Scott and his daughter to apply for third party coverage (which again,

Medicaid requires a much costlier insurance premium for the disabled than that of

private).  Why should they have?  Better to simply ignore the application(s) for months and then ignore the disabled applicant and keep having Scott pay for his own premiums. What could be more cost-effective for the State than that?  Based upon the fact that Tasha their other two children were (under Tasha's same plan), there is no reason to believe that Scott and M would not have been approved as well.

98.     Secondly (and even if we left M off the calculator as they did), in paragraph two on page 4 of the Decision, she writes, that the cost of Medicaid for the Appellant is $694.98.  She refers to the HIPP calculator as "correct" when it has been stated on the Record by Assistant Attorney General, David Lawrence, before the Appellate Court in the Second Department that it was NOT the correct number.  Think about it from a logical perspective: A SINGLE visit to a doctor for a routine checkup will cost approximately 200-300 dollars, so how could the number for the entire year be less than $700?  Where were they getting thus number?

99.     What this $694 number ACTUALLY is, is what Medicaid was responsible for AFTER the private Empire insurance Scott was paying for out of pocket (co-pays etc., or what his Empire plan did NOT cover).  This would make sense as this is what the calculator would seek out: is managed care the "more cost effective" avenue for the Agency or are his private fees lower?  Well, if we (or "regular Medicaid) are only paying-based on last year's analysis-$694 per year on behalf of the Petitioner, that is much less than monthly managed care premiums of about $400 to $500 monthly; so, let's deny him and have him keep paying his own premiums.  The $694 annual payment from the Agency is certainly their most cost-effective avenue even though it is unlawful and

NOT the cost-effective comparison they are supposed to be doing, they are supposed to be comparing their managed care options versus Scott's Empire plan, plain and simple.

100.    And even if they ascertain that the private insurance in this case is not as "comprehensive" then Koch should have found the family a plan together, rather than having the Petitioner go on paying his own premiums.  (Also, and most importantly, the concept of "utilization" (see attachment I and II of ADM-40 and 08 OHIP ADM-1, 2008 **see exhibit 2N**) is supposed to play a defining role in determining "comprehensiveness"-that is, how often does the recipient even take advantage of these "comprehensive" resources-and if he or she doesn't, then the "comprehensive" factor becomes irrelevant (How often has Scott receive physical therapy over the past two years?  Never?

101.    Well then, that fact plays into the comprehensive calculation that Mr. Koch was supposed to run but never did (and even if he had, was deemed outdated by Mariani in her decision on J's premiums, **pg. #6223734H, pg. 6-7**, exhibit **2L**, where she proffers *".... the cost-effective health insurance calculator is outdated and should no longer be used to determine cost-effectiveness."*  A closer look at his HIPP application (**see exhibit 2G**) reveals that he didn't run the calculator until October of 2016, well after he had rejected Petitioner for coverage.  So Basically, he was guessing based on a totally inapposite Number ($600 annually).

102.    The final point with respect to the HIPP analysis is it lacks explanation and specificity to the point that it is impossible to assess, analyze and argue against. Certainly, it is a ludicrous number, but where does it come from, what is the math behind it, what are the formula's used to arrive here?  Without this basic information, the Petitioner was not provided the ability to argue against it, which is a violation of his due

process. It took the Petitioner a great while to understand that that calculator to put it mildly, inaccurate (Mr. Koch had admitted to the Petitioner on the Record that he had never run the formula). Please see **DDS Memorandum 524EL, from 18 NYCRR 358-2.2n**: the rejection notice, **exhibit 2B**, "*premiums for healthy New York cannot be considered for reimbursement.*"

103.    Finally, the last paragraph of the decision on page 5 claims that the Petitioner failed to apply for parent-child coverage when he plainly realized the Agency was never going to help him not pay for his premiums. This is categorically false, as Petitioner applied with his daughter and submitted the application TWICE over a three-month period with no response from the third party unit (**see exhibit 2A**). Again, agency error and delay alone should result in reimbursement, as ignoring the Petitioner's application forces him to continue to pay for premiums against his will-lest he give up medical insurance, which puts and his family at risk. **Furthermore, again, and equally egregious, the Agency completely ignored the fact that Madison was on the application with her father**, running ONLY Scott's calculation and thus, never arriving at an accurate determination of whether or not Scott and his daughter would have been "cost effective."

104.    Further bias is expressed where Oto proffers the many adjournments made by Petitioners, but leaves out the fact that the Petitioner often must take his children on medical appointments and the OTDA was supposed to arrange a mutually beneficial date for hearing for both parties or at least, sufficient notice ahead of time-but did neither (correspondence with ALJ head Mark Lahey, head of scheduling Joanne Gerber, and supervisor Wong proved fruitless with regard to scheduling. No matter how many times

Petitioners pleaded for scheduling input or awareness of more than ten days, the requests fell on deaf ears.[3]

105.    And yes, Petitioner did adjourn in 2016 when he received the Agency packet on the day of the hearing, rather than five days before as is the regulation and was the promise of the Agency (it took two more years for the OTDA to call this hearing). Furthermore, this hearing was supposed to be closed in June of 2018 but Barbash asked for an adjournment solely so she could respond to the Petitioner's brief.  Four months later, when we reconvened in October 2018, the Agency submitted no such rebuttal to the brief; essentially the decision was put off for four months for absolutely no reason.  The bottom line is the petitioner never should have been paying his own health premiums. Just because he was new to Medicaid and social services does not mean the Agency and DOH should have taken advantage of him.  Neither he nor his household met the financial qualifiers to pay for ANY part of the cost-sharing expense (see **CFR 42 § 447.5 and CFR 42 § 447.72**), most notably, the premium, which must be paid for by the State. In fact, even if the law didn't agree with Petitioners, the agency still has the right to waive the premium if it creates an undue financial hardship, which it certainly did in their case (**CFR 42 § 447.55(b)(4)).**

---

[3] **18 NYCRR 358-5.2** Scheduling. (a) The fair hearing will be held at a time and place convenient to the appellant as far as practicable. **(b) *Priority scheduling…..*** *must be scheduled as soon as practicable after the request therefor is made. In determining the date…… consideration must be given to the nature and urgency of the appellant's situation, including any date before which the decision must be issued….*" **358-3.2** *Priority in scheduling of your hearing and determination will be provided when: (a) you are an applicant for emergency assistance to needy families with children, emergency assistance to aged, blind or disabled persons*" (such as Plaintiffs who have been in desperate need of reimbursement to continue proper care.

**FAIR HEARING #7151879Q (M MAIONE) AND 7152305N (J MAIONE)**

**(Appropriate Reimbursement for Early Intervention Transportation)**

106.    These are two hearings numbers continued from earlier.  OTDA conflated the issues with unrelated ones simply because of the name of the Petitioner.  Again, they originally had different numbers and were filed independently.

107.    From 2014 through 2015, Petitioners voluntarily drove their children J and M to and from special education pre- school school at "Starting Place" in Pearl River, New York.

108.    The Pre-school tuition was paid for by the New York State Department of Health, as a facet of the children's early intervention program that they must qualify for medically.  The children received occupational and physical therapy there, as well as special education.

109.    The voluntary drive program was through the Rockland County Department of Health, and parents were reimbursed for mileage in lieu of transporting their children on the bus (saving the County and State money on third party costs to the bus company).

110.    Petitioners' children had difficulty taking the bus due to J's stomach issues and M's anxiety disorder (see **exhibit 3E**, letter of necessity from psychiatrist, letter from gastroenterologist also submitted at Hearing).  However, Petitioners did want their children to become acclimated to the experience, so the Petitioners put their children on the bus on a reduced schedule, part-time.

111.    The issue at hand is the reimbursement for travel.  While the County did properly reimburse (amount per mile, unlike MAS) the Petitioners for driving their

children, they would only reimburse them for driving the one way; that is, if Ms. Ostler drove the children to school, Ms. Ostler would NOT be compensated for her drive BACK home, despite mileage and wear and tear taking effect just as it did when driving to the school.

112.    After speaking with a few people with a background with this situation, they referred the Petitioners to the law on the subject and it is quite clear that the law calls for reimbursement TO and FROM the school (**see exhibit 3B**). Also, the County would not reimburse for days when the bus was scheduled to transport the child home, but where the parents (Petitioners) had to pick up J or M from school without notice due to them being ill or having an emergency medical appointment. While this is understandable if the bus is already at one's home picking up the child in the morning, it doesn't seem so if the bus/school is notified **before** driving to the child's home after school, as notice would obviously be provided.

113.    Appropriately, under *Section header C, "Conformity with State Regulation with Federal Policy"* we refer your honor to *92 ADM-21, pg. 2 and 10 (***see exhibit 3A for related documents***)* based in part **on 18 NYCRR 505.10 and 42 CFR 431.53** and precedent case-law.  It states, "*Reimbursement for mileage in a private vehicle, when authorized, is assumed to be round-trip even if the MA recipient does not return with the driver to the origin point but remain in the medical facility.*

114.    Trip reimbursement policy is born from the following supporting regulations: **18 NYCRR § 505.10 (b) (22):** *"Undue financial hardship means transportation expense which the MA recipient cannot be expected to meet from monthly income or from available resources.  Such transportation expenses may*

include those of a recurring nature…..". *See also* **42 CFR § 447.52-447.56**: *"Medicaid is prohibited from imposing co-payments, deductibles, co-insurance, and other fees on services for children"* (and for adults living under 133% of the FPL, which is the case of Petitioners.

115.    See also: **34 CFR 300.142**: *"If a child is eligible for services through a non-educational public agency (i.e., State Medicaid Agency) and receives those services in an educational setting, the non-education public agency (i.e., State Medicaid Agency) is financially responsible."* **42 CFR § 447 (f)**: *"Medicaid premiums and cost-sharing incurred by all individuals in the Medicaid household may not exceed an aggregate limit of 5% of the family's income…."*. See also **42 CFR § 431.53 (Assurance of Transportation); and 42 CFR § 440.170 (transportation costs covered TO and FROM); EPSDT; 18 NYCRR §505.10**

116.    Based on these regulations, the Petitioners contacted the County Department of Health Early Intervention Department (**see Exhibit 3D**), making them aware of their claim; however, the Department declined responsibility.

117.    After requesting and convening for a New York State Fair Hearing, held by and decided by the New York State Department of Health, ALJ Gallagher/Oto decided that they cannot decide the issue as it pertains to the County Department of Health.  Oto proffers, on page 12, *"The Commissioner does not have the authority to review the determinations of the Rockland County Department of Health.  The adequacy of transportation reimbursement by an early intervention program in not a hearable issue for the fair hearing process as delineated in 18 NYCRR 358-3.1."*

118.    First, **358-3.1** does not explicitly state that it CANNOT review a decision made under/ an early intervention program; only that it DOES review denials made under a social service program.

119.    The early intervention transportation program, is run through the local Department of Health, but that which is a division of the State Department of Health which oversees ALL social services, including Medicaid.

120.    This is but one reason that County has the right, with recipient approval, to charge Medicaid with all early intervention services one's child receives.

121.    In fact, when the Petitioners contacted "Ron Hanson", he advised to request a fair hearing. And when Petitioners did so, they made the OTDA-OAH aware of the issue with the hearing request as mandated but the OTDA did not alert the Petittioner as to fair hearing being the improper forum.

122.    The bottom line is that the Petitioners have been entitled to twice the reimbursement they have received and neither the County nor the State will reimburse the remaining 50 percent.


## RETURN TO FAIR HEARING #6500902Z (M. Maione)

123.    For whatever inexplicable and unexplained reason, ALJ Gallagher refused to consolidate the Medical Answering Service ("MAS") portion of this hearing number with all other MAS hearings that are now before Honorable Judge Marx in a recently filed Article 78.

124.    In fact, more than the issues being identical to hearing # **6500974Y (see case number, 830/19**, before Judge Marx) they are indistinguishable, as they both argue

46

failure to reimburse for the same reasons and the same amount from the same ledger; in other words, the ledger submitted to MAS and the OAH by the Petitioners encompasses all family members; and while this hearing number refers to M, #6500974Y refers to J. Moreover, Oto's discussion and decision to both hearing numbers, is identical verbatim to this hearing number. The fact is, both of these hearing numbers used to fall under #6889115J (the OTDA/OAH separated it and we have no idea why), which was reimbursement for the entire family under one ledger painstakingly created by the Petitioners when neither MAS or the State would. Thus, when Oto claims that the Petitioners have failed to show that they are owed reimbursement by MAS, we assume that they are ignoring these calculations or never reviewed them.

125.    In an effort to avoid redundancy and further confusion, Petitioners are submitting the MAS/transportation Brief (as **exhibit 4A**, submitted at Hearing) as submitted before Judge Marx.

126.    Petitioners are only submitting TWO of the same exhibits from the MAS hearings, also in an effort to avoid duplicative confusion (and save everyone from photocopy overload). All other exhibits are filed under Article 78.

127.    Petitioners are submitting **Exhibit 4B-4E (4D shows Petitioners reimbursed at incorrect mileage rate)** again, only as they directly contradict the notion that ALJ Oto proffers that "*The Record does not contain unadjusted receipts for the time period at issue totaling approximately $8,000. The testimony offered by the Appellant's parents at the hearing lacked specificity and was insufficient to establish the are owed any additional reimbursement.*"

128.    First and foremost, the above is bombastic in its misrepresentation and is generally insulting. The only defense the ALJ could possibly mount (and the ALJ shouldn't be partisan anyway, but that is another sad issue-neither the Agency nor the State argued the ledger as incorrect!) as NO regulations or laws are on their side. The fact of the matter is the polar opposite of Oto's assertions: the ledger and financial breakdown submitted by the Petitioners is staggering (and was painstaking) in its precise accounting despite MAS's attempts to confound and confuse by never returning adequate invoices to the Petitioners so they knew what was reimbursed and what wasn't.

129.    However, the Petitioners took months to review EVERY submission and receipt of theirs and compare it to what was actually reimbursed and what was withheld and why. It was exhausting work (which should have been done by MAS/The State in the first place), but was precise when completed. (Oh, and any attempt by MAS to insinuate that Petitioners submitted duplicative invoices is categorically false.) Petitioners simply have twins with the same appointments on occasion and MAS instructed the Petitioners to submit two different claims for each child (as each child has their own authorization number). However, for MAS to turn around accuse Petitioners of submitting the same claim twice is unethical and untrue and only claimed in a base attempt to discredit the Petitioners-and they know it! Petitioners simply followed MAS policy and trusted them-all the way to being deceived out of thousands of dollars.

130.    The Petitioners did not file this hearing with the other MAS hearings as the other half of this hearing involved medical reimbursement, which involve same issues of all other hearings held on October 3rd and 5th, 2018.

APPLICABLE LAW

131.    The legal principles of **res judicata** (Jackson Maione) and **collateral estoppel** (Madison Maione) compel the County to continue reimbursement from the last submission date ongoing as Judge Mariani's Decision was based upon both statute with regard to co-pay reimbursement and medical necessity with regard to medical/therapy equipment, supplies and support.  These legal concepts best translate to applicable regulation under, **18 NYCRR § 358-6.3 Direction relative to similar cases**, which states, "When a fair hearing decision indicates that a social services agency has misapplied provisions of law, regulations, or such agency's own State-approved policy, the [Office of Administrative Hearings' (OAH's) letter transmitting such decision to such agency may contain a direction to the agency to review other cases with similar facts for conformity with the principles and findings in the decision."  The problem is that neither the Agency nor the State apply this directive, so people like Petitioners need to keep rehashing and rehearing the same issues over and over (see exhibit II for similar fair hearing, where again, no directive was issued).

132.    The change made in the "corrected" Decision with regard to medical premiums is both <u>wrong and entirely cryptic</u>.  Aside from the fact that the OTDA refers to NO statute or regulation under which the correction was made, nor really ever made a correction, the regulation presented by Petitioner and referred to by Mariani still stands: "*if such payment*" (referring to payment for premiums) "*...reduces the individual's net available income below the appropriate income*

*eligibility standard, the local social service district must pay or reimburse the recipient for the health insurance premium if it has been determined to be cost effective*" (**State Medicaid Reference Guide, pg. 428**).

133.    Aside from the above referenced law which applies to the premiums, Judge Mariani, in the "corrected" decision, refused to change the Decision as she believed it be unlawful to change the Decision.  To even open a closed decision (**see 18 NYCRR 358-6.6 (b)**), which is what our decision was for over TWO YEARS, all parties **must be put on notice** of such review (and the regulation is really for the benefit of the Petitioner who comes across information to change the initial decision; to our knowledge, no decision has EVER been changed by the State (such it being referred to as "final and binding" -let alone two years later!  The consequence however, was none to the Petitioners as they were permitted to retain the premium reimbursement; the point is exemplified in the lengths Oto and Co. will go to to change a sound legal decision to protect the State from future litigation using the Mariani decision on premium reimbursement as precedent.

134.    See **18 NYCRR 358-6.3**, *"Direction Relative to Similar Cases."*  Such Directive, following the original Decision, would have preempted Nancy Murphy's second rejection of claims, in the fall of 2015.  The rationale behind such a directive is that precedent may be established without chaos prevailing within the Fair hearing system, reflected in exactly this circumstance.  Never mind another hearing relying on a previous related decision, but in Petitioner's case, the very SAME representative denied the very SAME claim that had already been adjudicated, along with a published and disseminated Decision almost one year prior.

135.    See **18 NYCRR 358-6.4 (c)**, "*Compliance*".   In Petitioner's case (J), OAH responded, merely FOUR days after the request, with an incorrect compliance decision, one that had nothing to do with any compliance request made by Petitioner (**see exhibit H).**

136.    Petitioner Scott Maione has a clear right to reimbursement of health premiums based upon financial eligibility: **Social Service Law 367-a (b), as well as Section 360-7.5 (3)(i)(b) and 360-7.5(3)(i)(ii) and (iii).** And "*if such payment*" (referring to payment for premiums) "*...reduces the individual's net available income below the appropriate income eligibility standard, the local social service district must pay or reimburse the recipient for the health insurance premium if it has been determined to be cost effective*" (**State Medicaid Reference Guide, pg. 428**)

137.    Petitioners have a clear right to reimbursement ABOVE the Medicaid rate due to Agency error and delay: see **Admin. Directive 10 OHIP/ADM-9, 11/22/10; 18 NYCRR 360-7.5 (a) (4) (i); GIS O2 MA/033.**

138.    Again, see **18 NYCRR 358-6.3**, "*Direction Relative to Similar Cases*" which results in *collateral estoppel.*  In Petitioner's case, it isn't even as far removed as "similar cases" but the SAME case in fact.  Murphy's first reimbursements from fall 2013, cover Madison as well as Jackson and at the hearings, the State submitted correspondence on Madison, admitting having her expenses for reimbursement submitted in July 2013.  Moreover, Lynn Davison, at the December 16, 2013 hearing admits to knowledge that the State had "misplaced" Madison's receipts and Petitioner was again instructed by Mariani to hold on to duplicates until Decision, to which Petitioner acquiesced.

139.    See **Greenstein by Horowitz v. Bane, 833 F. Supp. 1054 (S.D.N.Y.**

**1993).** Discusses the unlawfulness of limiting reimbursement at the Medicaid Rate (see

**Greenstein v Dowling** as well) and not providing full reimbursement "incurred on

account of erroneous denial and delays in Medicaid payments.  It is clear that Petitioner

should be paid above the Medicaid rate due to continued agency delay, denying

responsibility for coverage for EVERY and ANY submission or request made to them.

See **18 NYCRR 360-7.5 (a) (3)** and *Administrative Directive* **10 OHIP/ADM-9,**

**11/22/10, pg. 6.**

140.    With respect to CPLR 7803, the "body" in this case is the local Agency

that "failed to perform a duty enjoined upon it by law".  That is to say, the local Agency

is compelled to reimburse ongoing as the Judge's decision is clear in its expression that

"to deny reimbursement is incorrect."  And the "body", again the Agency, in Petitioners'

case, Murphy specifically, lacked the "jurisdiction" to deny Petitioners' ongoing

expenses AFTER the Decision had been made, instructing that the denial of such

expenses was incorrect.  Simply, Murphy MUST carry out the Decision and reimburse

for these same expenses.

141.    When determinations are made to deny, reduce, or terminate Medicaid,

applicants and recipients must be given timely and adequate notice of their right to a fair

hearing. 42 U.S.C.§ 1396a(a)(3); 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c),

431.210; N.Y. Soc. Serv. Law § 22(12); 18 N.Y.C.R.R § 505.14(g)(3)(x).

142.    Social Security Act requires that the State Plan inform and educate

participants about EPSDT, its benefits and provisions. Section 1902(a) (43).

143.    EPSDT requires States provide all necessary services and supplies *"whether or not such services are covered under the State plan"*. 42 U.S.C. 1396d (a) and 1396d(r)(5).

144.    *"Payment may be made to reimburse the recipient"* ......and *"may be made with respect to services furnished by a provider who is not enrolled in the MA program"*.... 10 OHIP/ADM-9 11/22/10 and 18 NYCRR § 360-7.5 (a) (3).

145.    For sections that clearly outline what is required of the Agency and State concerning limitations of coverage with respect to their interpretation of the law refer to 18 NYCRR § 513.7 (a) (b) –*Determinations* and 513.5 and .6-*Evaluation of Requests and Obligations and Responsibilities of the DOH.*

146.    The Agency must pay co-pays.  42 U.S.C. 1396o § 1916 (2) (A) and 42 CFR § 447.55, fair hearing #6223734H and the Family Health Plus Premium Assistance Handbook.

147.    *"Direct reimbursement is not limited to the Medicaid rate or fee in instances where agency delay or caused the recipient to...pay for medical service that should have been paid for under the Medicaid program"*.  Admin. Directive 10 OHIP/ADM-9.

148.    "Medically necessary" is defined under 18 NYCRR § 513.1 (a) thru (c) as that which *"causes acute suffering; endangers life; interferes with the capacity for normal activity; or threatens to cause a significant handicap"* and *"restore the recipient to his or her best possible functional level."*

149.    *"Parties also have a right to an opinion that is consistent with past Agency decisions, or explains the reasons for departing from precedent. **An opinion that is***

53

*inexplicably contrary to other decisions reached on similar facts is a due process violation."* (*Charles A. Field Delivery Service v. Roberts*, 66 N.Y.2d 516 (1985). See also *Greenstein by Horowitz v. Bane*, 833 F. Supp. 1054, 1070, 1076-1077 (S.D.N.Y. 1993) (**"If redress is not adequate, plaintiffs have been deprived of property without due process."**) In addition, Defendants' Policy has not been implemented consistently. "'Patently inconsistent application of agency standards **to similar situations lacks rationality and is arbitrary.**'" *Vargas v. I.N.S.,* 938 F.2d 358, 362 (2d Cir.1991) (quoting *Contractors Transport Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir.1976)).

150.   *Courts owe less deference to an agency interpretation of a regulation that is inconsistent with earlier and later pronouncements it has made, because "the [agency's] expertise ... to which we normally defer becomes dubious when the expert cannot make up its own mind. New York City Health and Hosp. Corp. v. Perales, 954 F.2d at 861-62; see also Catholic Medical Ctr., Inc. v. N.L.R.B., 589 F.2d 1166, 1174 (2d Cir.1978) (agency's unexplained decision in deviating from precedent "is archetypical of arbitrary and capricious behavior").*

151.   See **Sharma v Sobol, 188, A.D.2d 833 (1992)**, due process violation resulting from delay.  The Mariani replacement essentially cost Plaintiffs three years, during which rescheduling wasn't accommodating, infants' receipts were lost by the local and State agencies, County attorney Lew Jeffries retired, no longer able to substantiate his assurance of relying on Mariani decision, and memories faded (Lynn Davidson the only county rep. present at EVERY fair hearing, went from being vocal that the Agency

promised to use the Mariani hearing as "guidance" to not being able to recall (unless someone asked her not to recall it).

152.    **18 NYCRR § 513.7 (a) (b), 513.5 and 513.6** *"The determination must be based upon a professional review by DOH personnel or clinical information and opinion...." And if there is no clinical information or documentation conflicting with the opinion of the treating practitioner....the DOH **must approve the request as submitted**."* See *S.D. ex. Rel. Dickson v Hood*, 391 F.3d 581 (5th Cir. 2004).

153.    See **18 NYCRR § 513.7 (a) (b)** *–Determinations* and **513.5 and .6** *Evaluation of Requests and Obligations and Responsibilities of the DOH*).   These sections clearly outline what is required of the Agency and State concerning limitations of coverage with respect to their interpretation of the law, misguided as it were.

154.    **18 NYCRR 358-5.2** Scheduling. (a) The fair hearing will be held at a time and place convenient to the appellant as far as practicable. **(b) Priority scheduling.....**must be scheduled as soon as practicable after the request therefor is made. In determining the date....... consideration must be given to the nature and urgency of the appellant's situation, including any date before which the decision must be issued...." **358-3.2** Priority in scheduling of your hearing and determination will be provided when:(a) you are an applicant for emergency assistance to needy families with children, emergency assistance to aged, blind or disabled persons" (such as Plaintiffs who have been in desperate need of reimbursement to continue proper *care.*

155.    *"the agency may provide for ANY other medical or remedial care specified in part 440 of this subchapter (42 CFR), even if the agency does not otherwise*

*provide for these services to other recipients or provide for these services to other recipients or provides for them in a lesser amount, duration or scope.*" (Also see **42 CFR 441.57**).

156.     Returning a verdict in a "reasonable amount of time" seems to be no more than bureaucratic lip service. Plaintiffs' statutory right to a Fair Hearing is secured by **42 U.S.C. 1396 a(a)** 3, creating a right to a disposition, "ordinarily within 90 days" of request, i.e., from start to finish, not 2-3 years after the fact (Mariani deliberated for one year and then it was "corrected" two years later and now Oto just deliberated for ). Lisnitzer v. Zucker, 306 F.Supp. 3d 522 (E.D.N.Y. 2018); Shaknes v. Berlin, 689 F. 3d 244, 250-251 (2d Cir. 2012); Cf., Konstantinov v. Daines, 101 A.D. 3d 520 (1st Dept. 2012).

157.     To open a closed decision (**see 18 NYCRR 358-6.6 (b)**), which is what our decision was for over TWO YEARS, all parties **must be put on notice** of such review). **N.Y. SAP. LAW 303: NY Code-Section 303** must call for Judge Mariani to complete what she started:....*another presiding officer may be assigned to continue with the case unless it is shown that substantial prejudice to the party will result therefrom.* The prejudice that has resulted? To start with, closure that could have been accomplished four years ago in a single afternoon, in front of the ALJ familiar with the issues and the case, has dragged on now in a dehumanizing effort to convince the County and State that we even won a fair hearing in 2014? Where is ALJ Mariani? County attorney Lew Jefferies? Where did Madison' file go? How did the entire Record from #6223734H disappear? Delay and change of ALJ's (twice) has certainly benefitted the State.

158.     **Memorandum LCM-100, 5/29/1991**, refers to compliance during review (which was not the case), notice of review (which was not the case) and complying with

"Direction in Similar Cases."  Written by Deputy Commissioner and General Counsel

Susan Demers, with regard to following prior decisions as precedent, she closes with,

"*This will ensure that appellants' rights are protected, and avoid unnecessary litigation*

*to enforce compliance*."  This is conceptually related to res judicata and collateral

estoppel, which the State neglected to issue the Agency with a "Direction in Similar

Cases", **18 NYCRR 358-6.3**. Following he Mariani decision.  It does not exist in a

vacuum as no decision does.  It relegates all "final and binding decisions" to arbitrary in

theory then.

159.    **42 C.F.R. § 440.130 (d),** defines necessary equipment and supplies as

items that provide for "*maximum reduction of a physical or mental disability and*

*restoration of a recipient to his best [possible functional level*.

160.    Please see Mayer v Wing, 922 F. Supp. 902 (S.D.N.Y. 1996), which finds

reduction or denial of services "*arbitrary and capricious where there was no medical*

*improvement or change in circumstances*."  Please also see, Muhlstein v HRA, 865

N.Y.S. 2d 647 (2nd Dept. 10/2008).  The Court held it would be arbitrary and capricious

of the Agency to ignore prior hearing decisions or precedents.  "*An opinion that is*

*inexplicably contrary to other agency decisions reached on similar facts is a due process*

*situation*" (**Manual for Administrative Judges and Hearing Officers, 2011, pg. 67**).

And finally, "*An opinion that is inexplicably contrary to other agency decisions reached*

*on similar facts is a due process situation*" (**Manual for Administrative Judges and**

**Hearing Officers, 2011, pg. 67.**  Taking into account the above regulations and cases,

how then can the State justify two contrasting hearing decisions based on the same

information about the same people?  It can't!

161.    See <u>Dickson v Hood, 5th circuit, 11/15/2004</u>.  Medical necessity trumps any State plan of coverage.

162.    *"Direct reimbursement is not limited to the Medicaid rate or fee in instances where agency delay or caused the recipient to…pay for medical service that should have been paid for under the Medicaid program"*.  **Admin. Directive 10 OHIP/ADM-9**.  If any argument remains as to co-pays and deductibles being considered "cost-sharing expenses", see **42 USC 1396e (c)(1 ) (a),** they are indeed "cost sharing obligations" and "payments towards medical assistance."

163.    And with respect to Massaro's analysis of items she considers outside the purview of Medicaid, will all due respect, she obviously did not examine the Hearing record, or Mariani's Decision carefully enough.  **42 CFR 441.57, 42 CFR 440.130 (d) as** is essential to Petitioner's argument and Mariani's analysis with regard to medical necessity.  <u>Medical necessity trumps the State Plan</u>.  Moreover, in the **Medicaid Reference Guide, under 495.3**, clear differentiation is made between items "covered by the Medicaid" program and items that are "medically necessary" (again, see *Dickson v Hood, U.S. Court of Appeals, fifth circuit, 11/14/2004*
:  **Social Service Law 367-a (b), as well as Section 360-7.5 (3)(i)(b) and 360-7.5(3)(i)(ii) and (iii).**

164.    Petitioner has a clear right to reimbursement ABOVE the Medicaid rate: see **Admin. Directive 10 OHIP/ADM-9, 11/22/10; 18 NYCRR 360-7.5 (a) (4) (i); GIS O2 MA/033.**

165.    See **Greenstein by Horowitz v. Bane, 833 F. Supp. 1054 (S.D.N.Y. 1993).**  Discusses the unlawfulness of limiting reimbursement at Medicaid Rate (see

**Greenstein v Dowling** as well) and not providing full reimbursement "incurred on account of erroneous denial and delays in Medicaid payments."

166.    It is clear that Petitioner should be paid above the Medicaid rate due to continued agency/State delay, denying responsibility for coverage for EVERY and ANY submission or request made to them and the Agency's current refusal to properly assess (which means completing a transmittal form that is then sent to the State DOH to make the final determination) further Petitioner claims, according to Thomas Mascola.  See **18 NYCRR 360-7.5 (a) (3)** and *Administrative Directive* **10 OHIP/ADM-9, 11/22/10, pg. 6.**

## PRIOR APPLICATION

167.    Petitioner has not made a prior application for the relief requested other than has been stated herein.

## RELIEF REQUESTED

WHEREFORE, Petitioner respectfully requests that this Court issue an Order directing Rockland County and New York State to reimburse Petitioners ongoing from 2011 for any and all medical and transportation expenses, taxes, Hearing costs:

(a)     Reimbursement of Infant J's medical expenses from May, 2012 ongoing. As of and through May of 2015, they total approximately $60,000;

(b)     Reimbursement of Infant M's medical expenses from birth ongoing. Reimbursement of family medical expenses (Scott, Tasha, and infant S) from 2011 ongoing. Together, for family (Scott, Tasha, S) and M, it totals approximately $25,000;

(c)     Reimbursement of Scott's premium costs and associated medical costs from 2011 to 2014.  They total $21,683.59 including premiums, co-pays, deductibles, OTC, and DME;

(d)     Reimbursement of transportation expenses, both for medical appointments and early intervention preschool.  The amount is at least $10,000;

(c)     awarding attorneys' fees in favor of Petitioner and against Respondents in

an amount to be determined at the conclusion of this proceeding; and

(d)     directing the Rockland County DSS and the NYDOH to follow the "direction relative to similar cases" and follow prior hearing decisions and precedent cases involving the same issues;

(e)     Direct the OTDA to consolidate similar fair hearings for all Appellants;

(f)     Granting Petitioners such other and further relief as this Court deems just and proper.


Dated:        New York, New York
              July 10, 2019


Respectfully submitted,


[Tasha Ostler-Pro-Se Petitioner]          [Scott Maione-Pro-Se Petitioner]
87 Shetland Drive                         87 Shetland Drive
New City, NY, 10956                       New City, NY, 10956


TO:     New York State Department of Health
        Corning Tower
        Empire State Plaza,
        Albany, NY 12237

        Attorney General of New York State
        44 South Broadway
        White Plains, New York 10601

### VERIFICATION

STATE OF NEW YORK        )
                        ) ss.:
COUNTY OF ROCKLAND  )

Scott Maione and Tasha Ostler, being duly sworn, depose and says:

We are the Petitioners, Scott Maione and Tasha Ostler in the above-captioned

action. We have reviewed the Petition herein and know the contents to be true to our own

knowledge, except as to those matters alleged on information and belief, and as to those

matters, we believe them to be true.

Dated:        New York, New York
              July 10, 2019

_____        _____
[SCOTT MAIONE]                       [TASHA OSTLER]

Sworn to before me on this
1 0 th day of July, 2019

_____
Notary Public

Jeanette  Borzon
Notary Public of New York
ID #01  380374
Commison Expires 09/04/2022