UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT MAIONE and TASHA OSTLER, For themselves and on behalf of their three infant children, <br><br> Plaintiffs, <br><br> -v- <br><br> DR. HOWARD A. ZUCKER, Commissioner of the New York State Department of Health, SAMUEL D. ROBERTS, Commissioner of the New York State Office of Temporary and Disability Assistance, JOAN SILVESTRI, Commissioner, Rockland County Department of Social Services, and DARLENE OTO, Principal Hearing Officer, Office of Temporary and Disability Assistance, each in their personal and official capacities, <br><br> Defendants. | Docket No.: 18-cv-7452 <br><br> **AMENDED COMPLAINT** <br><br> **JURY DEMAND** |

Plaintiffs, Scott Maione ("Maione" or "Plaintiff") and Tasha Ostler ("Ostler" or "Plaintiff"), for themselves, and for and on behalf of their infant children, J_ _ _ _ _ _ Maione (" J ") and M_ _ _ _ _ _ Maione (" M "), by and through their counsel, the Law Offices of Louis J. Maione, Esq., P.C., as and for their Amended Complaint against the enumerated and named defendants ("Defendants"), allege herein as follows:

## NATURE OF THE ACTION

1. Plaintiffs, parents of infant children recipients of the Medical Assistance Program ("Medicaid"), with disabling and chronic health conditions, and the infant Plaintiffs, by and through their attorney, initiate this action, *inter alia*, to challenge: (1) lack of due process afforded their children in connection with Medicaid expense reimbursement for purchases of Durable Medical Equipment ("DME"), an example of which would be a nebulizer required to

- 1 -

ameliorate flare ups of asthmatics, and other medically necessary medical supplies; co-pays incurred by the infants for medical and hospital visits, which were either reduced or denied by the Rockland County Department of Social Services ("DSS" or "County") and the New York State Department of Health ("DOH"), in addition to the improper reduction and denial of reimbursement for, and underpayment of expenses.

2. Plaintiffs' children, twins now eight years of age, suffer from chronic disabilities requiring the use of specific medical equipment, supplies, services and frequent visits to specialists and therapists, including, *inter alia*, cerebral palsy, neurofibromatosis, an inter-cranial pineal cyst on the brain, and severe global cognitive and motor delays, and have been disabled from birth.

3. DOH reimbursement policy is in violation of Plaintiffs' rights, *inter alia*, under the Rehabilitation Act of 1973 ("Rehabilitation Act"), Title II of the Americans with Disabilities Act ("ADA"), as well as U.S.C. §1983 et seq.

4. This action, *inter alia*, is also for injunctive and declaratory relief on behalf of the infants and the adult Plaintiffs as parents of the three infant children, all of whom are Medicaid recipients, for the unlawful denial of reimbursement of medical expenses.

**JURISDICTION and VENUE**

5. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 and 1367 (a).

6. Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §1391(b), in that it is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## THE PARTIES

7. Scott Maione and Tasha Ostler, residents of Rockland County, New York, have three (3) infant children, two of whom have disabling and chronic health conditions and are recipients of Supplemental Security Income ("SSI") benefits as disabled children who have limited income and resources.

8. One cannot qualify for SSI benefits unless determined to be medically disabled.

9. The two infants are each Medicaid recipients entitled to reimbursement of out-of-pocket medical expenses according to the provisions and policies of DOH, developed in accordance with approved guidelines for such reimbursement established by the federal government.

10. Defendant, Dr. Howard A. Zucker ("Zucker"), is the Commissioner of DOH and as such is responsible for the administration of the Medicaid program in the State of New York.

11. Defendant, Samuel D. Roberts ("Roberts"), is the Commissioner of Office of Temporary and Disability Assistance ("OTDA") and as such is responsible for the operations of the Office of Fair Hearings ("Fair Hearings"), including but not limited to ensuring compliance with New York State and federal Medicaid policy, scheduling and conducting Hearings, issuing recommended decisions after Hearings, and ensuring compliance with Fair Hearing decisions involving the Medicaid program.

12. Defendant, Joan Silvestri ("Silvestri") was the Commissioner of the Defendant, DSS, at some relevant times herein and, as such, was responsible for the operation and oversight of the County Medicaid Agency, and the resulting improper and unlawful denial of medical expense reimbursement to the Plaintiffs. DSS is a defendant herein.

13. Defendant, Darla Oto ("Oto"), Principal Hearing Officer, OTDA, is responsible for hearing decision oversight. She unlawfully "vacated" a decision in this case, and replaced it, ignoring Plaintiffs' requests for the adherence to that decision in connection with reimbursement of ongoing receipts.

**Significant Other Participants, Not Designated as Defendants**

14. Susan Sherwood ("Sherwood") is the former Commissioner of the DSS, who was in charge of the department during much of the relevant times herein.

15. Nancy Murphy ("Murphy"), is the former Medicaid supervisor specifically in charge of unlawful reimbursement

16. Nirav Shah ("Shah") is the former commissioner of the DOH, who was in charge of the department during some of the relevant times herein.

17. Kristen M. Proud ("Proud") is the former Commissioner of the OTDA, who was in charge of the department during some of the relevant period for this case.

18. Adrienne Alcaro ("Alcaro"), is the former Medicaid Director who oversaw Nancy Murphy.

19. Anne Marie Massaro ("Massaro"), is a representative of Office of Health Insurance Premiums ("OHIP"), a division of the DOH, who responded to Plaintiffs on behalf of Dr. Zucker, further unlawfully denying reimbursement.

20. Defendant, Darla Oto ("Oto"), Principal Hearing Officer, OTDA, is responsible for hearing decision oversight. She unlawfully "vacated" a decision in this case, and replaced it, ignoring Plaintiffs' requests for the adherence to that decision in connection with reimbursement of ongoing receipts.

21. Rebecca Syrotynski, former Medicaid calculations clerk, who along with Adrienne Alcaro, denied coverage for Plaintiffs, alleging that expenses were not covered under Medicaid.

22. Flo Mercer ("Mercer"), OTDA-OAH Compliance Coordinator, thwarted Plaintiffs attempts at reimbursement, aware that reimbursement.

## BACKGROUND FACTS

23. Plaintiffs currently reside in Rockland County, New York.

24. In late 2011, one of Plaintiffs' children, J. ("J") Maione, born prematurely and disabled, was placed on SSI, a process which automatically qualifies one for Medicaid and associated benefits back to the time of birth, once the child is considered medically disabled.

25. In early 2013 J's twin sister, M ("M"), also born disabled, was retroactively placed on Medicaid after being enrolled in the SSI program and, thus, automatically qualified for Medicaid benefits back to date of birth and, with it, reimbursement of all medical expenses.

26. Plaintiffs' third child, S _ _ _ _ _ Maione ("S"), age six, is also a Medicaid recipient as are the parents due to household income guidelines as determined by the federal government.

27. In or around 2011, after discovering they were eligible for reimbursement of retroactive out of pocket expenses, Plaintiffs submitted those receipts for reimbursement to DSS.

28. According to EPSDT ("Early Periodic Screening and Diagnostic Testing" essentially, Medicaid for Children) and federal Medicaid law, it was the local agency, in this case DSS, which is supposed to reach out to infant recipients, particularly disabled ones, to aid and expedite coverage and secure necessary DMEs, supplies and necessary services after being notified by the local Social Security office.

29. Instead, DSS did the opposite, first denying that coverage even existed and, then, instructing Plaintiffs to merely **"send in [their] receipts to determine coverage." All emphasis hereinafter provided.**

30. Following denial of approximately 99% of the submitted claims for J. Maione in 2012 (Madison had not yet been approved for SSI at that point due to a very long waiting process), Plaintiffs requested a Fair Hearing for J.

**First Fair Hearing**

31. At the first Fair Hearing session in May of 2013, the assigned Administrative Law Judge, as well as County attorney in attendance, Lew Jefferies, Esq. ("Jefferies"), requested that Plaintiffs cease submissions of similar expense reimbursements for J, and wait on all submissions for M (as she was now SSI and Medicaid qualified, and eligible back to birth) until a decision would be rendered, the import of which was that any decision would determine what expenses qualified for reimbursement.

32. Both the ALJ and Jefferies proffered on the record ("Record") that additional receipts/invoices submitted would only slow the process down at that point but that the award reached would present "guidance and clarity as to what is and is not covered" in respect to the additional receipts, as well as to M's not yet submitted receipts; considering that many of the children's expenses were exactly the same, this made perfect sense. Plaintiffs, therefore, consented to deferring submission with the assurance from Jefferies that ongoing receipts would be reimbursed according to the decision rendered.

33. When the Hearing finally reconvened approximately three months later, ALJ Sarah Mariani ("Mariani"), had been appointed to, and presided over the Hearing, at which time she informed the parties that she would be presiding over the remainder of Plaintiffs' Hearings.

- 6 -

34. On December 16th, 2013, the Fair Hearing concerning J's reimbursement reconvened. The State, however, submitted no papers or brief in opposition, and no exhibits.

35. Apparently in an attempt to be fair and balanced, ALJ Mariani called Albany **during the Hearing** and demanded that DOH find an attorney to defend the matter, even affording the State considerable time to respond.

36. As a result, Attorney Jane McCloskey, Esq., ("McCloskey") submitted a written rebuttal to the Plaintiffs claims, **albeit months later**, with Plaintiffs given the opportunity to reply.

37. On November 13, 2014, almost one full year after the inception of the Hearing before ALJ Mariani, **and more than eighteen months after the Hearing process began**, ALJ Mariani returned a decision and order (Decision" or "Mariani Decision") in favor of the Plaintiffs.

**Mariani Decision**

38. Judge Mariani's Decision, rendered after considering the parties' contentions, read succinctly as follows: **"The determination to deny** the Appellant's request for medical assistance reimbursement **was not correct.** Based on **OHIP and the Rockland County Agency's own concessions presented during the fair hearing** and the Regulations**, these determinations are reversed."**

39. Following this Decision, Petitioners were sent a form indicating the amount they were to be reimbursed, with instructions to forward more receipts for reimbursement for **both** of their children.

- 7 -

40. Plaintiffs understood the instructions to include all Hearing-related expenses, together with J's ongoing receipts (J had not been reimbursed for any expenses incurred throughout the Hearing and deliberation process of over one year and a half).

41. Based upon the Decision, Plaintiff's third child, S. Maione, born 12/24/12, and both parents would be entitled, *inter alia,* to co-pay and over-the-counter ("OTC") reimbursements.  **"Medicaid is prohibited from imposing co-payments, deductibles, co-insurance, and other fees on services for children"** See N.Y. S.O.S. Law 367-a regarding payment exemptions; also 42 U.S.C. 1396e-1, and 1396o and 42 CFR, Sections 447.52 through 447.57.

42. After sending in the reminder of the receipts for the period through March 2015, Plaintiffs awaited a response.

43. Nearly six months later, in September of 2015, Plaintiffs received a rather sloppy, hand-written log **again denying approximately 99% of** submitted expense receipts. The transmittal came from the same Nancy Murphy who initially had denied reimbursement prior to, but ostensibly which had been rectified by the Mariani Decision; the same Nancy Murphy whose "**determinations were not correct**" according to ALJ Mariani.

44. At first, Plaintiffs thought the notification to be in error, but after corresponding with Murphy and her superior, Adrienne Alcaro, the Plaintiffs learned that Murphy and Alcaro in abrogation of Mariani's Decision were denying the reimbursements, erroneously maintaining the position that only J's receipts prior to the issuance/receipt of his Medicaid card ("Medicaid Card" or "CBIC Card") were to be reimbursed.

45. It became apparent to Plaintiffs that the DSS had no idea how to process recipients with what is known as Third Party Coverage (3D Party Plan").

- 8 -

46. Plaintiffs were enrolled, and only enrolled in the 3D Party Plan because DSS and the State determined it was more "cost-effective" for the State to reimburse Plaintiffs for their private plan premiums ("Premiums"), rather than to pay for their coverage under one of the County's contractually participating managed care HMOs.

47. Under the 3D Party Plan, under the auspices and essentially a version of the Family Health Plus Plan ("FHPP"), the recipient first must see a doctor in his/her network and, of course, use the card issued by that particular network.

48. Few doctors continue to accept "Regular Medicaid" being replaced over the last ten years with a participating local Medicaid managed care insurers.

49. Therefore, in the instant case, use of the CBIC Card, which both Murphy, and later Ms. Masaro, in denying reimbursement insisted must be used, essentially was moot in this case. The two bureaucrats were wrong in addition to the fact that they obviously felt justified in disregarding and overturning an ALJ's Decision without proper procedure.

50. The CIBC Card in the instant matter is secondary; only in the extremely rare occasion where a doctor accepts both their primary and "Regular Medicaid" would it be utilized by this family. Other than that, it simply exists to pick up expenses which the primary does not.

51. The State actually benefits in this case because its Premium reimbursement to the family is cheaper than having Plaintiffs on an HMO Managed Care Plan and DSS, after requesting from Plaintiffs and receiving the information, agreed with Plaintiffs that they should keep their private insurance as it was more "cost effective" for the State.

52. Moreover, in Plaintiffs case, in the County's scheme Medicaid HMO Premiums are much higher because they charge much more for disabled children; private insurance **does not** make such a distinction.

53. Therefore regular Medicaid must pick up all co-pays, OTC supplies, all medically necessary DMEs, supplies, and services regardless of whether the CIBC Card is used or not.

54. The Plaintiffs are a rare example of a family that has a private insurer as its primary coverage, and regular Medicaid as secondary; most Medicaid recipients in New York are covered primarily by Medicaid managed care as primary coverage, with everything paid for in the latter case by the managed care provider (HMO)—all costs. Not so in this family's case.

55. The very nature of Plaintiffs' program is predicated on reimbursement; that is to include Premiums, and co-pays. The only expense which had been consistently reimbursed since the Mariani Decision has been Premiums.

56. The DSS and State refused to accept or understand that Plaintiffs, unlike most Medicaid recipients, have no managed care to rely on for support, guidance or coverage. Plaintiffs' coverage is private, rather than Medicaid, and at the instigation of t(he State designed as such to save money on the premiums.

57. In the instant matter, the DSS/State denials were predicated either on a misapprehension of the law, or a total disregard for its application.

58. DSS, which was referred to as the "Agency" in ALJ Mariani's Decision, not only did not understand its directives, but it almost appears that nobody actually read the Decision it.

59. "States **are required** to cover any service that is **medically necessary**…whether or not the service is covered under the State Plan" and "…even if the agency **does not otherwise provide for these services to other recipients** or provides for them **in a lesser amount**, duration or scope." 42 U.S.C. §1396d (r)[1905(r)]; 42 CFR §§441.57, 431.53, 441.62 (a), 441.56 (a) (2) (iv), 441.62 (b), and 440.170 (a) (i).

**Attempt To Resolve the Impasse**

- 10 -

60. In an attempt to rectify the situation, Plaintiffs submitted a "Hearing Compliance Complaint" ("Compliance Complaint") to DOH; essentially an appeal.

61. In response, Plaintiffs received a letter from Flo Mercer, just seven days after the Compliance Complaint. Incredibly, she too ignored the substantive portion of Plaintiffs' Compliance Complaint; conversely, she merely addressed the much less important issue of to whom the reimbursement check should be written.

62. In turn, Plaintiffs wrote to Mark Lahey, top ALJ in Albany, who never responded.

63. Frustrated by the lack of response to the seminal issue, Plaintiffs contacted Defendant Zucker, which prompted a response on his behalf from Anne Marie Massaro of the Office of Health Insurance Programs ("OHIP").

64. Massaro's response was as illogical as Murphy's second rejection of Plaintiffs' receipts.

65. Plaintiffs sent in further receipts to the DSS and received a response from County attorney, Thomas Mascola, Esq. ("Mascola"), stating that there would be no further reimbursements made to Plaintiffs, also referring Plaintiffs to Massaro's letter. That was the extent of Mascola's reply; an attorney failing to explain the reason for the denial rather referring Plaintiffs to a letter from a non-attorney who also cited no authority for the position taken by these Defendants.

66. Finally, in December of 2015, Plaintiffs received a response from the OTDA-OAH, by Darla Oto, informing them **more than two years after the Mariani Hearing Decision** was issued, which was supposed to be "final and binding", that it was being **"vacated"** and replaced with another version or, as Oto referred to it, a "Corrected Decision." In her letter, Oto cited a pretext for the putative change but inexplicably made no reference to, or responded in any

- 11 -

Case 7:18-cv-07452-KMK   Document 167   Filed 06/04/21   Page 12 of 20
Case 7:18-cv-07452-KMK   Document 106   Filed 10/07/19   Page 12 of 44

fashion to Plaintiffs inquiries about the ongoing reimbursement issue for their son and reimbursements for both daughters.

67. This Corrected Decision, essentially which left Mariani's Decision intact albeit it was similarly written, strangely, in ALJ Mariani's first person syntax except for a very brief portion **by an unidentified author** interspersed between two previously written paragraphs, purporting to indicate that it was being "corrected" in respect of the issue of reimbursement of premiums due to an error in law; **however, the Corrected Decision failed to proffer or cite the law upon which it relied.**

68. The "Corrected" Decision offers no legal explanation as to where ALJ Mariani's reasoning went wrong. Conversely, it affirmatively and unabashedly admits that Mariani had been approached to change the Decision **but refused;** ALJ Mariani said that there was no error in law supporting her original decision, and **proffered that the "corrected" decision was unlawful!**

69. While DSS did not demand, or even request repayment of the reimbursed Premiums due to, *inter alia*, admitted Agency error and delay, it essentially eviscerated Mariani's Decision, not only for Plaintiffs but for any other recipients similarly situated.

70. In Mariani's Decision, it is clear that there are certainly circumstances, such as Plaintiffs, where Premium reimbursement must be paid by the State, as well as expenses incurred which were medically necessary.

71. The issues for which the Plaintiffs reached out to the Commissioner's office went unanswered and unresolved; and reimbursements *in futuro* for the Plaintiffs were denied, again disregarding Mariani's Decision.

**Attempts To Follow The Law and Exhaust Remedies**

72. At that point, Plaintiffs operating on a *pro se* basis had little recourse but to file an Article 78 for Mandamus, to compel the State to honor the original Decision and review and process receipts for reimbursement which it denied for the wrong reasons. OTDA's premise ostensibly was that they would not reimburse premiums ("Premiums") as they were not eligible under the State's Medicaid Policy.

**OTDA's Erroneous Reasoning**

73. As a matter of law, OTDA's premise is wrong.

74. According to the Medicaid Reference Guide ("MRG"), referred to in Mariani's Decision, "if such payment [the premium] reduces the individual's net available income **below the appropriate eligibility standard**, the local social service district **must pay or reimburse** the recipient for the health insurance premium if it has been determined to be cost effective."

75. By reimbursing J for Premiums in 2014, as well as for expenses, DSS actually recognized and adhered to the foregoing MRG mandate. And, DSS already had conceded that Plaintiffs' private plan was cost effective when it acquiesced to Plaintiffs remaining with a private provider.

76. However, **almost two years later** in its putative Corrected Decision, OTDA took the completely opposite position without enunciating its rationale.

77. OTDA only indicated that it was not requiring repayment of the reimbursed expenses paid to J " **due to error and delay.**"

78. To reiterate, Plaintiffs then attempted to exhaust their remedies by filing a *pro se* Article 78 Petition for Mandamus, which resulted in the New York State Supreme Court, Rockland County, per the Honorable Sherri Eisenpress, J.S. C. ("Eisenpress"), directing

- 13 -

Plaintiffs back to Hearings to exhaust their remedies, indicating that theirs was not a matter for Mandamus, which the Court in its opinion concluded was not the remedy available. [1]

79. As a result, Plaintiffs expected to revert to seven (7) additional Hearings for reimbursement of expenses for family members, all concerning reimbursements for the same expenses addressed at the Mariani Hearing, plus Scott's individual private Premiums and related medical expenses from 2011 through 2013.

**Arbitrary Removal of ALJ Mariani**

80. Among these scheduled Hearings was one to consider reimbursement to infant, M, of expenses some of which were incurred by M exactly for the same kinds of expenses, e.g., pharmaceutical and doctor visit co-pays.

81. Due to the fact that there were a number of Hearings to be convened, Plaintiffs requested that they be consolidated, or at least scheduled for the same day, as the issues were closely related. In addition, Plaintiffs requested that they be given adequate advanced notice as the children were not yet of school age; being disabled had myriad number of scheduled doctors' visits; and advanced planning was necessary rather than to bring three small children not yet of school age to what could be 5-6 hours or more of Hearings.

82. OTDA's Office of Administrative Hearings ("OAH"), disregarded Plaintiffs' requests until, almost immediately after Plaintiffs filed a complaint in federal court in which they complained, *inter alia*, of OAH's refusal to consolidate nine (9) transportation-related matters,

---

[1] **Unfortunately, Supreme Court Justice Eisenpress never heard the transcripts of the Mariani Hearing in question because the State in violation of the requirements of an Article 78 proceeding never provided the Record to the Court as it was compelled; and Judge Eisenpress inexplicably did not call the state on this failure.**

- 14 -

Case 7:18-cv-07452-KMK Document 106 Filed 10/07/19 Page 15 of 44

when that office contacted Plaintiffs and arranged for the Hearings to be heard on days on which Plaintiffs were available.

83. OAH refused to consolidate those nine (9) cases, which dealt exclusively with reimbursement for transportation claims by Plaintiffs to which they were entitled by law.

84. Prior to those Hearings, Joanne Gerber ("Gerber") of OAH informed Plaintiffs that the Hearings would be administered by ALJ Christopher Gallagher ("Gallagher"). When queried by Scott Maione as to why ALJ Gallagher, and not ALJ Mariani was presiding over these cases when Mariani was intimately acquainted with the family and its issues, Gerber's response was that the ALJs were chosen **randomly**. In fact, Gerber reiterated that statement sometime later, although ALJ Gallagher actually told Plaintiffs that he was, "selected to preside" over their Hearings..

85. About a month and one-half prior to the first Hearing before ALJ Gallagher on the transportation issues, Plaintiffs asked Lynn Davidson ("Davidson"), a DSS legal representative, who is the only individual who ever attended every single Hearing, if she would be so kind as to provide Plaintiffs with all of the documents of the Agency's which were expected to be used in the upcoming Hearings, to which Davidson complied.

86. However, the documents only arrived on Plaintiffs' doorstep, in a large cardboard box, two days prior to the Hearing which caused Plaintiffs, overwhelmed with the volume documents and three infant children, to request an adjournment because many of the documents had never been seen before by Plaintiffs.

87. Contained therein, however, was a piece of correspondence between OTDA and OAH which directed that "ALJ # 288 should not be scheduled for Appellants' hearings." [2]

---

[2] **ALJ # 288 is Sarah Mariani.**

- 15 -

88. Inexplicably, this arbitrary and capricious directive appears to have been authored not by anyone at OAH, but by one Susan A. Sherwood ("Sherwood"), the Commissioner of DSS, even though the DOH presides over Hearings, and the DSS essentially is the respondent. This extra-judicial directive was taken well before the issuance of the Corrected Decision.

89. Upon information and belief, Sherwood has no official capacity nor holds any position with DOH or OTHA-OAD, nor is DSS an adjunct or division of OAH.

90. In essence, DSS, the respondent in these Fair Hearings, was dictating what ALJ should be presiding over these "Fair Hearings" where ALJ's ostensibly are chosen at random at least according to Ms. Gerber.

**The Gallagher Hearings**

91. As a result of the preclusion of ALJ Mariani from adjudicating any of Plaintiffs cases, nine (9) Hearings concerning reimbursement of travel and travel related expense reimbursement were assigned to ALJ Galagher. These Hearings sometimes were referred to by Plaintiff as the "MAS Hearings" in the federal action which they brought because they were centered on travel-related expenses; and Medical Answering Services ("MAS"), a defendant in that matter, was the DOH's third-party transportation vendor.

92. Prior to the inception of those 9 Hearings, Plaintiffs concerned with, among other things, statute of limitation questions and that an ALJ had been arbitrarily and capriciously precluded from hearing Plaintiffs' cases, filed an action in the Southern District of New York assigned to the Honorable Jesse Furman ("Furman"), (the " 1st Federal Action").

93. In addition, Plaintiffs raised issues, *inter alia*, of due process because in abrogation of a state directive they had been thwarted from scheduling Hearings on a

- 16 -

consolidated basis as opposed to a haphazard scheduling, irrespective of the common subject matter and parties being exactly the same.

94. In addition, the 1st Federal Action was initiated because NY State Medicaid Transportation Policy ("Transportation Policy"), and the way it was drafted, is in direct contravention of federal law. The implementation of the illegal Transportation Policy was the underlying rationale for DOH's refusal to reimburse for transportation.

95. The 1st Federal Action was dismissed, with prejudice, on motion by the defendants. That decision was affirmed by the United States Court of Appeals for the Second Circuit ("2d Circuit") **with the proviso** that the Second Circuit allowed for the infant Plaintiffs to refile their claims as they improperly had been represented by their parents.

96. In other words, that part of the decision authored by Judge Furman was overturned by the Second Circuit when it opined that the dismissal to the children should have been **without prejudice**.

**Ripened Claims of Infants**

97. Those claims of the infants resulting from the adverse rulings in the transportation Hearings, actually ripened during, and after the pendency of the Motion to Dismiss brought in the 1st Federal Action and the decision of the 2d Circuit; therefore, those claims could not, and had not been considered therein on their merits. [3]

98. The results of those Hearings concerning transportation expense reimbursement to the infant Plaintiffs therefore are raised herein on their behalf for the first time, together with the infants' already accrued claims rather than initiating a new and separate action.

---

[3] **In addition, irrespective of likely being correct that the children could not be represented by their** *pro se* **parents without adequate counsel, Judge Furman was abjectly incorrect in ruling that there is no federal right to be transported by the state for medical attention, and no entitlement to be reimbursed for having incurred those expenses.**

- 17 -

**The Incongruity of the Gallagher Decisions**

99. In all of those nine (9) Hearings, none of which had been completed nor in most instances even convened when the 1st Federal Action was initiated, ALJ Gallagher, in response to Plaintiffs challenge of the legality of the Transportation Policy, effectively ruled that, "The Policy is 'beyond the jurisdiction of the Commissioner and cannot be addressed at an Administrative Hearing."

100. In other words, the DOH, at least according to ALJ Gallagher, as well as ALJ Darla Oto, Gallagher's supervisor who signed off and sanctioned his decisions, inexplicably is not in a position to determine if the Transportation Policy which the State of New York supposedly created, and upon which it relies in adjudicating Fair Hearings addressed to the issue of reimbursement of travel expenses, comports with federal policy and law?

101. The adult Plaintiffs in a prophylactic attempt to protect their rights also initiated another *pro se* Article 78 proceeding in respect of these nine Hearing decisions, and one other, which was intertwined with a medical and DME reimbursement issue; Plaintiffs did so despite the fact that there are federal questions involving due process in those Hearings which only can be resolved by a federal court.

102. This second Article 78 proceeding also was initiated prophylactically on a *pro se* basis for non-travel expenses such as DME and over-the-counter medications, etc., for the same reason.

**Post Eisenpress Hearings**

103. After the Eisenpress decision in which the Supreme Court essentially directed Plaintiffs to new Hearings to determine the reimbursement of expenses to infant, J, seven (7) Fair Hearings were convened also presided over by ALJ Gallagher, but after he presided over the transportation matters.

104. These Hearings, which were the subject of the Mariani Decision, and the Eisenpress remand, did not take place until the fall of 2018, almost six (6) years after Plaintiffs had requested Fair Hearings on these issues.

105. These Hearings focused on DME and OTC reimbursement, co-pays, and extraneous medical supplies.

106. In one, for example, Fair Hearing 7152305N held on October 5, 2018, ALJs Gallagher and Oto, in denying reimbursement for infant J's DME expenses, **the very same expenses for which he had been reimbursed before**, again erroneously argued that reimbursement could not be made after receipt by J of the Medicaid Card (the "CIBC Card").

107. This Decision was erroneous for any number of reasons, to wit: infant J had previously been reimbursed for these same expenses **after** he had been issued his CIBC Card; secondly, ALJ Mariani correctly based her decision for reimbursement on "medical necessity" and the Defendants position vis-à-vis the CIBC Card simply is wrong.

108. The infants herein, and the entire household, are by law deemed members under the auspices of "The Third-Party Insurance Unit" ("TPI") which is governed by the FHP.

109. Approximately 10 years ago, the state of New York began to do away with Medicaid which required one to have a Medicaid Card. Instead, it adopted managed care providers in each county.

- 19 -

110. Medicaid recipients would no longer carry a Medicaid Card rather the card issued by the managed care insurer. A recipient had a choice of a limited number of providers. Alternatively, a recipient could maintain his/her private insurance if it were found to be "cost effective" for the state.

111. In that case, as with the family in this action, a recipient must go through the private insurer first and Medicaid would "pick up" whatever the primary insurer did not cover. This system is administered through FHP.

112. In the instant action, the state and County elected, and benefited from the Plaintiffs being on this program as the Premiums are far cheaper than those of managed care options because, *inter alia*, managed care options (HMOs for example) charge more for disabled infants like the ones who are parties to this action, while private insurance does not.

113. Therefore, Gallagher and Oto's denial of reimbursement based on their erroneous contention that Plaintiffs must use their CIBC or Medicaid Card is not only not germane to this situation because this family is compelled to use its primary insurer first (at the point that all of these Hearings occurred, Empire Insurance), but it is erroneous as a matter of law.

114. Under the FHP provisions it specifically provides that medical expenses are in fact reimbursable.

115. So, if one of the members of the Plaintiff family visits a doctor and must pay a co-pay, that co-pay is reimbursable under the FHP provisions as well as under state and federal Medicaid law.

116. As another example, and a matter of law, a child on Medicaid **cannot be responsible for any cost sharing expense**. Furthermore, any household member that is "categorically eligible," which means the family income is at or below 100% of the federal