# EXHIBIT A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Scott Maione and Tasha Ostler,<br>(On Behalf of Their Infant Children)<br><br>                   Plaintiffs,<br><br><br><br>      -v-<br><br><br>Dr. Howard A. Zucker, Commissioner of N.Y. State Dept. of Health, The N.Y. State Department of Health, Samuel D. Roberts, Commissioner of The Office of Temporary and Disability Assistance-Office of Administrative Hearings, The Office of Temporary and Disability Assistance-Office of Administrative Hearings, Joan Silvestri, Commissioner, Rockland County Dept. of Social Services, and  Susan Sherwood, former Commissioner of Rockland County Dept. of Social Services<br><br>                   Defendants, | Docket No.: 18-cv-7452 (KMK)<br><br><br>**SECOND AMENDED COMPLAINT**<br><br><br>**JURY DEMAND** |

Plaintiffs, Infant children, J_ _ _ _ _ _ Maione ("J "), M_ _ _ _ _ _ Maione ("M "), and S_ _ _ _ _ Maione ("S"), by and through their counsel, the Law Offices of Louis J. Maione, Esq., P.C., as and for their Second Amended Complaint against the named defendants ("Defendants"), allege herein as follows:

## NATURE OF THE ACTION

1.     Plaintiffs, the Infant children ("Infants") recipients of the Medical Assistance Program ("Medicaid"), with disabling and chronic health conditions, by and through their

attorney, initiate this action, *inter alia*, to challenge: (1) lack of due process afforded them in connection with Medicaid expense reimbursement for purchases of Durable Medical Equipment ("DME"), an example of which would be a nebulizer required to ameliorate asthmatics flare ups, and other medically necessary medical supplies; as well as co-pays incurred by the infants, as advanced by their parents ("Parents") on their behalf, for medical and hospital visits, which either were reduced or denied by the Rockland County Department of Social Services ("DSS" or "Agency" or "County") and the New York State Department of Health ("DOH" or "State"), in addition to the improper reduction and denial of reimbursement for, and underpayment of related and associated expenses.

2.     Plaintiffs also seek reimbursement of necessary travel related expenses to and from doctors, specialists, hospitals, and therapists' appointments denied them by Medical Answering Services ("MAS"), an adjunct and agent of DOH.

3.     Plaintiffs, twins now nine years of age, suffer from chronic disabilities requiring the use of specific medical equipment, supplies, services and frequent visits to specialists and therapists, including, *inter alia*, cerebral palsy, neurofibromatosis, an inter-cranial pineal cyst on the brain, and severe global cognitive and motor delays, and have been disabled from birth.

4.     This action, *inter alia*, also is for declaratory relief that the Infants not be made to attend hearings for expenses already decided to be medically necessary, covered under their medical plan and already deemed compensable.

## JURISDICTION and VENUE

5.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 and 1367 (a). Venue is proper in the Southern District of New York, pursuant to 28 U.S.C.

§1391(b), in that it is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## THE PARTIES

6.      Scott Maione and Tasha Ostler, residents of Rockland County, New York, have three (3) Infant children, two of whom have disabling and chronic health conditions and are recipients of Supplemental Security Income ("SSI") benefits as disabled children who have limited income and resources.

7.      The three Infants only are the Plaintiffs herein.

8.      One cannot qualify for SSI benefits unless first determined to be medically disabled. The two Infant Plaintiffs, "J" and "M," are disabled and each are Medicaid recipients entitled to reimbursement of out-of-pocket medical expenses according to the provisions and policies of DOH, developed in accordance with approved guidelines for such reimbursement established by the federal government; all three Infants are entitled to Medicaid coverage.

9.      Defendant, Dr. Howard A. Zucker ("Zucker"), is the Commissioner of DOH and as such is responsible for the administration of the Medicaid program in the State of New York.

10.      Defendant, Samuel D. Roberts ("Roberts"), at all relevant times herein was the Commissioner of Office of Temporary and Disability Assistance ("OTDA") and, as such, is responsible for the operations of the Office of Fair Hearings ("Fair Hearings"), including but not limited to ensuring compliance with New York State and federal Medicaid policy, scheduling and conducting Hearings, issuing recommended decisions after Hearings, and ensuring compliance with Fair Hearing decisions involving the Medicaid program.

11.     Defendant, Joan Silvestri ("Silvestri") was the Commissioner of DSS at most relevant times herein and, as such, was responsible for the operation and oversight of the County Medicaid Agency, and the resulting improper and unlawful denial of medical expense reimbursement to the Plaintiffs.

12.     Defendant, Susan Sherwood ("Sherwood"), is the former Commissioner of the DSS, who was in charge of the department during much of the relevant times herein.

### OTHER RELEVANT PARTICIPANTS, NOT DEFENDANTS

13.     Nancy Murphy ("Murphy"), is the former Medicaid supervisor specifically in charge of unlawful reimbursement

14.      Nirav Shah ("Shah") is the former commissioner of the DOH, who was in charge of the department during some of the relevant times herein.

15.     Kristen M. Proud ("Proud") is the former Commissioner of the OTDA, who was in charge of the department during some of the relevant period for this case.

16.      Adrienne Alcaro ("Alcaro"), is the former Medicaid Director who oversaw Nancy Murphy.

17.      Anne Marie Massaro ("Massaro"), is a representative of Office of Health Insurance Premiums ("OHIP"), a division of the DOH, who responded to Plaintiffs on behalf of Dr. Zucker, further unlawfully denying reimbursement.

18.      Darlene Oto ("Oto"), Principal Hearing Officer, OTDA, is responsible for hearing decision oversight. She unlawfully "vacated" a decision in this case, and replaced it, ignoring Plaintiffs' requests for the adherence to that decision in connection with reimbursement of ongoing receipts.

### THE BACKGROUND FACTS

19.     Plaintiffs currently reside in Rockland County, New York.

20.     In late 2011, J. Maione, born prematurely and disabled, was placed on SSI, a process which automatically qualifies one for Medicaid and associated benefits back to the time of birth once the child is considered medically disabled.

21.     In early 2013 J's twin sister, M, also born disabled, was retroactively placed on Medicaid after being enrolled in the SSI program and, thus, automatically qualified for Medicaid benefits back to date of birth and, with it, reimbursement of all incurred medical expenses.

22.     The third Plaintiff, S _ _ _ _ _ Maione ("S"), age seven, as a matter of law also is a Medicaid recipient as are the Parents due to household income guidelines as determined by the federal government.

23.     In or around late 2011, after discovering the Infants were eligible for reimbursement of  out-of-pocket medical expenses retroactive to birth, their Parents submitted the receipts incurred for DME to DSS for reimbursement; these included, over the counter supplies, co-pays, premiums and related medical expenses.

24.     According to EPSDT ("Early Periodic Screening and Diagnostic Testing," a functionality of Medicaid for Infants) and federal Medicaid law, it was the obligation of the local Agency, in this case DSS, to reach out to Infant recipients, particularly disabled ones, to aid and expedite coverage and secure necessary DMEs, supplies and necessary services after being notified by the local Social Security office. [1]

---

[1] Medicaid mandates EPSDT coverage for Infants who are legally entitled to this coverage. See Section 1902(a)(43) of the Social Security Act; See also 42 U.S.C § 1396d(a); 1396d(r)(5)) and 42 CFR § 441.61; 441.50-57.

25.     Instead, DSS abrogated EPSDT and initially denied coverage and/or that it even existed, and then instructed Plaintiffs' Parents merely to "*send in [their] receipts to determine coverage.*"  *All emphasis hereinafter provided.*

26.     Following denial of approximately 99% of the submitted expenses for J. Maione in 2012, because at that point Madison had not yet been approved for SSI due to a very long waiting process, Plaintiffs' Parents on the Infant's behalf requested a Fair Hearing ("Hearing") for J.

27.     DSS erroneously rejected the expenses, *inter alia*, because it contended that, the expenses were not covered under Medicaid and/or that they were incurred after the issuance of a CIBC or Medicaid card ("CIBC Card").

28.     DSS was wrong for a number of reasons. For example, the family ("Family") was under the auspices of third-party coverage ("3d Party Coverage") which is managed under the FHP-PAP, *which mandates reimbursement*.

29.     The reason that the Family was put under the FHP-PAP is because 3d Party Coverage is run through that Program; Medicaid has no such program and typically utilizes Managed Care HMOs.  Not, however, in the case of this Family which are indeed Medicaid recipients and entitled to the same coverage and protections under federal law.

30.     The County and DOH *determined that it was more "cost effective" for the State to reimburse the Family for their private plan premiums rather than to pay for their coverage under one of the County's contractually participating managed Medicaid HMO's, which charged more for disabled members while private insurance made no such distinction. And, it was for this reason that DOH determined that the Family should go on 3d Party Coverage managed by the FHP-PAP.*

31.     In other words, *the State chose to put this Family, and these Infants, in the situation where they end up being denied those entitlements to which they otherwise would be afforded were they assigned to HMO's.* This is the gravamen of the instant case.

**First Fair Hearing, 2013**

32.     At the fair Hearing in 2013, the assigned Administrative Law Judge, Sarah Mariani ("Mariani"), as well as the County attorney in attendance, Lew Jefferies, Esq. ("Jefferies"), requested that Plaintiffs cease further submissions of similar expense reimbursements for J, and *wait on all submissions for M* (M was now SSI and Medicaid qualified, and retroactively eligible to birth) until a decision would be rendered, the import of which was that any decision would determine what type of expenses qualified for reimbursement *for both Infants.*

33.     Both ALJ Mariani and Jefferies proffered *on the record* ("Record") that additional receipts/invoices submitted during the Hearing would be unwieldy and only would slow the process down at that point.

34.     Conversely, Jefferies, on behalf of the respondent, DSS, represented that the award reached would present "guidance and clarity" in respect to the additional receipts of J., as well as to those of M's not yet submitted receipts, as they were essentially the same; considering that many of the Infants' expenses *were exactly the same*, this made perfect sense. Plaintiffs, therefore, through their Parents, consented to deferring submission with the *assurance from Jefferies that ongoing receipts would be reimbursed according to the decision rendered by the ALJ.*

35.     On December 16th, 2013, the Hearing concerning J's reimbursement finally was re-convened. T*he State, however, submitted no papers or brief in opposition, and no exhibits.*

36.     Apparently in an attempt to be fair and balanced, ALJ Mariani called Albany *during the Hearing* and demanded that DOH find an attorney to defend the matter, even affording the State considerable time to respond.

37.     As a result, Attorney Jane McCloskey, Esq., ("McCloskey") submitted a written rebuttal to the claims, *albeit months later*, with Plaintiffs being given the opportunity to reply. The State's failure, however, protracted the Hearing procedure without proffering any reason why it had been unprepared to participate at the Hearing.

38.     On November 13, 2014, almost one full year after the inception of the Hearing *and more than eighteen months after the Hearing process began,* ALJ Mariani returned a decision and order ("Decision" or "Mariani Decision") in favor of the Plaintiffs. **[2]**

**The Mariani Decision**

39.     Judge Mariani's Decision, rendered after considering the parties' contentions, read in pertinent part as follows: *"The determination to deny* the Appellant's request for medical assistance reimbursement *was not correct.* Based on OHIP and the Rockland County Agency's own *concessions presented during the fair hearing and the Regulations, these determinations are reversed."  The Decision in large part was based on "medical necessity."*

40.     "*Medically necessary*" is defined under 18 NYCRR § 513.1 (a) thru (c) as that which *"causes acute suffering; endangers life; interferes with the capacity for normal activity*; or

---

**[2]** When a determination is reached to deny, reduce, or terminate Medicaid, applicants and recipients must be given timely and adequate notice of their right to a fair hearing. 42 U.S.C.§ 1396a(a)(3); 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c), 431.210; N.Y. Soc. Serv. Law § 22(12); 18 N.Y.C.R.R § 505.14(g)(3)(x). See also 18 NYCRR 358-5.2 and 45 CFR § 155.545 (b) (1).

threatens to cause a significant handicap" and to "restore the recipient to his or her best possible functional level."

41.     In other words, ALJ Mariani determined that *all* of J's expenses were legitimate; they were covered, reimbursable, *medically necessitated expenses per Medicaid EPSDT law*. And, in turn, DSS reimbursed the parents for all of those expenses, approximately $32,000 in amount, beginning with, but not limited to, *retroactive premiums and copays.*

42.     According to the Mariani Decision, "*Pursuant to GIS message 02 MA/019, if a medically needy recipient pays health insurance premiums [and it] reduces the individual's net available monthly income below the appropriate income eligibility standard, the local social services district must ……pay or reimburse the recipient if the premium is determined to be cost effective…".*

43.     Following the Mariani Decision, the Infants' Parents were sent a form indicating the amount they were to be reimbursed, with instructions to forward more receipts for reimbursement for *both* of their children.

44.     Plaintiffs' parents understood the instructions to include all Hearing-related expenses, together with J's ongoing receipts. J had not been reimbursed for any expenses incurred either throughout the Hearing and/or deliberation periods, an epoch of more than one year and a half.

45.     Based upon the Mariani Decision, the third child, S. Maione, born 12/24/12, and both Parents also would be entitled, *inter alia,* to co-pay, Durable over-the-counter ("OTC"), DME, and supply reimbursement because, Medicaid *is prohibited* from imposing co-payments, deductibles, co-insurance, and other fees on services for children and adults living below 133% of the federal poverty line, which results in the Family becoming "categorically eligible.''

46.     Furthermore, EPSDT requires States to provide all the necessary services and supplies, "*whether or not such services are covered under the State Plan.*" (42 U.S.C 1396d (a) and 1396 (d) (r) (5).

47.     As well as *any services that are medically necessary whether or not covered under the State plan and even if the Agency does not otherwise provide for these services to other recipients or provides for them in a lesser amount, duration or scope.*

48.     After sending in the remainder of the receipts for the period through March 2015, Plaintiffs' Parents awaited a response.

49.     Nearly six months later, in September of 2015, Plaintiffs received a sloppy, hand-written log *again denying approximately 99%* of submitted expense receipts. The transmittal came from the same Nancy Murphy who had denied reimbursement prior to, and ostensibly rectified by the Mariani Decision; the same Nancy Murphy whose *"determinations were not correct"* according to ALJ Mariani.

50.      M's expenses, many of *which were exactly the same as J's*, and which were held in abeyance in accordance with Lew Jefferies' request, and based upon his representations, were rejected by DSS *along with J's ongoing receipts for the very same expenses for which he had recently been reimbursed.*

51.     This was a deprivation of M's due process rights; a deprivation of monies for which she should have been reimbursed and to which she was legally entitled.

52.     At first, Plaintiffs' Parents thought the notification to be in error, but after corresponding directly with Murphy and her superior, Adrienne Alcaro, the Parents learned that Murphy and Alcaro, in abject contravention of Mariani's Decision, were denying reimbursements, erroneously maintaining the position that only J's receipts prior to the

issuance/receipt of his Medicaid or CIBC Card were reimbursable when the State actually had reimbursed for expenses incurred after the issuance of that CIBC Card in direct contravention of the position taken by the two bureaucrats.

53. Here, DSS was categorically depriving the Infants of coverage, a property right already determined to be their legal entitlement by ALJ Mariani, and with it violating their due process rights under law.

54. DSS, as well as the DOH, apparently was refusing to accept that federal law preempts state law when it came to applying the tenet of "*medical necessity*" which, under statute, supersedes all State regulation.

55. Plaintiffs and Parents were enrolled, *and only enrolled* in the 3rd Party Coverage *because DSS and the State determined it was more "cost-effective"* for the State to do so. In other words, the State made a reasoned assessment based on a software algorithm that determined it to be more cost-effective *to reimburse Plaintiffs for their private plan. This was the State's commitment for which it later reneged!*

56. Under the 3rd Party Coverage Plan, a recipient first must see a doctor in his/her network and, of course, use the participation card *issued by that particular coverage provider.*

57. Therefore, in the instant case, use of the CBIC Card, which both Ms. Murphy and, later, Ms. Masaro, in denying reimbursement insisted must be used, was error. A moot point in this case because the State has insisted that Plaintiffs use their private insurance card. The two women were wrong in addition to the fact that, *without authority or resort to procedure*, they somehow felt justified in unilaterally disregarding and essentially overruling an ALJ's Decision without regard to either.

58. Regular Medicaid, which was therefore secondary to the Plaintiffs' private insurance, *must pick up all co-pays*, OTC supplies, all medically necessary DMEs, supplies, and services regardless of whether the CIBC Card is used or not. *This is mandated under the FAF-PAP!* Please see appended hereto as **Exhibits A,** pertinent excerpts from the Medicaid Reference Guide ("MRG"), accompanied by §367-a of the Social Service Law of N.Y.; **Exhibit B**, Administrative Transmittals 08 OHIP/INF-6 (consisting of 2 pages) and 08 OHIP/Adm-1(consisting of 8 pages); **Exhibit C,** "Employer Fact Sheet, an attachment to 08 OHIP/Adm-1; **Exhibit D,** the Approval of J's participation in the FHA-PAP; and **Exhibit E**, "Frequently Asked Questions About FHP-PAP", which is an attachment to 08 OHIP /INF-6, respectively.

59. The Plaintiffs and their Parents happened to be the rare example of a Medicaid Family that had a private insurer as its primary coverage, and "regular" Medicaid as secondary; most Medicaid recipients in New York are covered primarily by Medicaid managed care as primary coverage, with everything paid for in the latter case by the managed care provider (HMO)—all costs. Not so in this Family's case; but the County and State did not seem to know how to reconcile the scenario that they had created.

60. In the instant matter, the DSS/State denials were predicated either on a complete misapprehension of the law, or a total disregard for its application, the result of which was a denial of rights guaranteed to the Plaintiffs by federal statute. For example, a transmittal from Adrienne Alcaro and Nancy Murphy, DSS Medicaid, *inexplicably stated* that "*MA does not pay co-pays."* See **Exhibit F** appended hereto.

61. This, in light of the fact that it is an immutable fact that Medicaid *does* pay co-pays, and even more enigmatic in that when J finally was reimbursed at a point in time, co-pays were reimbursed to him.

**Attempt to Resolve the Impasse, Follow the Law and Exhaust Remedies**

62.  Plaintiffs, through their Parents, operating on a *pro se* basis, had little recourse but to file an Article 78 for Mandamus to compel the State to honor the Mariani Decision and review and process receipts for reimbursement which it denied for the wrong reasons. The Parents brought the claim before the federal Court due to the apparent inability of the State to reconcile its two opposing mandates: one, that reimbursement cannot be made after receipt of the CBIC Card (which is what the State continued to argue) but at the same time, the DOH placed the Plaintiffs on the "most cost-effective" insurance for the State, which happens to be the FHP-PAP, under which the Plaintiffs were, *and still are*, reimbursed monthly for private insurance premiums. Nonetheless, the State has refused to reimburse Plaintiffs for any other medical costs, despite the FHP-PAP mandate that it must and federal law which prohibits any cost sharing.

63.  If federal Medicaid/EPSDT law covers all "medically necessary" costs and services above and beyond State imposed limitations, *as it does*, with federal courts recognizing these costs not just to be entitlements but *guaranteed by federal statute*, the failure to reimburse therefore is a deprivation of personal property; a deprivation of due process.

64.  The jurisdiction of the federal court is appropriate and necessary where the State has adopted two contravening positions which have resulted in deprivation of Plaintiffs' Constitutionally guaranteed rights; by failing to reimburse Plaintiffs for expenses while benefitting by reimbursing for lower premiums as a result of placing the Family on the 3d Parry Coverage plan.

65.  Moreover, Plaintiffs, through their parents, indeed sought more fair Hearings after the same DSS employee (Murphy) made the same erroneous decision vis-a-vis submission of receipts incurred during and after the Mariani Decision despite Judge Mariani's *admonition* to D

SS concerning attention to the MRG which prohibits the State from holding categorically eligible recipients from any cost sharing expenses; in other words, this Family and these Plaintiffs.

66.     According to the MRG, directly referred to in Judge Mariani's Decision, "if such payment [the premium] reduces the individual's net available income *below the appropriate eligibility standard*, the local social service district *must pay or reimburse* the recipient for the health insurance premium if it has been determined to be cost effective."

67.     This is not an option; it's a Medicaid directive.

68.     Ignominiously, DSS ignored both Mariani's Decision and the representations made by the DOH at the Hearings in 2013 (per Lew Jefferies) to apply the standards of res judicata and collateral estoppel to the issue of the Infants' ongoing receipts depending, of course, upon the rulings made by Judge Mariani with respect to those items presented to her.

69.     The Plaintiffs, through their Parents, simultaneously filed an Article 78 Mandamus while requesting fair Hearings on these new rejections.

70.     Their expectation was that an Article 78 would prevent unnecessary time spent at fair Hearings rehashing the same issues, or spend hours organizing the same documents that they had submitted two years prior while spending money that they didn't have on childcare and photocopying, etc.

71.     However, Judge Sherri Eisenpress, J.S.C. ("Eisenpress"), to whom the Article 78 had been referred, directed the Plaintiffs' Parents back to the Hearing system without ever reviewing  the Mariani record, which was never submitted by the State, despite its obligation to do so.

## THE ORIGINAL HEARING DECISION

72. By reimbursing J for Premiums in 2014, as well as for his expenses, DSS actually recognized and adhered to the foregoing MRG mandate. And, DSS already had conceded that Plaintiffs' private plan was cost effective when it directed Plaintiffs to remain with a private provider.

73. Plaintiffs attempted to exhaust their remedies by filing a *pro se* Article 78 Petition for Mandamus, which resulted in the New York State Supreme Court, Rockland County, per Judge Eisenpress, directing Plaintiffs back to Hearings to exhaust their remedies, indicating that theirs was not a matter for Mandamus, which the Court in its opinion concluded was not the remedy available.

74. Plaintiffs expected to revert to approximately seven (7) additional Hearings for reimbursement of expenses for family members, all concerning reimbursements for the same expenses addressed at the Mariani Hearing,

**<u>Arbitrary Removal of ALJ Mariani</u>**

75. Among these scheduled Hearings was one to consider reimbursement to infant M of expenses, many of which were incurred by M exactly for the same kinds of expenses as J, e.g., pharmaceutical and doctor visit co-pays.

76. Prior to the new Hearings, Joanne Gerber ("Gerber") of OAH informed Plaintiffs that the Hearings would be administered by ALJ Christopher Gallagher ("Gallagher"). When queried by Plaintiffs' Parents why ALJ Gallagher, and not ALJ Mariani, who was intimately acquainted with the Family and the issues, Gerber's response was that the ALJs were chosen *randomly*. In fact, Gerber reiterated that statement sometime later, although ALJ Gallagher

contradicted Ms. Gerber by actually telling Plaintiffs' Parents that he was, "*selected to preside*" over their Hearings.

77.     About a month and one-half prior to the first Hearing before ALJ Gallagher on the transportation issues, Plaintiffs' Parents asked Lynn Davidson ("Davidson"), a DSS legal representative, who is the only individual who ever attended every single Hearing, if she would be so kind as to provide Plaintiffs with all of the documents of the Agency's which were expected to be used in the upcoming Hearings, to which Davidson complied (*albeit* a mere two days before the Hearing).

78.     Contained therein, however, was a piece of transmittal correspondence between OTDA and OAH which directed, "*do not schedule with her*" in reference to ALJ Mariani presiding over further Plaintiffs' hearings.[3]

79.     Inexplicably, this arbitrary and capricious directive appears to have been authored not by anyone at OAH, but by one, Susan A. Sherwood ("Sherwood"), the Commissioner of Rockland County DSS at the time, even though the DOH presides over Hearings while DSS essentially is the respondent. This extra-judicial directive was taken immediately after ALJ Mariani decided in Plaintiffs' favor in November of 2014.  So instead of well-informed Mariani hearing the ongoing issues that resulted from her determination, as she was supposed to, she was never scheduled again. Upon information and belief, Sherwood has no official capacity nor holds any position with DOH or OTDA, nor is DSS an adjunct or division of OAH.

80.     DSS then, the respondent in these Hearings, was dictating what ALJ should be presiding over these "Fair Hearings" where ALJ's ostensibly are chosen at random at least according to Ms. Gerber.

---

[3] ALJ # 288 is Sarah Mariani.

**The Gallagher Hearings**

81.     As a result of the preclusion of ALJ Mariani from adjudicating any of Plaintiffs' cases, nine (9) Hearings concerning reimbursement of travel and travel related expense reimbursement, were assigned to ALJ Gallagher.

82.     These Hearings sometimes were referred to by Plaintiffs as the "MAS Hearings" in the federal action which they brought because they involved travel-related expenses, and MAS, a defendant in that matter, was the DOH's third-party transportation vendor.

83.     Prior to the inception of those nine Hearings, Plaintiffs' Parents filed the aforementioned action in the Southern District of New York assigned to the Honorable Jesse Furman ("Furman"), (the "1st Federal Action").

84.     The 1st Federal Action was initiated because N.Y. State Medicaid Transportation Policy ("Transportation Policy") *is in direct contravention of federal law*. The State Policy was never approved by the federal Center for Medicaid/Medicare Services ("CMS"), which is required to make any changes to a Medicaid State Plan.

85.     The Policy was in direct contravention of federal law because it violated a primary federal Medicaid statute, *which is that children cannot be responsible for any cost-sharing medical expense.*

86.     Thus, the Transportation Policy's decision to leave a Medicaid minor "holding the bag" so to speak because he/she didn't submit his or her invoice within ninety days *(which as a matter of law only applies to providers)*, or only an arbitrary percentage of a meal during a medical visit, would now be reimbursed when it used to be up to $78 regardless of which meal of the day it was, per the State Medicaid Plan.

87.     The 1st Federal Action was dismissed on motion by the defendants. Judge Furman opined essentially that the fair Hearing system was "robust" and perfectly capable of deciding the matters despite that the fiasco surrounding the Mariani Decision proved anything but capable of deciding matters.

**Ripened Claims of Infants**

88.     Those claims of the Infants resulting from the adverse rulings in the transportation Hearings, actually ripened during, and after the pendency of the Motion to Dismiss brought in that 1st Action; *therefore, those claims could not, and had not been considered therein on their merits.* [4]

89.     The results of those Hearings concerning transportation expense reimbursement to the Infant Plaintiffs therefore are raised herein on their behalf for the first time, together with the Infants' already accrued claims which were not dismissed as against them.

90.     Not only is the State's Transportation Policy unlawful, it was created by MAS, the State vendor for Medicaid transportation *and not the Department of Health*, *as required under federal law.*

91.     The policy is unlawful; it relies on a law ((18 NYCRR § 540.6) to deny recipients (of all expenses) if they submit travel invoices *after ninety days*; however, this regulation applies *only to providers*.  There is no time limit for expense reimbursement for recipients under Medicaid law.

92.     In ALJ Gallagher's decision (¶6, pg. 13), it states "the Appellant's parents are *correct in that Section 540.6 (a)(1) refers to providers and would not be applicable to them.*"

---

[4]  Irrespective of being correct that the children could not be represented by their *pro se* Parents without adequate counsel, Judge Furman was incorrect in ruling that there is no right to be transported by the state for medical attention, and no entitlement to be reimbursed for having incurred those expenses.

Inexplicably, in ALJ Gallagher's very next sentence he states that because that statute *is incorrectly subsumed in the Policy* and relied upon by the State to deprive Plaintiffs of reimbursement, he had to rule in favor of the State. *That philosophy is nonsensical!*

93.     Secondly, MAS and the DOH denied the Infants for trip expenses in total disregard of 18 NYCRR § 505.10 and Administrative Directive 92 ADM-21, 6/2/92, which explains the eight factors that determine *medical necessity* of travel expense coverage. Although Plaintiffs, through their parents, *received prior approval for their trips*, they were nonetheless denied for reimbursement (meals and tips) based upon a policy *that did not even exist prior to 2014,* and was unlawfully created, besides being arbitrary and capricious in its determinations of who and what would be reimbursed.

94.     Despite Plaintiffs having submitted doctors' (psychiatrist and gastroenterologist) letters of *medical necessity* and prescriptions alerting MAS and the DOH to a *specific required feeding regimen for their children,* MAS denied meal coverage with total disregard of those medically necessitated requirements.

95.     The MAS mileage reimbursement policy also is unlawful!

96.      It should have been applied at the IRS "standard rate" for the following reason: the State Medicaid Plan reads in pertinent part that, *"Payment of reimbursement for use of a personal vehicle of a volunteer driver or family member of a MA recipient will be made at the Internal Revenue Service's established rate for Standard Mileage"* which is over 50 cents per mile (close to the PVM or Personal Vehicle Mileage rate), with slight variation depending on the year in question.

97.     MAS has been reimbursing at the rate of about 24 cents per mile which, again, is the IRS tax deductible rate and *has nothing to do with a pay rate*. The escort or attendant of an

Infant (the parents in this case) is simply filling the role of any vendor that would receive income for transportation (and for much less). Any third-party transporter *and* an attendant would cost the DOH much more money than simply reimbursing the appropriate rate to the Parent.

98.     Finally, MAS sends W-9s, reflecting taxable income, to the Plaintiffs' Parents because they *must* declare the reimbursement as income. The bottom line is that it is income and despite what MAS or the DOH proffer, the IRS does *not* distinguish between in-home and out-of-home driving rates, simply medical versus business, one being driving yourself, the other, driving somebody, else, anybody else, whether they are family, whether they live in your home or not.

99.     MAS sent denial notices from 2011 through 2016 without any itemization, description, or indicating recourse to further action. When determinations are made to deny, reduce, or terminate Medicaid, applicants and recipients must be given timely and *adequate notice* of their right to a Fair Hearing.

**The Incongruity of the Gallagher Transportation Decisions**

100.    In all of those nine (9) Hearings, none of which had been heard or decided when the 1st Federal Action was initiated, ALJ Gallagher, in response to Plaintiffs' Parents challenge of the legality of the Transportation Policy, effectively ruled that, "*The Policy is beyond the jurisdiction of the Commissioner and cannot be addressed at an Administrative Hearing.*"

101.    In other words, the DOH, at least according to ALJ Gallagher, as well as ALJ Darla Oto, Gallagher's supervisor who signed off and sanctioned his decisions, inexplicably contended that it was not in a position to determine if the Transportation Policy, *which the State*

*of New York supposedly created,* and upon which it relies in adjudicating Fair Hearings addressed to the issue of reimbursement of travel expenses, comported with federal Medicaid policy and law? As well as if it actually comported to State law as well? *Nonetheless, the ALJ deferred to the Policy irrespective of opining that he was not in a position to do so!*

102.    It is important to note that Judge Furman did not know the outcome of those Hearings when he rendered his decision, nor did the complaint before Judge Furman have anything to do with the distinct issue of non-transportation reimbursement (such as what ALJ Mariani had decided in 2014) which included co-pays, supplies, and durable medical equipment ("DME").

103.    A "robust" system is one where an ALJ can render a decision, *wrong or right*, which might be subject to an appeal; not a system where the ALJ opines that the Commissioner is not in a position to decide if a State policy comports to the law thereby depriving the recipient of what is supposed to be a "fair" Hearing. In fact, the opposite is true—it guarantees the recipients have to appeal because the ALJ is feckless in his/her ability to decide on the law!

**Post Eisenpress Hearings on Non-Travel Related Expenses**

104.    After the Eisenpress Article 78 decision in which the Supreme Court essentially directed Plaintiffs to new Hearings to determine the reimbursement of expenses to Infant J, seven (7) Hearings were convened and also presided over by ALJ Gallagher, *but after he presided over the transportation matters.*

105.    These Hearings, which were the subject of the Mariani Decision, and the Eisenpress remand, did not take place until the fall of 2018, *three years after Plaintiffs had*

*requested fair Hearings on these issues.* These Hearings focused on DME and OTC reimbursement, co-pays, and medical supplies. [5]

106.    In one Hearing, for example, Fair Hearing 7152305N held on October 5, 2018, ALJs Gallagher and Oto, in denying reimbursement for infant J's DME expenses, *the very same expenses for which J previously had been reimbursed*, again erroneously argued that reimbursement could not be made after receipt by J of the CIBC Card despite that it was *the law of the case.* [6]

107.    Conversely, ALJ Mariani correctly based her Decision for reimbursement on "*medical necessity*" and reimbursed for expenses incurred after the issuance of the CIBC Card, indicating clearly that she understood the 3d Party Coverage platform. Being under the 3d Party Platform, but still Medicaid recipients, the Infants *by law simply cannot be responsible for any cost-sharing expenses.  Medicaid must reimburse.*

108.    The Second Circuit in ruling on such matters has opined that "the results of such hearings will be binding on the state," and that Medicaid hearing decisions are binding based on § 431.246. The statutory right to a fair hearing must include within it the right to effective redress.

---

[5] After the last session in front of ALJ Mariani, she told the parties that *she would reconvene* the Hearing to address the ongoing expenses to Infant J as well as his sister's expenses dependent, of course, upon what decision she reached. Thereafter, having awarded reimbursement to Plaintiffs', Mariani then was yanked off in place of ALJ Gallagher which resulted in a lengthy discontinuance of almost a year which certainly was not attributable to the Plaintiffs.

[6] 18 NYCRR 358-6.3, reads in pertinent part as follows: "When a fair hearing decision indicates that a social services agency has misapplied provisions of the law, regulations, .......the OAH letter transmitting such decision to such agency" (as in Infant J's case, Hearing #6223734H)" may contain a direction to the agency to review other cases with similar facts for conformity with the principles and findings in the decision.  "See, e.g., Charles A. Field Delivery Service v Roberts, 66 N.Y.2d 516 (1985), that concludes, "*An opinion that is inexplicably contrary to the other agency decisions reached on similar facts is a due process violation.*"  It is also renders the Agency and system of review such as Fair Hearings arbitrary and capricious.  Vargas v I.N.S., 938 F. 2d 358, 362 (2d Cir. 1991); *Greenstein by Horowitz v. Bane*, 833 F. Supp. 1054 (S.D.N.Y. 1993).

109.    Therefore, the Mariani Decision, which awarded reimbursement of expenses, etc. when those receipts represented expenses for "medical necessity? Was binding on the Agency for all other matters in which the Agency could not challenge medical necessity.

110.    The Infants herein, and the entire household, are by law deemed members under the auspices of "The Third-Party Insurance Unit", governed by the FHP-PAP.

111.    So, if one of the members of the Plaintiff Family visits a doctor and must pay a co-pay, that co-pay is reimbursable under the FHP provisions as well as mandated under State and federal Medicaid law.

112.    The FHP Policy requires the recipient to go through their primary provider and, as a result, there will be additional expenses which Medicaid is required to cover, and which only can be achieved through reimbursement because there is no Medicaid provider to pay.

113.    A second argument erroneously posited by DOH, *and dismissed by ALJ Mariani,* was that all of the expenses incurred must be "Medicaid covered expenses."

114.    This argument is specious because Medicaid has no definitive restrictions or boundaries for coverage so long as the expense is considered "*medically necessary*" as *determined by a medical practitioner.*

115.    Therefore, any rejections of Infants' legitimately incurred expense items by DOH and DSS only could be achieved if substantiated by obtaining an opinion by a medical professional that the expense was not "medically necessary" for that specific Infant, and for that specific item or doctor's visit.

116.    That never once occurred in the instant matter! Not only did DOH and/or DSS *never challenge medical necessity*, but only argued, erroneously, that it was "… not covered by Medicaid" *which is not a legitimate reason for denial.*

## STATUTORY AND REGULATORY SCHEME

### The Medicaid Program and its Administration in New York State

117.    Medicaid is a joint federal-state program established under the Medicaid Act which provides federal funding for state programs that furnish medical assistance and rehabilitation and other services to needy individuals.  42 U.S.C. §§ 1396–1396w-5; 42 C.F.R. §§ 430.0–456.725.

118.    States are not required to participate in the Medicaid program, *but if they so choose, they must conform to federal law and regulations in order to qualify for federal financial participation.* 42 U.S.C. §§ 1396a, 1396c.

119.    Any state participating in the Medicaid program must adopt an approved State plan and must administer the program through a "single state agency." 42 U.S.C. § 1396a (a)(5); 42 C.F.R. § 431.10(b)(1); State Plan Under Title XIX of the Social Security Act – Medical Assistance Program (March 10, 2011). [7]

120.    New York has elected to participate in the Medicaid program, and the single State Agency responsible for the administration of the Medicaid program in New York is DOH.  *N.Y. Soc. Serv. L.* § 363-a (1); 1996 *N.Y. Laws* Ch. 474, §§ 233–248.

121.    This single State Agency is permitted only to delegate certain functions (eligibility determinations, appeals) to certain entities (local districts), and is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(c), (e). This is the regulation is the underpinning for why it was illegal for MAS to write the Policy.

---

[7] New York State plan available at https://www.health.ny.gov/regulations/state_plans/docs/nys_medicaid_plan.pdf, with amendments at https://www.health.ny.gov/regulations/state_plans/status/.

122. DOH ultimately remains responsible to supervise the actions of its agents, including the OTDA and DSS, and to ensure that its agents comply with the federal and state statutes and regulations governing the Medicaid program. 42 U.S.C. § 1396a (a)(5); 42 C.F.R. §§ 431.10, 431.50, 441.61, 435.903; N.Y. Soc. Serv. Law §§ 363-a (1).

123. Federal law and regulations require a state's Medicaid program to provide Medicaid applicants and recipients with recourse to an administrative Fair Hearing when Medicaid benefits are denied, reduced, or terminated. 42 U.S.C. § 1396a (a)(3); 42 C.F.R. § 431.220.

124. When determinations reached are to deny, reduce, or terminate Medicaid, applicants and recipients must be given timely and adequate notice of their right to a fair Hearing. 42 U.S.C. §1396a (a)(3); 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c), 431.210; N.Y. Soc. Serv. Law § 22 (12); 18 N.Y.C.R.R § 505.14(g)(3)(x).

125. The Social Security Act requires that the State Plan inform and educate participants about EPSDT, its benefits and provisions. Section 1902(a) (43).

126. *EPSDT requires States provide all necessary services and supplies "whether or not such services are covered under the State plan. 42 U.S.C. 1396d (a) and 1396d (r)(5).* So, there is no limitation in coverage.

127. Therefore, if a doctor prescribes a certain mouthwash for a recipient, *as medically necessary* because the mouthwash in that case was an ameliorative for the recipient's oral cancer lesions, it is irrelevant that the state does not cover mouthwash under its plan, *or that mouthwash is a readily available generic product. For that recipient, if it's medically necessary then it must be covered unless supported by a challenge by a medical expert of the State.*

128.    "Payment may be made to reimburse the recipient"……and "may be made with respect to services furnished by a provider who is not enrolled in the MA program"…. 10 OHIP/ADM-9 11/22/10 and 18 NYCRR § 360-7.5 (a) (3); see also 18 NYCRR § 513.5 (a) (b) et seq.

129.    Pursuant to GIS message 02 MA/019, referred to in the Mariani Decision, if a medically needy recipient pays health insurance premiums and……reduces the individual's net available monthly income below the appropriate income eligibility standard, the local social services district must ……reimburse the recipient…"

130.    And, adults living under 100% of the federal poverty level, like the Plaintiffs in the instant action, cannot pay any cost-sharing expenses. 42 CFR § 447.53.54; Social Security Law 1902.

131.    The Agency/DSS *must pay co-pays*.  42 U.S.C. 1396o § 1916 (2) (A) and 42 CFR § 447.55; the Family Health Plus Premium Assistance Handbook.

132.    "Direct reimbursement is not limited to the Medicaid rate or fee in instances where agency delay caused the recipient to…pay for medical service that should have been paid for under the Medicaid program".  Admin. Directive 10 OHIP/ADM-9.

133.    "Medically necessary" has been previously defined herein. It includes that which *"*causes acute suffering; endangers life; *interferes with the capacity for normal activity*; or threatens to cause a significant handicap" and to "restore the recipient to his or her best possible functional level."

134.    Necessary equipment and supplies are defined as items that provide for "maximum reduction of a physical or mental disability and restoration."

135.     And, most importantly, *only a medical professional can make contrary determinations to purchases based upon medical necessity.*

136.     *The phrase, "not covered under Medicaid"* is a hollow one as the boundaries of coverage are limited only by a doctor's opinion of need.  18 NYCRR § 513.7 (a) (b); §§ 513.5 and 513.6.  "The determination must be based upon a *professional* review by DOH personnel or clinical information and opinion…."  *"And, if there is no clinical information or documentation conflicting with the opinion of the treating practitioner….the DOH must approve the request as submitted."*

137.     Therefore, neither a DOH non-medical professional, or a mere employee, or even an ALJ at a Hearing, is qualified to determine that a service or DME, etc., is not medically necessary without more; *rather, only a credentialed professional may challenge the established opinion that what has been prescribed for the recipient is not medically necessary.* And, if that occurs, then and only then must there be a process to resolve the putative dispute.

138.     Moreover, even if they had such authority, not one of the Agency's denials was based on medical necessity and, therefore, by basing its denial on a pretext the Agency violated the Plaintiffs' due process.

**Medicaid Appeal Rights under the United States and New York  State Constitutions**

139.     No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. Amend. XIV, § 1. The monies not being reimbursed to Plaintiffs is property of the Plaintiffs to which they are being deprived.

140. No person shall be deprived of life, liberty *or property* without due process of law. N.Y. Const. Art. I, § 6.

**The Results of The Seven Expense Reimbursement Hearings**

141. All seven of the Hearings for reimbursement of expenses were decided against the Plaintiffs based on the same faulty reasoning.

142. ALJs Gallagher and Oto further argued that the Mariani Decision did not specifically order reimbursement, rather only to evaluate such requests. This was not accurate.

143. In fact, the County did evaluate those submissions and paid the reimbursement dollar for dollar. *Ergo*, the County must have agreed with the Mariani Decision and the Plaintiffs..

144. Here again the Defendants utilizing the same erroneous arguments which ALJ Mariani dispelled, denied reimbursement because of the "receipt of the Card issue" and that these expenses are "not covered by Medicaid." *Both of these arguments are erroneous as a matter of law.*

145. These departments, all under the DOH auspices, violated fair Hearing procedures in order to prohibit the Plaintiffs from receiving any further expense reimbursements for DMEs and other medically necessary medical supplies, co-pays, etc., in violation of Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3), the Due Process Clause of the 14th Amendment to the United States Constitution; U.S. Const. Amend. XIV, § 1, and the New York State Constitution, N.Y. Const. Art. I, § 6.

146. Plaintiffs also bring a §1983 claim to enforce their denied federally secured right to be reimbursed for actual out-of-pocket expenses incurred for medically necessary Medicaid

supplies and services for their chronically ill children as the Agency failed to perform any of their legal responsibilities under EPSDT. This is a deprivation of a property right.

147.    This federal District in many prior decisions has specifically allowed such claims to be brought under 42 U.S.C.A. § 1983.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

148.    Plaintiffs initiated this claim in this Court because they could not have raised the Constitutional law claims or sought the broader remedies available under §1983 before the local administrative agencies, including the DOH and OTDA.

149.    In addition, the due process rights of the Infants already have been denied and therefore are subject to adjudication by a federal court.

150.    The New York State court system cannot assure litigants that it provides an adequate forum for the Constitutional claims raised herein.

151.    Deference to state administrative process and state preclusion law is limited when that would impair enforcement of Plaintiffs' federal rights because from the record established in the matters of these Plaintiffs and this Family, it is apparent that DOH and DSS has refused to follow federal Medicaid EPSDT; the State has failed to follow federal law.

152.    Although they are recipients and, therefore, should not have to pay any cost-sharing expenses, ever, the State has them on a plan for its own benefit that is failing to reimburse Plaintiffs for costs they should not have to incur in the first place. This is a gross violation of Medicaid law and the State should be estopped from arguing otherwise because the State was the actor which put this process in motion.

153.    Aside from the Defendants' actions being unconstitutional, the issues appear to be totally beyond the State's ability to resolve where ALJs admittedly are unable to reconcile State policy and law as opposed to federally guaranteed rights.

154.    Not one State or County attorney, official, or ALJ (aside from ALJ Mariani, who, irrespective of the fact that Hearing decisions should be decided within 90 days, took a painstaking year to become fully acquainted with the relevant laws, issues and precedents) understand or is familiar with EPSDT and federal Medicaid and disability law. [8]

155.    Any exhaustion of further agency appeals appeared to be futile because the State refuses to reconcile its policies against federal law, and there is no assurance that any dispositions in the Article 78 matters will resolve this federal question.

156.    Given the lengths that the OTDA went to refuse to apply the basic legal concepts of res judicata and collateral estoppel to Mariani's Decision, and to preclude Judge Mariani from presiding over any further Hearings, offers ample proof that pursuing any further Hearings with the State of New York is a futile endeavor. [9]

157.    When the Hearings were able to be conducted in full, the ALJ was unable to determine the lawfulness of the State Transportation Policy, again, denying the Plaintiffs their Constitutional right to a legal remedy. With regard to the non-transportation expenses, they have been held responsible for copays and denied necessary supplies and medicines as either "not covered under Medicaid" or "didn't use the Medicaid card" a deprivation of rights guaranteed under federal law.

---

[8] ALJ Gallagher for example said on the record that *he did not know what EPSDT was, or what it stood for.*

[9] The OTDA refused to incorporate the "Direction Relative to Similar Cases" which mandates that the agencies must consider previous Hearing decisions with respect to current claims before them. The aforementioned administrative directive exists to prevent exactly the problem at the core of the instant matter, namely that Plaintiffs are required to attend Hearings in perpetuity.

# COUNT I

## PLAINTIFFS HAVE BEEN DERPRIVED OF
## DUE PROCESS IN VIOLATION OF 42 U.S.C. § 1983

158.    Plaintiffs repeat and re-allege paragraphs one (1) through one hundred, fifty seven (157), inclusive, as if fully set forth at length herein, and incorporate by reference all previous allegations.

159.    The failure to conduct, and promptly conclude Hearings by issuing a Decision within ninety (90) days, is a violation of due process under 42 U.S.C §1983, the result of which in the instant matter was a failure by Defendants to reimburse Plaintiffs for legitimately incurred expenses and costs to which they were entitled, thereby depriving Plaintiffs, disabled Infants, of monies necessary to continue visitation to doctors and therapists to ameliorate their conditions particularly at a crucial stage of cognitive and physical development.

160.    Not one Hearing was scheduled and/or held within 90 days as required under N.Y. State policy, *and equally mandated by Medicaid*, and not one decision was rendered in 90 days of completion, including the Mariani Decision, a thoughtful, well-reasoned one determining the reimbursement responsibility of the Defendants for the costs and all expenses due the Plaintiffs, which should have served as a template for these kinds of expenses with no further legal proceedings or Hearings.

161.    Instead, the Plaintiff, J, was deprived of reimbursement for two (2) years, and presently, over five (5) years for the same exact expenses, approximately another Forty Thousand ($40,000.00) Dollars. [10]

---

[10]  In that $32,000.00 reimbursement the Agency reimbursed for co-pays as well as for expenses incurred prior to issuance of the CIBC Card.

162.    In addition, the result of having these monies being withheld, precluded the Infants from being able to attend doctors' visits and therapy sessions which would have served to ameliorate the conditions of both Infants, resulting in the exacerbation of those conditions and resulting physical damages which will be established at trial.

163.    Infant Plaintiff M, for example, has been deprived of reimbursement, as well as for expenses identical to that of her brother, like co-pays and over the counter medications that mandate reimbursement, for seven (7) years.

164.    These actions by Defendants amount to a violation of due process pursuant to 42 U.S.C. §1983 by depriving the Infants of their property rights.

165.    In addition, for eight years, the State, in conjunction with MAS, failed to notify Plaintiffs' Parents of the Infants' right to redress in respect to deficient travel reimbursements, as well as failing to apprise them of lawful explanations of benefits, explanation of partial reimbursement and denial, making it impossible to effectively contest any reimbursement deficiencies at any fair Hearings.

166.    This is a violation of due process.

167.    Moreover, when DOH/OTDA scheduled fair Hearings, they did so on a trip by trip basis, resulting in what morphed into dozens of fair Hearings on the same exact issues, the DOH refusing to consolidate them or even hear a number of them on the same day.

168.    It actually took six years to get the State to schedule the Hearings together, and only after Plaintiffs' Parents initiated a lawsuit in federal court.

169.     The process itself of failing to have timely Hearings is itself a violation of due process because the insistence of convening Hearings on a case-by-case basis for Plaintiffs who had to resort to hundreds of doctor visits, makes it impossible to continue those visits if it takes as long as it did to contest reimbursement actually needed to finance future doctor visits.

170.     Moreover, the sheer expectation of the Plaintiffs' parents attending dozens of Hearings over the same issues on different dates, and on a week's notice, while caretaking three Infants, and often during pre-arranged specialists' appointments months in advance in an expectation that amounts to a due process as redress is an impossibility.

171.     As a result, for example, M has sustained and with all likelihood, have permanent foot damage as a result of an inability to address her CP disabilities with the attention it requires.

172.     And, J needed advanced cognitive, physical and behavioral attention. DOH Reimbursement was the only was his Parents could afford to finance the visits he needed.

173.     As a result, J's developmental delays and deficits are more pronounced than ever.

174.     By the time the fair hearings were finally held in 2018, instead of the ALJs taking the necessary time to review all of the invoices, transmittals and receipts to find that the Plaintiffs were denied reimbursement anywhere in the realm of what they should have, Gallagher/Oto ignored the evidence (literally ignored as in made no mention of it in their decisions!) and then took six months to render a decision that, in the end, failed to make a determination on the lawfulness of the Transportation Policy.

175.     And regarding the non-transportation expenses, the ALJ based his/her decision upon the wrong time period, actually considering only the brief time (2011) window that had already been reimbursed via the Mariani hearing FOUR years prior.  The ALJs literally ignored-

as in made no mention in their decision-the thousands of dollars of expense submissions along with prescriptions and letters of necessity from 2013 through 2015!

176.     By reason of the foregoing, the Defendants have violated the Plaintiffs' due process rights, depriving Plaintiffs of property at least in the amount of $40,000.00, in this case monies due them and necessary to continue treatment which resulted in further physical damage for the inability of the Plaintiffs to continue those needed treatments.

## **COUNT II**

177.     Plaintiffs repeat and re-allege paragraphs one (1) through one hundred, seventy-six (176), inclusive, as if fully set forth at length herein, and incorporates by reference all previous allegations.

178.     With regard to the transportation expenses incurred by Plaintiffs, the Defendants have violated and continue to violate Plaintiffs' due process rights protected under the Due Process Clause of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and the New York State Constitution, N.Y. Const. Art. I, § 6, by citing an inability to determine the legality of the State Transportation Plan yet deciding against the Plaintiffs in the face of uncontroverted evidence that the N.Y. State Policy was created for the first time in July of 2014 by MAS, *without the authority to do so* by CMS, and thereby abrogated federal Medicaid/EPSDT law. In other words, it was not a legitimate Policy not having been created or, at the very least, by, the State DOH or approved by CMS.

179.     Therefore, that "Policy" in no way became a part of the State Medicaid Plan.

180.     In reliance of this putative Policy, the Plaintiffs were compelled to pay part of their cost-sharing expenses, an abrogation of federal Medicaid law.

181.    In fashioning his decisions in respect of the transportation issue, the presiding ALJ determined the 90-day policy to submit travel invoices was inapplicable to the Plaintiffs yet deferred to the Policy nonetheless, thereby issuing both arbitrary and capricious decisions which again resulted in the deprivation of monies due the Plaintiffs, an amount in excess of approximately Forty Thousand ($40,000.00) Dollars.

182.    Because the Policy never was reviewed by CMS, the DOH was able to reimburse for mileage at an unlawful rate and reimburse meals at an arbitrary and capricious rate, in defiance of State per diem regulations and in disregard of "medical necessity".

183.    The ALJ also opined that despite his/her inability to determine the legality of the Policy in respect of submission of claims within 90 days, that it was beyond "their jurisdiction", they nonetheless deferred to the illegal Policy anyway.

184.    By reason of the foregoing, the Plaintiffs' rights to due process have further been damaged.

## COUNT III

185.    Plaintiffs repeat and re-allege paragraphs one (1) through one hundred, eighty-four (184), inclusive, as if fully set forth at length herein, and incorporates by reference all previous allegations.

186.    Under 42 USC §1396 a (10) and 42 CFR 447.56, "cost sharing" expenses, including premiums, co-pays and deductibles cannot be paid by Plaintiffs, who are disabled as defined by law, or for that matter any other member of the Family, due to age, disability, and financial status, being below 100% of the Federal Poverty Line ("FPL").

187.     Defendants have continued to ignore the difference between "managed care Medicaid" and "3d Party Coverage" which is the plan on which these Infants were placed by the State.

188.     In Plaintiffs' case, the use of the Medicaid or "CBIC" Card is moot no matter how many times the Agency/State insists upon its use, and denial of reimbursement via coverage based on lack of use is unlawful.

189.     Without any regard to the Federal and State rules and regulations for reimbursement of DMEs and other *medically necessary* medical supplies, co-pays, and other similar expenses incurred by these disabled children, Plaintiffs were denied reimbursement of these expenses by the Defendants.

190.     This is a classic example of conflict preemption. The Supremacy Clause of the Constitution invalidates state laws that interfere with or are contrary to laws of Congress.

191.     In the case of these Infant Plaintiffs, the State mandate or provision of the use of the CBIC Card stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.

192.     Moreover, the State has time and again ignored the importance of "medical necessity," eviscerating the tenets of Medicaid, so crucial in its mandate, which is to treat each recipient as an individual, with a tailored medical regimen.

193.     The State has ignored prescription after prescription and letters of necessity from preeminent doctors and therapists, deferring to the hollow rejoinder of "not covered under Medicaid;" an unlawful reason that undermines the entire philosophy of Medicaid.

194.    Not once in the last nine years did anyone argue against the medical necessity of any expense sought to be reimbursed.  Not once did the State refer a single expense to any medical professional to contest its legitimacy as required by law.

195.    In fact, in 2014, the State reimbursed $32,000 of such expenses, *as it should have*, including ones for purchases after receipt of the Medicaid card thereby eviscerating the State's contentions.

196.    Since 2011 the Plaintiffs have been responsible for co-pays, DME, OTC medications, and other supplies despite federal Medicaid law prohibiting the same.

197.    The expenses which were incurred by Plaintiffs are in excess of Sixty Thousand ($60,000.00) Dollars.

198.    Defendants have denied the well-settled mandate of *medical necessity* per federal law (42 U.S.C. 1396d (a) and 1396d(r) (5)) and improperly denied expenses without regard to medical authorization.  (18 NYCRR § 513.7 (a) (b), 513.5 and 513.6).

199.    As a result of the unlawful actions of the Defendants, Plaintiffs have suffered and continue to suffer significant improper expense reimbursements, a violation of EPSDT and with it a violation of 42 U.S.C. §1983 for a deprivation of Plaintiffs' rights to these entitlements.

## COUNT IV

### DEFENDANTS HAVE VIOLATED THE INFANTS' RIGHTS UNDER THE REHABILTATION ACT and TITLE II of the ADA

200.    Plaintiffs repeat and re-allege paragraphs one (1) through one hundred, ninety-nine (199), inclusive, as if fully set forth at length herein, and incorporates by reference all previous allegations.

201.    Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified disabled persons under any program or activity receiving federal financial assistance.

202.    Enrollees under state Medicaid programs are clearly "otherwise qualified disabled persons" under the Medicaid program, and are entitled to receive such mandatory Medicaid services as expense reimbursements for DME, OTC, services, and co-pays where medically necessary.

203.    When these services either are not provided, because of lack of reasonable accommodations, Plaintiffs are discriminated against in a program that receives federal financial assistance.

204.    State departments, such as NYSDOH, which are subject to §504 because they receive federal funding are equally subject to Title II of the ADA, which requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. [11]

205.    The sheer inability to participate in an activity such as in M's case is a violation of her ADA rights.  Where a "normal" child may or may not need sun protection supplies, M

---

[11] Infant M, e.g., is denied coverage for sun lotion protectant. One example of a "medically necessary" expense being denied. Denial of coverage for sun protection for M will not merely cause a sunburn, as it might for any other Medicaid recipient who does not suffer from neurofibromatosis, but it will cause serious damage precisely because of her malady. It is not sunscreen *qua* sunscreen, it is a medically necessary, prescribed by a doctor, emollient used to protect a child with neurofibromatosis who from time to time even requires the sunscreen when exposed to outdoor light at times.

requires them at all times because, unlike the general public, she has neurofibromatosis, and the sun exacerbates her condition.

206.    For example, J, *per prescription*, who was compelled to wear diapers until he was seven (7) years old due to gastrointestinal issues, incontinence, and cognitive delays, was initially denied coverage until the Mariani Decision granted it based on "medical necessity." He was subsequently denied again for this "medically necessitated" coverage for the same unlawful reason on which the State based its denial the first time, that diapers are not a covered item by Medicaid *when in fact they are.*

207.    Sunscreen protection for instance is not an item specifically not covered by Medicaid. There is no such expense under the law, *which is why there is miscellaneous coding in both the State Pharmacy and DME/Supply coding books for precisely the event where a Medicaid representative must code an expense under an "atypical" but "medically necessary" expense.*

208.    Medicaid is a federal program that is operated and administered by the state, and though states may choose to provide Medicaid through agents such as MAS, the state remains responsibility under federal law for operating a program that is free of discrimination on the basis of disability.

209.    Regulations enacted under § 504 prohibit state Medicaid agencies from providing directly or through contractual, licensing, or other arrangements , "any aid, benefit, or service that denies people with disabilities the opportunity to participate in or benefit from Medicaid, affords people with disabilities an opportunity to participate in or benefit from healthcare services that are not equal to that afforded others, or provides people with disabilities with an aid, benefit or service that is not as effective as that provided to others. 45 C.F.R. §84.4(1)(i) (ii), (iii)

"Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving Federal Financial Assistance", indicates that states are also prohibited from operating Medicaid using methods of administration "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 45 C.F.R. § 84.4(b) (4).

210.    As a public entity, regulations enacted under Title II of the ADA requires the state to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the program service or activity." 28 C.F.R. §35.130(b) (3).

211.    The entire Transportation Policy is a violation of the ADA, just as it is a violation of EPSDT law, because it sets strict and finite parameters of reimbursement with zero consideration of the "medical necessity" of an individual's needs *even before those needs are presented for consideration.*

212.    It was the State's decision ultimately to approve Plaintiffs for private coverage; and they did so only because the premium was cheaper as it did not upcharge for disabled children, where the local managed care HMOs do.  This benefitted the State; however, it does not grant the State the authority to deny coverage and then reimbursement, leaving disabled children without their necessary doctor visits, supplies, equipment and services.

213.    In fact, the State should be equitably estopped from adopting that position since it was the State that pushed Plaintiffs and the Family into 3d Party Coverage.

214.     Without the reimbursement, the Plaintiffs have been unable to maintain their prescribed and medically necessary services, equipment, supplies and visits; all expenses would have to be out of pocket with no assurance that it would be reimbursed.

215.     Basically, the Agency/State used the less expensive premium for its benefit, while disregarding the needs of the disabled, withholding additional federal money that should have been reimbursed to the Plaintiffs for the costs incurred by them and for the expenses necessary to combat and ameliorate their disabilities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for a judgment against Defendants as follows:

A.     Directing Defendants to reimburse Plaintiffs for over $90,000 of unlawfully denied medical expense reimbursement, a violation of their due process rights, as well as to direct Defendants to reimburse for expenses deemed to be "medically necessary" and lawfully entitled reimbursement such as for transportation;

B.     Direct the Agency, the DOH and the OTDA, to implement and follow the "Direction Relative to Similar Cases" (18 NYCRR § 358-6.3), wherefore Plaintiffs do not have to attend repetitive fair Hearings over the same expenses previously adjudicated to be medically necessary for them and, therefore, reimbursable;

C.     Directing Defendants to reimburse Plaintiffs for hearing preparation, attendance and accounting expenses (the Agency/State neglected to undertake their duty) and interest accumulated on purchases made by Plaintiffs on credit cards and loans;

D.      Directing Defendants to implement required EPSDT/ 3d Party Coverage Party outreach (see 87 ADM-40, 10/28/87), receive necessary Medicaid education on both the above and "medical necessity," and agree to adhere to federal law in return for federal dollars;

E.       Directing Defendants to pay statutory damages, if any;

F.      Direct Agency, OHIP, DOH, and MAS to cease and desist from arbitrary and capricious setting of deadlines for submission of receipts/expenses by Medicaid entitled recipients.

G.      Directing Defendants to pay for any legal fees incurred by the Plaintiffs pursuing this matter; and

H.      Granting such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury on all matters so triable.


Dated: November 21, 2020                          */s/ Louis J. Maione*
                                                  Louis J. Maione, Esq. (8589)
                                                  Attorney for Infant Plaintiffs

EXHIBIT A

| UPDATED: JUNE 2010 | 40.2 |
| --- | --- |

# CATEGORICAL FACTORS

## FAMILY HEALTH PLUS (FHPlus) and FAMILY HEALTH PLUS PREMIUM ASSISTANCE PROGRAM (FHP-PAP)

**Description:**  FHPlus provides comprehensive managed care health insurance to low-income adults who have income above the current Medicaid levels. With few exceptions, adults cannot have private health insurance. All adults age 19-64 who apply for Medicaid and appear to be ineligible for reasons of excess income are evaluated for their potential eligibility for FHPlus. (See **CATEGORICAL FACTORS** PREGNANCY for treatment of pregnant women).

The prescription drug benefit under the Family Health Plus Program is administered by the Medicaid Program, and not by the health plan. FHPlus recipients must use a NYS Common Benefit Identification Card (CBIC) to obtain pharmacy benefits.

The Family Health Plus Premium Assistance program is available to A/Rs who have or have access to qualified and cost-effective employer sponsored health insurance (ESI) and who are otherwise eligible for Family Health Plus. An A/R with access to ESI is an individual whose employer offers health insurance benefits to its employees, and the individual is eligible for those benefits. For example, an employer may only offer benefits to employees who work full-time. In addition, the ability of the applicant to enroll in those benefits must be reasonable and uncomplicated. For example, if the employer is not cooperative in providing necessary plan information to the applicant or to the district, then the district would be unable to determine if "access" exists.



Individuals in receipt of FHP-PAP shall have available to them health care services including: payment of the recipient's share of the premium, co-insurance, any deductible amount, and the cost sharing obligations for the A/R's employer-sponsored health insurance that exceed the amount of the person's FHPlus co-payment obligations. The A/R will also receive services and supplies otherwise covered by the FHPlus program, but only to the extent that such services and supplies are not covered by the person's employer sponsored health insurance.

**NOTE:**  Although COBRA coverage is not considered employer sponsored insurance, if the health insurance meets the standard benefit package and passes the FHP-PAP cost effectiveness test, such COBRA payments qualify for payment under the FHP-PAP.

**Policy:**  Applicants who meet the following criteria may be eligible for FHPlus:

**FindLaw.** FOR LEGAL PROFESSIONALS

N.Y. SOS. LAW § 367-a : NY Code - Section 367-A: Payments; insurance

**Search N.Y. SOS. LAW § 367-a : NY Code - Section 367-A: Payments; insurance**

- Search by Keyword or Citation

Search

1. (a) Any inconsistent provision of this chapter or other law notwithstanding, no assignment of the claim of any supplier of medical assistance shall be valid and enforceable as against any social services district or the department, and any payment with respect to any medical assistance shall be made to the person, institution, state department or agency or municipality supplying such medical assistance at rates established by the appropriate social services district and contained in its approved local medical plan, except as otherwise permitted or required by applicable federal and state provisions, including the regulations of the department; provided, however, that for those districts for whom the department has assumed payment responsibilities pursuant to section three hundred sixty-seven-b of this chapter, rates shall be established by the department, except as otherwise required by applicable provisions of federal or state law. A social services official may apply to the department for local variations in rates to be applicable, upon approval by the department, to recipients for whom such district is responsible. Claims for payment shall be made in such form and manner as the department shall determine.



(b) Where an applicant for or recipient of public assistance or medical assistance has health insurance in force, is enrolled in a group health insurance plan or group health plan covering care and other medical benefits provided under this title, payment or part-payment of the premium, co-insurance, any deductible amounts and other cost-sharing obligations for such insurance may also be made when deemed cost-effective pursuant to the regulations of the department.

(c) Any inconsistent provisions of this title or other law notwithstanding and to the extent that federal financial participation is available therefor and in accordance with the regulations of the commissioner, payment of the premium for coverage under a group health insurance plan or group health plan may be made under the medical assistance program on behalf of a person not otherwise entitled to public assistance or medical assistance if the social services official determines that the savings in expenditures to the program as a result of such coverage are likely to exceed the amount of the premiums paid and such person has:

(i) income (as determined in accordance with the methodology used to determine eligibility for benefits under the federal supplemental security income program) in an amount less than or equal to one hundred per cent of the federal income official poverty line (as defined and annually revised by the federal office of management and budget) applicable to the person's family size;

(ii) resources (as determined in accordance with the methodology used

EXHIBIT B

# DOH

# STATE OF NEW YORK
# DEPARTMENT OF HEALTH

Corning Tower      The Governor Nelson A. Rockefeller Empire State Plaza      Albany, New York 122__

Richard F. Daines, M.D.
*Commissioner*

Wendy E. Saunders
*Chief of Staff*

| INFORMATIONAL LETTER | |
|---|---|

**TRANSMITTAL:** 08 OHIP/INF-6

**DIVISION:** Office of Health Insurance Programs

**TO:** Commissioners of Social Services

**DATE:** September 29, 2008

**SUBJECT:** Family Health Plus Premium Assistance Program: Frequently Asked Questions

**SUGGESTED DISTRIBUTION:** Medical Assistance Directors
Temporary Assistance Directors
Staff Development Coordinators
Legal Staff
Fair Hearing Staff

**CONTACT PERSON:** Local District Liaison
Upstate: (518)474-8887
NYC: (212)471-4500

**ATTACHMENTS:** Attachment I: Family Health Plus Premium Assistance Program: Frequently Asked Questions

## FILING REFERENCES

| Previous ADMs/INFs | Releases Cancelled | Dept. Regs | Soc. Serv. Law & Other Legal Ref. | Manual Ref. | Misc. Ref. |
|---|---|---|---|---|---|
| 08 OHIP/ADM-1 08 MA/011 | | | 369-ee 3-a | | |

## Is the Premium Assistance Program as good as Family Health Plus?

**Comprehensive Health Care Coverage**

Inpatient/outpatient health care

Physician services

Radiation therapy, chemotherapy, hemodialysis

Drug, alcohol, mental health services

Emergency ambulance services

Durable medical equipment

Prescription drugs

Lab tests, x-rays

Vision, speech and hearing services

Rehabilitative services

Hospice

Dental

You will get these benefits either through your Employer's Health Insurance or through your Medicaid benefit.

## Are there additional benefits?

The Premium Assistance Program also pays for :

Your share of the Premium for your employer based insurance  and

Reimburses for;

Deductibles;

Co-insurance;

Co-payments that exceed the Family Health Plus co-payment schedule.

## What happens if I have to wait to join my employer's health insurance?

If you are eligible for this program, but are not yet enrolled in your employer's insurance, you may be enrolled in a Family Health Plus Managed Care Plan temporarily until your employer's insurance enrollment period allows you to sign up.

Children 18 years old and younger will also be evaluated for Medicaid or Child Health Plus while waiting to enroll in your employer's health plan.

## Where can I apply?

You may apply using the Access NY Health Care application which can be printed from our website at: www.health.state.ny.us/nysdoh/fhplus/index.htm

Or call our toll free hotline at: 1-877-934-7587.

Or visit your local department of social services.

You may also apply through Facilitated Enrollers, which are available near you.

Call 1-877-934-7587 to find a Facilitated Enroller in your County, or visit: www.health.state.ny.us/nysdoh/fhplus/how_can_I_apply.htm

## How do I apply?

You will need to complete an application, provide certain information on income and resources, and complete a personal interview before an eligibility determination can be made.

# DOH STATE OF NEW YORK
# DEPARTMENT OF HEALTH

Corning Tower ' The Governor Nelson A. Rockefeller Empire State Plaza     Albany, New York 12237

Richard F. Daines, M.D.
*Commissioner*

Wendy E. Saunders
*Chief of Staff*

| **ADMINISTRATIVE DIRECTIVE** | **TRANSMITTAL**: 08 OHIP/ADM-1 |

**TO:**   Commissioners of
Social Services

**DIVISION:** Office of Health
Insurance Programs

**DATE:** January 25, 2008

**SUBJECT:** Family Health Plus Premium Assistance Program

**SUGGESTED
DISTRIBUTION:**   Medicaid Staff
Fair Hearing Staff
Legal Staff
Audit Staff
Staff Development Coordinators

**CONTACT
PERSON:**   Local District Liaisons
Upstate (518)474-8887     NYC (212)417-4500

**ATTACHMENTS:**
A.   Applicant Fact Sheet
B.   Employer Fact Sheet
C.   Third Party Health Insurance Form
D.   Plan Qualifications and Cost Effectiveness Worksheet
E.   Manual Notice of Decision
F.   Dear Member Letter

## FILING REFERENCES

| Previous ADMs/INFs | Releases Cancelled | Dept. Regs. | Soc. Serv. Law & Other Legal Ref. | Manual Ref. | Misc. Ref. |
|---|---|---|---|---|---|
| 05 OMM/ADM-4 | | | 369-ee | | GIS 07MA021 |
| 03 OMM/ADM-2 | | | | | GIS 06MA026 |
| 02 OMM/ADM-5 | | | | | GIS 05MA009 |
| 01 OMM/ADM-6 | | | | | GIS 03MA025 |
| 05 INF-16 | | | | | GIS 03MA020 |
| 93 ADM-29 | | | | | GIS 03MA019 |
| 02 INF-02 | | | | | GIS 02MA013 |
| 87 ADM-40 | | | | | GIS 02MA017 |
| | | | | | GIS 02MA018 |
| | | | | | GIS 02MA019 |
| | | | | | GIS 02MA025 |
| | | | | | GIS 02MA033 |
| | | | | | GIS 01MA014 |

**Date:**  January 4, 2008

**Trans. No.**  08 OHIP/ADM-1                                    **Page No.** 2

## TABLE OF CONTENTS

I.    Purpose                                                          3

II.   Background                                                       3

III.  Program Implications                                            3

IV.   Required Action

      A.   Definitions                                                5
      B.   New Applications with Employer-Sponsored Health
           Insurance Coverage                                         5
           Eligibility
           Determination                                              6
      C.   Renewals with Employer-Sponsored Health Coverage           7
           Continued Eligibility
           Determination
      D.   Transitions                                                9
      E.   Payment                                                   10
           1.   Employee Premium                                     10
           2.   Co-pays and Deductibles                              10
           3.   FHPlus Co-Pay Schedule                               11

V.    Communication with Employers                                   11

VI.   Systems Implications                                           12

      Upstate                                                        12
      A.   WMS
           Individuals Pending Enrollment
           Enroll Individuals
           EPI Code
           Categorical Codes
           Coverage Codes
           BICS Pay Types
           Change to 3209 Printing
      B.   PCP
           PCP Exclusion
      C.   CNS
      D.   EEDSS
      E.   eMedNY

      New York City                                                  13

VII.  Schedule E                                                     14

VIII. Effective Date                                                 14

IX.   Attachments

      A.   Applicant Fact Sheet
      B.   Employer Fact Sheet
      C.   Third Party Health Insurance Form
      D.   Plan Qualifications and Cost Effectiveness Worksheet
      E.   Manual Notice of Decision
      F.   Dear Member Letter

**Date:** January 4, 2008

**Trans. No.** 08 OHIP/ADM-1                                    **Page No.** 3

## I. Purpose

This Administrative Directive (OMM/ADM) provides direction to local departments of social services (LDSS) regarding the implementation of the Family Health Plus Premium Assistance Program (FHP-PAP).

## II. Background

Chapter 58 of the Laws of 2007 amended Section 369-ee of the Social Services Law by adding a new subdivision 3-a which specifies that individuals meeting the eligibility requirements for Family Health Plus (FHPlus) cannot enroll in or must disenroll from a FHPlus insurance plan if a determination is made that the individual has access to cost-effective employer sponsored health insurance. Such individuals eligible for FHPlus with access to cost-effective employer sponsored health insurance must enroll in the employer sponsored health insurance in order to receive or continue to receive health care services under the FHPlus Program. In addition, individuals who do enroll in cost effective employer-sponsored health insurance shall have available health care services including: payment or part payment of the premium, co-insurance, any deductible amounts, and the cost sharing obligations for the individual's employer-sponsored health insurance that exceed the amount of the person's FHPlus co-payment obligations. The individual will also receive services and supplies otherwise covered by the FHPlus program, but only to the extent that such services and supplies are not covered by the person's employer sponsored health insurance.

Persons eligible for the Family Health Plus Premium Assistance Program include individuals eligible for FHPlus who have access to qualified employer sponsored health insurance that has been deemed to be cost effective. This includes uninsured parents, aged 19-64, of a child under the age of 21 with gross family income up to 150% of the federal poverty level and countable resources that do not exceed 150% of the annual Medically Needy income standard based on family size. It also includes uninsured childless adults aged 19-64 with gross household income up to 100% of the federal poverty level and countable resources that do not exceed 150% of the annual medically needy income standard based on family size.

Individuals who are eligible for employer-sponsored health coverage through Federal, State, county, municipal or school district health benefit plans are not allowed to enroll in Family Health Plus. Therefore, these individuals are not eligible to participate in the Family Health Plus Premium Assistance Program.

## III. Program Implications

Eligibility determinations for this program will be completed as part of the initial application and renewal processes.

At the time of initial Medicaid application or renewal, individuals will be asked if they have access to employer sponsored health insurance (ESHI). If they answer affirmatively, the requirement to enroll in qualified, cost effective employer sponsored health insurance will be explained to the individual. The individual will be asked to provide information about the available employer sponsored health

**Date:** January 4, 2008

**Trans. No.** 08 OHIP/ADM-1        **Page No.** 4

insurance coverage. Pending a final determination regarding the ESHI, individuals otherwise eligible for Family Health Plus will be enrolled, or continue to be enrolled in a FHPlus plan. Upon obtaining information about the ESHI coverage available to the individual, the (LDSS) will make a determination as to whether the coverage is deemed both qualified and cost effective. If the ESHI coverage is not deemed both qualified and cost effective, the individual will be allowed to remain in the FHPlus plan. If the coverage is deemed qualified and cost-effective, the individual will be enrolled in the ESHI and disenrolled from the FHPlus plan at the earliest opportunity; that is, at the time the individual both meets the employer's requirements for participation in the plan and is permitted to enroll. FHP PAP enrollment delays may occur if the ESHI has an annual open enrollment period or wait time for coverage. If the available employer plan(s) changes before the employee can enroll, the LDSS may need to determine whether the plan remains qualified and cost effective. However, the individual will not be forced to disenroll from his/her FHPlus plan until he/she can enroll in the ESHI Program; for example: during an ESHI open enrollment period or after a required "waiting period".

If the individual leaves employment, is laid off, or retires; or if the employer drops coverage or changes the coverage so that it no longer meets the criteria for being both qualified and cost-effective, and the individual is found to still meet the FHPlus income and resource eligibility criteria, the individual may enroll in a FHPlus plan for coverage.

For those individuals who enroll or who are enrolled in ESHI, the FHPlus Premium Assistance program will pay the portion of the premium not paid by the employer. Payments will be made by the LDSS as arranged between the district and the payee using current premium payment methods.

The FHPlus Premium Assistance program will also pay claims for ESHI deductibles, coinsurance and co-payments following the current Medicaid rules for deductibles and co-payments, when such claims are submitted to Medicaid by Medicaid enrolled providers.

The LDSS will reimburse FHPlus Premium Assistance program enrollees for ESHI deductibles, coinsurance and co-pays paid by the enrollee to non-Medicaid enrolled providers upon the submission of proper documentation to the LDSS. Deductibles and coinsurance paid by the enrollee to non-Medicaid enrolled providers will be reimbursed in full. Co-pays paid by the enrollee to non-Medicaid enrolled providers will be reimbursed to the extent that the co-pays exceed the amount of the enrollee's co-payment obligations under Family Health Plus.

FHPlus wrap-around benefits will also be provided on a fee-for- service basis to individuals enrolled in ESHI to the extent that such benefits are provided by a FHPlus plan, but are not covered by the individual's employer sponsored health insurance coverage.

Enrollees in the FHPlus Premium Assistance program are required to use Medicaid enrolled providers for FHPlus wrap-around services. Medicaid providers will be reimbursed for provision of FHPlus benefits that are not covered by the ESHI up to the Medicaid rate of payment minus the enrollee's applicable FHPlus co-payment. Payment will be made through eMedNY using current claims and remittance processes.

- Enter the EPI code of A on screen 4 in WMS. This will result in a system-generated disenrollment from the FHP managed care plan with an effective date as of the MA coverage FROM date, which will be the first day of the month after T+14;
- Follow current procedures to enter the Third-Party health insurance information into the eMedNY Third-Party Sub-system for each recipient covered under the ESHI.
- Pay the ESHI premium each month, as determined by agreement between LDSS and the payee;
- Issue OHIP-0011 Attachment E, "Notice of Decision For Family Health Plus-Premium Assistance Program;" for the adults and an expanded eligibility notice for the children;

4. If the TPHI form is not returned:

- If FHPlus eligible, reauthorize the case for one year as a case type 24 with coverage code 34; continuing enrollment in a FHPlus managed care plan;
- Enter Anticipated Future Action code of 913 "Open enrollment month for PAP" and anticipated date of ESHI enrollment in WMS to track open enrollment period and take necessary action to follow-up with Applicant/Recipient for future eligibility and enrollment in ESHI. Open enrollment periods generally occur in November for January and April for June.
- Enter an HII (health insurance indicator)of "7" on screen 1 in WMS;

  Using the AFA codes and HII indicator as a tickler system, the district should mail to the recipient a copy of the Applicant Fact Sheet, "Family Health Plus and Family Health Plus Premium Assistance Program (FHP-PAP)" Attachment A, to explain the Premium Assistance Program and include a copy of the Third Party Health Insurance Form, Attachment C, prior to the applicable open enrollment period of November or June.

  And/or:

  Mail to the employer a copy of the FHP PAP Employer Fact Sheet Attachment B, and include a copy of the Third Party Health Insurance Form, Attachment C, prior to the applicable open enrollment period of November or June.

## D. Transitions



In instances where a transition is made from a Family Health Plus managed care plan to the Family Health Plus Premium Assistance Program OR from the Family Health Plus Premium Assistance Program to a Family Health Plus managed care plan, the district must ensure that no gaps in coverage occur.

Therefore, if a FHPlus recipient enrolls in an ESHI and an overlap of coverage occurs, the district must reimburse the A/R for the premium directly and instruct the A/R to use the FHP coverage during the transition month. Disenrollment from FHPlus managed care must be processed as timely as possible to avoid a gap in coverage.

**Date:** January 4, 2008

**Trans. No.** 08 OHIP/ADM-1                                              **Page No.** 10

In situations where a client loses ESHI, the LDSS worker must end date the third-party health insurance information from the eMedNY Third-Party sub-system and continue coverage with Coverage Code 20 until the FHP managed care plan enrollment is processed.

Medicaid units need to inform managed care units of transitions to ensure timely enrollments/disenrollments and appropriate notice to health plans if necessary.

**E. Payment**

1. Employee Premium

   Upstate Local Departments of Social Services must reimburse the amount of the employee premium for ESHI through the Benefit Issue Control System (BICS) system. Reimbursement may be made to the employer, insurance carrier, or to the employee if the premium is deducted from the employee's pay check.

   Districts wishing to provide reimbursement outside the BICS system must request in writing an exception to this requirement. The request, along with a written proposal of the alternative methods the district wishes to employ, must be sent to:

   > New York State Department of Health
   > Third Party Liability Unit
   > 99 Washington Avenue
   > Albany, New York 12210

2. Co-pays, Deductibles and Coinsurance

   Family Health Plus Premium Assistance Program enrollees should be encouraged to use ESHI providers that are also enrolled in the Medicaid/FHPlus programs. This will allow deductibles, coinsurance and co-payments (that exceed those normally paid by FHPlus enrollees) to be paid through the eMedNY system, following Medicaid rules for payment of deductibles, coinsurance and co-pays.

   For information on how Medicaid enrolled providers may submit claims for deductibles, coinsurance and co-pays, please refer to page 21 of the January 2007 Medicaid Update. Under the heading: Medicaid Recipients with Medicare Managed Care (HMO/MCO) Coverage.



   In instances where a non Medicaid/FHPlus provider is used, reimbursement of co-pays, deductibles, and coinsurance will be made to the enrollee upon submission of documentation that demonstrates that the deductible and coinsurance and/or the co-pay was paid. No payment for incurred, but not paid, deductibles or co-payments will be made to the recipient. Documentation may include cancelled checks and/or billing statements from providers. Such reimbursement to the recipient must be made through the BICS system. (See number #1 above) Deductibles and coinsurance payments may be made directly to the provider by the LDSS if the district has a vendor ID for the provider and proof that the ESHI plan applied the service fee to the deductible.

**Date:** January 4, 2008

**Trans. No.** 08 OHIP/ADM-1

U2 - FHP PAP Deductible - Deductible payments can be made using this code.

U3 - FHP Co-Pay Differential - The difference between a FHP/MA co-pay and the plan's co-pay can be made using this code.

U4 - FHP PAP Other - Other would be used to make payments under special circumstances for FHP medical services that were not provided by the plan nor by a Medicaid provider.

U5 - FHP PAP Coinsurance -Reimbursements for coinsurance can be made using this code.

U2, U3, U4 and U5 issuance will be once only. Payment schedule should be blank. Method of payment can be unrestricted or vendor as authorized. No special claiming code should be used.

**Change to 3209 Printing**
The TPHI will print on the last column in screen 4 that has the heading "UNIQ POP". The heading will be changed to "TPHI" at a future date. The EPI field may be added to the 3209 in the future.

**B. PCP**

If an adult or child is identified by being in PAP with the entry of an EPI code of "A" and has an existing PCP enrollment, a system-generated disenrollment will occur with an effective date as of the MA Coverage "From" date, which as described above will be the first day of the month after PAP.

**PCP Exclusion**
Updates to the eMedNY Third-Party subsystem are transmitted to WMS daily. As the individual's insurance will be entered in Third Party an update will be sent to WMS and a "Y" will be populated in the TPHI field. Individuals with a TPHI code = Y will be excluded from managed care auto-enrollment.

**C. CNS**

CNS notices to support the Family Health Premium Assistance Program will be developed in the future.

**D. EEDSS**

The EEDSS question set will be modified to collect information about employer sponsored health insurance.

**E. eMedNY**

**Third Party Subsystem**
The employer's insurance is third party insurance, and must be entered like other commercial insurance in the Third-Party Subsystem in eMedNY.

**New York City**

New York City systems instructions will follow separately.

**Date:**   January 4, 2008

**Trans. No.**   08 OHIP/ADM-1

<div align="right">

**Page No.** 14
</div>

---

### VII.  <u>Schedule E</u>

Premium, deductible, coinsurance and co-payments made on behalf of recipients under the Family health Plus Premium Assistance Program must be included in Line 18 of Schedule E.

### VIII.  <u>Effective Date</u>

The provisions of this Directive are effective January 1, 2008.

Deborah Bachrach, Deputy Commissioner
Office of Health Insurance Programs

EXHIBIT C

ATTACHMENT B

'7

# EMPLOYER FACT SHEET

## Family Health Plus Premium Assistance Program (FHP-PAP)
### What employers need to know about FHP-PAP.

## What is the Family Health Plus Premium Assistance Program:

The Family Health Plus Premium Assistance Program is the State's premium assistance program for Family Health Plus eligible individuals who have access to employer-sponsored health insurance.

The Family Health Plus Premium Assistance Program is a public/private partnership that helps lower-income employees participate in your company's health insurance plan. If your employee and your company's health insurance plan are qualified and the plan is cost effective, the Family Health Plus Premium Assistance Program will pay for the employee's share of your company's health insurance premium. The Family Health Plus Premium Assistance program will also cover the cost of any deductibles, coinsurance and co-payments associated with your company's health plan. This makes your offer of health insurance more affordable for your employees and their families.



## How it helps you:

Participation in the Family Health Plus Premium Assistance program allows your employees to enroll in your company's health insurance at little or no cost to them and at no additional cost to you. This will help you attract and retain qualified employees by giving them access to affordable health insurance. This may also help decrease absenteeism and increase productivity, increase participation rates in your health plan, which may help your company maintain qualification for group insurance coverage, and improve overall employee satisfaction and health.

## Premium Payments:

There is no additional cost to you to have your employee participate in the Family Health Plus Premium Assistance Program. You may be asked to agree to accept payments from Family Health Plus for your employee's share of his or her monthly premium, and to provide updated information to the LDSS on an annual basis regarding any changes to your health plan's insurance offerings or adjustments to premiums.

## How it works:

Under the Family Health Plus Premium Assistance Program, individuals eligible for Family Health Plus with access to employer-sponsored health insurance will be asked to provide information about the costs and benefits of the health plan(s) available to them through their employer. You may be asked to complete a short form or questionnaire about the health plan(s) you offer. Your company's health insurance plan must meet

certain standards for covered benefits and costs. Most commercial plans in New York will meet these requirements. If the LDSS determines that your company's health plan meets certain standards for covered benefits and is cost effective, your employee will qualify for premium assistance, and reimbursement for deductibles, coinsurance and co-payments associated with the employer-sponsored health insurance. Employees eligible for the Family Health Plus Premium Assistance Program will also get a Medical Assistance Benefit card, which will allow them to access any Family Health Plus benefits which are not covered by your company's health insurance plan.

Employees must apply with a facilitated enroller or directly to the local social services district in the county where they live to determine if they qualify for the Family Health Plus Premium Assistance Program. If your employee qualifies for the Family Health Plus Assistance Program, the LDSS will work with you and your employee to ensure that he or she is enrolled in your company's health plan as soon as possible.

**Are you allowed to release information to the Family Health Plus Premium Assistance Program and the LDSS about your employee's health benefits?**

Yes. Employees who apply for the Family Health Plus Premium Assistance Program will have to sign a release authorizing their employers to release health benefits information to the New York State Medicaid /Family Health Plus Program, via the LDSS.

**To speed up the process:**

If you'd like to have your company's health plan pre-qualified for the Family Health Plus Premium Assistance Program for eligible employees in a given county or counties, just call the applicable county social services department(s).

**To learn more about the Family Health Plus Premium Assistance Program:**

Call the local Department of Social Services in your county:

EXHIBIT D



# COUNTY OF ROCKLAND
## DEPARTMENT OF SOCIAL SERVICES
The Dr. Robert L. Yeager Health Center
Building L - Sanatorium Road
P.O. Box 307
Pomona, New York 10970-0307
Telephone: (845) 364-2000

C. SCOTT VANDERHOEF
County Executive

SUSAN SHERWOOD
Commissioner

Managed Care Unit
Direct Line: (845) 364-3243
Fax Number: (845) 364-3984
Not for Service of Process

December 28, 2011

Tasha Ostler
624 Sierra Vista Lane
Valley Cottage, NY 10989

**Re: Health Insurance premiums**
**Case Number: M0060692**

Dear Tasha Ostler:

After a review of your file, it has been determined that it is cost effective for this department to pay for your health insurance premium at this time. Please fill out the enclosed W-9 and return in the self-addressed envelop.

Therefore, payment will be made upon receipt of your bill and proof of payment.

Please remember we can no longer accept fax copies.

If you have any questions please do not hesitate to call (845) 364-3243.

Very truly yours

# NOTICE OF DECISION FOR FAMILY HEALTH PLUS – PREMIUM ASSISTANCE PROGRAM

| NOTICE DATE: 12-28-11 | EFFECTIVE DATE: 12-01-11 | NAME AND ADDRESS OF AGENCY/CENTER OR DISTRICT OFFICE |
|---|---|---|

CASE NUMBER: M 0060692  
Unit or Worker Name: MANAGED CARE

NAME AND ADDRESS OF AGENCY/CENTER OR DISTRICT OFFICE:  
ROCKLAND COUNTY DSS  
P.O. BOX 307  
POMONA, NY 10970

CASE NAME (And C/O if Present) AND ADDRESS:  
JACKSON MAIONE  
C/O TASHA OSTLER  
674 SIERRA VISTA LANE  
VALLEY COTTAGE, NY 10989

GENERAL TELEPHONE NO. FOR QUESTIONS OR HELP

| OR | Agency Conference | (845) 364-3243 |
|---|---|---|
| | Fair Hearing Information and Assistance | (800) 342-3334 |
| | Record Access | (845) 364-3342 |
| | Legal Assistance Information | (845) 634-3627 |

| OFFICE NO. | UNIT NO. | WORKER NO. | UNIT OR WORKER NAME: BARRY CONROY | TELEPHONE NO. 845 364-3243 |
|---|---|---|---|---|

The Local Department of Social Services (LDSS) has made a decision concerning your eligibility for Family Health Plus Premium Assistance Program.

This Department will:

[X] **ACCEPT** the application dated 12-14-2011 for (name(s)) JACKSON MAIONE  
Effective: 12-01-2011, the premium assistance program will pay $ 634.46 [ ]weekly [ ]bi-weekly  
[X] monthly [ ]quarterly

[ ] **DENY** the application dated _____ for (name(s)) _____  
The reason for this action is as follows:

    [ ] It is not cost effective for Medicaid to pay the premium for your employer sponsored health insurance plan.

[ ] **CONTINUE** the premium payment for (name(s)) _____, effective _____. The premium assistance program will pay $_____ [ ]weekly [ ]bi-weekly [ ]monthly [ ]quarterly

[ ] **TAKE NO ACTION** on the application dated _____, since it was withdrawn.

[ ] **CHANGE** from Family Health Plus Managed Care to Family Health Plus Premium Assistance Program for (name(s)) _____. You will be disenrolled from _____ Health Insurance Plan effective: _____ and enrolled in your Employer's Health Insurance Plan _____, effective: _____. The Premium Assistance Program will pay $_____ [ ]weekly [ ]bi-weekly [ ]monthly [ ]quarterly

[ ] **DISCONTINUE** Premium Assistance Program for (name(s)) _____  
Effective _____. The **reason** for this action is as follows:

    [ ] You no longer have access to your employer's health insurance plan; you will be enrolled into the Family Health Plus plan you chose on your application.

    [ ] You no longer have access to your employer's health insurance plan. You must complete the enclosed Family Health Plus Plan enrollment form and return it within 10 days to the address listed above if you want to receive Family Health Plus benefits.

    [ ] It is not cost effective for Medicaid to continue paying the premium for your employer sponsored health insurance plan. You must notify us **within 10 days** to tell us if you will remain in the employer sponsored health insurance and pay the cost of the premium yourself. If you fail to respond your coverage will end. If you choose to discontinue your health insurance, you must provide us with written proof of your termination date, and you must choose a Family Health Plus plan **within 10 days** if you want to receive Family Health Plus benefits.

    [ ] It is not cost effective to continue to pay for your premium.

EXHIBIT E

Other than the $25 annual cap for co-payments on dental services, Family Health Plus has no other cap on co-payments. Family Health Plus plans will be responsible for the implementation of applicable co-payments and tracking the annual dental cap.

The FHPlus recipient should be reimbursed the difference between the co-pay paid and the FHPlus co-payment schedule amounts. If there is a co-pay for a service for which there is no corresponding FHPlus co-pay, we would reimburse the whole amount.

Vision Benefits
Currently, the Family Health Plus vision benefit is similar to the Medicaid vision benefit. The Family Health Plus vision benefit will cover the following once every 2 years: 1) one eye exam; 2) either one pair of prescription eyeglass lenses and a frame, or prescription contact lenses where medically necessary; and 3) one pair of medically necessary occupational eyeglasses. Lost eyeglasses are no longer a covered benefit.

**45. Q: What is the difference between coinsurance and co-payment?**

A: Having a health plan that includes a coinsurance, or percentage participation rate, means that the member and insurance carrier each pay a specified percentage of the healthcare cost.

For instance, if the health plan has an 80/20 coinsurance rate, the insurance plan pays for 80% of the eligible medical expense and the member is responsible for the remaining 20%. A co-payment, on the other hand, is a fixed dollar amount ($5.00 for example) that the member is required to pay regardless of the cost of the service received.

To compensate for the possibility that a catastrophic medical loss could cause a member severe financial distress, many major health insurance carriers include what is known as a "coinsurance cap", or stop-loss limit in their plans. The provision sets limits on the member's potential out-of-pocket costs per year. Such caps generally range from $2,000 to $3,000, depending on the plan, but limits can be as low as $1,000.

**46. Q: Who will the district pay the premium payments to?**
A: Premium payments can be made to the applicant, the employer or the carrier as arranged with the payee. Per 08 OHIP/ADM-1, Upstate district are instructed to make payments via the Benefit Issue Control System (BICS).



**47. Q: Who is responsible to pay the co-pays, coinsurance and deductibles?**
A: The recipient pays the co-payments, coinsurance and deductibles and brings the receipt into LDSS for reimbursement.



**48. Q: Can an individual with FHP-PAP refuse to pay a co-pay, for example at the pharmacy, and still receive their prescription?**
A: If the recipient is using the New York State Benefit Identification card (because drugs are not included in the ESI) to obtain prescriptions, the recipient may refuse to pay the co-pay per current Medicaid rules. If the individual is using the ESI commercial insurance card, she/he may not refuse to pay the co-pay. The district will reimburse the recipient for the co-pay paid minus the FHPlus co-pay amount.

**49.  Q:  Is there a hardship provision if the member says they cannot pay the co-pays and deductibles up front for services?**
A:     There is no hardship provision in the FHP-PAP legislation.

**50.  Q:  When the commercial policy has a co-payment that is greater than the FHPlus co-payment, how much should the district reimburse the member?**
A:     The member pays the ESI co-payment to the provider.  The district reimburses the member the ESI co-pay amount minus any applicable FHPlus co-pay amount.

**51.  Q:  If a member requests cash to pay a co-pay prior to seeing a provider should the district authorize payment prior to the appointment?**
A:     No, only paid receipts may be submitted to the district for reimbursement.

**52.  Q:  Will this program reimburse coinsurance, deductibles, and/or co-pays for benefits which are not provided by FHPlus even though they are provided by the ESI?**
A:     No.  We will not pay or reimburse for a service not otherwise covered by Family Health Plus.

**53.  Q:  If a member goes out of network for a service that is provided under the employer's plan (it is also a service covered under FHPlus), and the member pays cash for it, can the district deny reimbursement because the member went out of network?**

A:     The member may be reimbursed, but must present an Explanation of Benefits (EOB) from the plan showing the amount the plan paid towards the claim.  The reimbursement would equal the amount which would not be paid by the plan minus the FHPlus co-payment.

**54.  Q:  If a member goes for a non-FHPlus benefit, such as chiropractor, is the member entitled to reimbursement for a co-payment paid?**
A:     No. We will not pay or reimburse for a service not otherwise covered by Family Health Plus.

**55.  Q:  Is reimbursement required to a recipient who does not use their own ESI provider, or a Medicaid provider?  Or will it be a patient "out of pocket" expense? Is Payment Type code U4 used in this instance? At what rate is the claim reimbursed?**

A:     There may be times when a service is not covered under the employer's policy and the recipient used a non-Medicaid provider for a benefit that would otherwise be covered by FHPlus.  The recipient would have to provide the LDSS with an Explanation of Benefits (EOB) showing the claim was denied by the employer plan.  In these instances the recipient can be reimbursed for payment made, minus the FHPlus co-payment amount for the service.  U4 is the BICS pay type to be used.


**56.  Q:  Can the district tell the recipient they have a limited time to bring in receipts for reimbursement?**
A:     No. However, recipient education is key. Advise them to bring in receipts in a timely manner. Local districts are also required to process reimbursements in a timely manner.

EXHIBIT F

**NEW YORK**
state department of

Commissioner

Executive Deputy Commissioner

FES
MCGUUGQ2

RECEIVED

DEC 11 2013

ROCKLAND COUNTY
DEPT. OF SOCIAL SERVICES

December 9, 2013

Office of Administrative Hearings
NYS Office of Temporary & Disability Assistance
P.O. Box 1930
Albany, NY 12201-1930

RE: DOH Court Case Reimbursement
Appellant's Name: Jackson Maione c/o Tasha Ostler
Fair Hearing Number: 6223734H
Hearing Date: 12/16/2013

To Whom It May Concern:

This will acknowledge receipt of the notice that the above fair hearing is being scheduled for Tasha Ostler (parent) on behalf of Jackson Maione (appellant). This information is submitted in relation to the hearing and submitted in lieu of personal appearance.

Claims were submitted to our office in 2013 for reimbursement for services rendered to the appellant. A completed form OHIP-0031 – Claim Transmittal Form was not submitted with the receipts; therefore New York State Department of Health (DOH) staff completed a Form OHIP-0031 based on those receipts that we interpreted to be legitimate Medicaid claims. The claim, as outlined in the schedule below, was processed on August 23, 2013.

| Provider | Date of Service | Description of Service | Total Charged | Appellant Paid (after private insurance | Amount DOH Paid Appellant | Reason |
|---|---|---|---|---|---|---|
| Varies | Varies | Physician Service Copays | $1,209.00 | $152.43 | $0.00 | MA does not pay copays. |
| Mt. Kisco Medical Group | 3/1/11 – 10/28/11 | Physician Service Copays | Not specified | $240.00 | $0.00 | MA does not pay copays. |
| Drug World of West Nyack | 3/30/11 – 3/26/13 | Prescription drugs | Not specified | $367.24 | $41.54 | MA pays up to the MA rate for the prescription. Missing NDC codes. Claims after the Krieger period. |
| No. Westchester Hospital | 4/14/11 – 12/1/11 | Breast pump rental | $360.00 | $360.00 | 63.00 | Payment for 1 claim was processed based |