**Gasior Declaration**

**Exhibit F**



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
*********************************************
In the Matter of the Application of Scott Maione
And Tasha Ostler (and on behalf of their infant children)

                     Petitioners Pro Se,

for a Judgment Pursuant to Article 78
of the Civil Practice Law and Rules,

        -against-

HOWARD ZUCKER, on behalf of the
NEW YORK STATE DEPARTMENT OF HEALTH and
THE NEW YORK STATE DEPARTMENT OF HEALTH.

                     Respondent.
*********************************************

**NOTICE OF PETITION**

Doc ID:  Type: COU
Kind: ARTICLE 78
Recorded: 06/24/2019 at 04:51:00 PM
Fee Amt: $305.00 Page 1 of 0
Rockland County, NY
Paul Piperato County Clerk
**SU-2019-000830**

**PLEASE TAKE NOTICE** that upon the annexed Verified Petition of Scott Maione and Tasha Ostler and on behalf of their infant children, sworn to on JUNE 24, 2019, and upon all papers filed and the proceedings previously conducted in this matter, and the exhibits annexed hereto, an application pursuant to Article 78 of the Civil Practice Law and Rules ("CPLR") will be made to this Court at Room _____ of the Courthouse located at 1 South Main Street, New City in the County of Rockland, State of New York on the _19TH_ day of August 2019, at 9 a.m. in the forenoon, or as soon thereafter as Counsel may be heard, for an order and judgment pursuant to CPLR §§§ 7803(1), 7803(2), 7803(3) of the CPLR:

    (1) adjudging that Respondent's determination to deny Petitioner and family with Medicaid Coverage through Reimbursement of medical transportation costs, was arbitrary and capricious, in violation of lawful procedure, affected by error of law, and was not based on substantial evidence; and reversing the same as the State failed to perform a duty enjoined upon it by law and the State proceeded both in excess and without jurisdiction;

    (2) reversing the Respondent's Nine Decisions After Fair Hearings held on March 15,2018, the first of which was decided on February 22, 2019 and received by Petitioners on March 1, 2019 which denied Petitioners' application for reimbursement, found in favor of the Respondents, and failed to reimburse appropriately; and

    (3) granting any further relief as this court deems just.



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

----------------------------------------------x

SCOTT MAIONE AND TASHA OSTLER
(and on behalf of their infant children)

                    Petitioners,

       v.

HOWARD ZUCKER, on behalf of the
NEW YORK STATE DEPARTMENT OF HEALTH and
THE NEW YORK STATE DEPARTMENT OF HEALTH.

                    Respondents.

For a Judgment Pursuant to Article 78
of the Civil Practice Law and Rules
----------------------------------------------x

Index No.:

2019 - 000830

**VERIFIED PETITION**

**To The Supreme Court of the State of New York:**

### PRELIMINARY STATEMENT

This Petition ("Petition") is brought pursuant to Article 78 of the Civil Practice

Law and Rules of New York ("CPLR"), by Scott Maione and Tasha Ostler, and their

infant children, J, M, and S ("Petitioners"), *inter alia*, seeking the overturning of, and

challenging a number of administrative agency determinations rendered by Fair Hearing

("Fair Hearing") decisions ("Decisions") issued by the New York State Department of

Health ("DOH"), by and through Administrative Law Judge Christopher Gallagher ("ALJ

Gallagher"), which Decisions were arbitrary and capricious, against the weight of

established law, and essentially not supported by substantial evidence or a rational basis

in that ALJ Gallagher actually conceded that the Commissioner of the DOH was not in a

1

position to interpret the law which applied to the reimbursement of medical transportation related expenses to the duly entitled, and qualified Medicaid recipients, thereby abrogating his promulgated duties as a Hearing Officer and those of the DOH in administering Medicaid assistance to New York State residents. CPLR §§ 7803(3) and 7803(4).

Petitioners also seek reimbursement of the expenses which are incidental to the relief sought hereunder as these types of expenses will be ongoing to the Petitioners' children needs and will continued to be incurred *in future* in addition to depriving other recipients of these benefits. It is necessary, therefor, for Petitioners to establish the erroneous position taken by DOH in connection with this matter so that other ALJ's do not come to the same wrong conclusions. The damages are incidental to the DOH's requirement to comply with the law. CPLR 7806.

Petitioners were denied such reimbursement at Fair Hearings (#'s 6500974Y; 712430R; 7242566Z; 7412432M; 7412440J; 7292592R; 7242589J; 7242579K; and 7282812Q), held on March 15, 2018 at the Rockland County Department of Social Services. Please see as **Exhibit AA appended hereto.**

**(*Emphasis provided throughout) **(Exhibits A through S packets were submitted at fair hearing and are being submitted before this court as well.)** Also, see exhibit F13-16-again, exhibits submitted at hearings- for examples of MAS inadequate reimbursement (no detailed explanation of what is being paid, merely check stubs which evolve into date of service with invoice number, which is totally inadequate: No indication of rate of mileage or whether any mileage was reimbursed at all, no meal reimbursement amount, or breakdown of any ancillary expenses such as parking, tolls,

etc.  All that is indicated is simply the amount paid.  How can Petitioners contest what they do not know?  And, just as importantly, recipients were never given any notices of their right to a fair hearing prior to the summer of 2014 as well.  Essentially, it is NOT a denial as until the summer of 2014, MAS fails to indicate any denials whatsoever, nor cite any regulations.  F13-16 reveals this went on until the Policy created in July of 2014 was dispersed, despite Petitioners requesting proper denials for YEARS so that they could see what in fact was being reimbursed or denied and contest the denials.  This is further evidence that not only does MAS not adhere to federal and state laws to properly reimburse the recipients according to the assurance of transportation of 42 CFR 431.53, 440.170 and outlined in 18 NYC 505.10, but also to fail to inform them of their reimbursement amounts, but they fail to assist the recipient in acquiring their proper reimbursement amounts failing to fulfill their duty according to 42 CFR 441.56(a)(2)(iv) and 441.62 (b).

Petitioners' brief, exhibit list, and submission list of invoices/receipts ("packets") submitted to Medical Answering Services ("MAS'), the third-party vendor or broker for transportation expenses acting on behalf of DOH, illuminates the detailed discrepancy in reimbursement to Petitioners.

Decisions for these Fair Hearings were rendered beginning Friday, March 22, **2019, a full year after they were heard. Please see Exhibit BB appended hereto.** Plaintiffs' statutory right to a Fair Hearing is secured by **42 U.S.C. 1396 a(a)** 3, creating a right to a disposition, "ordinarily within 90 days" of request, i.e., from start to finish, not 2-3 years after the fact (Mariani deliberated for one year and then it was "corrected" two years later). Lisnitzer v. Zucker, 306 F.Supp. 3d 522 (E.D.N.Y. 2018); Shaknes v. Berlin,

689 F. 3d 244, 250-251 (2d Cir. 2012); Cf., Konstantinov v. Daines, 101 A.D. 3d 520 (1st

Dept. 2012). The decisions were received by mail (the decisions dated 2/22) by Petitioner

beginning on Friday, March 1, 2019. The Fair Hearings were heard by ALJ Gallagher

but decided by the designee of the Commissioner ("Commissioner") of DOH, Darla Oto

("Oto").

Oto is the same ALJ whom Petitioners requested not preside over any further

Petitioner actions prior to these hearings, as there is ample evidence of bias and prejudice.

Initially, two full years after the Decision was rendered, Oto attempted to change Fair

Hearing Decision #6223734H (11/13/14), which awarded reimbursement to Petitioners,

and only in retaliation after the Petitioners had filed a complaint that the Decision and its

subsumed Order as not carried out in favor of Petitioners (partial reimbursement was still

owed).

Only after meeting with resistance by ALJ Sarah Mariani ("Mariani") who had

issued that Decision, and ALJ Mariani's outright refusal to change her Decision, correctly

citing the "unlawfulness" of such an attempt by Oto, did the Decision remain the same.

In fact, ALJ Mariani was supposed to hear the ensuing MAS hearings, but was

removed by the OTDA and Oto **(Please see Exhibit CC appended hereto)**, without

reason, immediately after her Decision awarding Petitioners victory in the #6223734H

matter was made to stand. No justification was provided for Mariani's removal. Years

have literally passed, where the MAS issues could have been resolved without so much

confusion if only the OTDA had not removed Mariani. In 2018, ALJ Gallagher was

installed by Oto to preside over every future hearing.

4

So, Oto, who attempted to brow beat an ALJ hired by DOH (Mariani) because Mariani not only rendered a Decision with which Oto apparently took exception but who also would not re-call that Decision and indicted that the request to change it was "unlawful," was removed permanently from hearing any of Petitioners' cases, all of which were relegated to Oto's hand-picked surrogate, ALJ Gallagher.

In addition, in 2018, after Gallagher instructed Petitioners to send in further exhibits-unintentionally omitted from the record-which he would consider re-opening if the Fair Hearing hadn't yet been decided because of the absence of those exhibits, Oto intercepted the very documents **and refused to reopen the Record**.

Gallagher was never even made aware that these exhibits had been sent to him. And although Petitioners contacted the Office of Temporary and Disability Assistance ("OTDA" under the DOH) Commissioner, Samuel Roberts ("Roberts"), making him aware of these exhibits, Gallagher still was never notified of their existence. So although sent specifically to ALJ Gallagher, as he requested, he never received them and admitted as much at the October, 2018 Fair Hearings.

Simply put, ALJs Gallagher should never have been presiding over any Petitioners hearings and Oto certainly should not be associated with any further Petitioner matters. **18 NYCRR 358-3.4(k), 18 NYCRR 358-5.6(c)(1)(iii) 19 NYCRR 358-5.6(c) (2).**

### BACKGROUND

As early as 2012, Petitioners began to be reimbursed for medical transportation expenses associated with doctors' visits for the infant handicapped twins; these included parking, tolls, meals, and mileage costs assumed by the parent Petitioners, either as

patients themselves or as transporters of their children as patients. The reimbursement amounts were correct.

These costs legally are supposed to be reimbursed by the State of New York (included in the New York State Medicaid Plan via CFR 42 §440.170) and had been for a time with the help of some prodding of MAS by former DOH Transportation Unit head, Tim Perry-Coon, up through 2012. It may be no coincidence that as Mr. Perry-Coon departed his post in the fall of 2014-see email exhibit FF14-38- directly following the emergence of the "Policy", that significant reduction in reimbursement resulted. In that email, Mr. Perry-Coon also apologizes for MAS's "behavior" and assures Petitioners to be "patient" and that "you will be reimbursed." After Perry-Coon departed, that never happened.

Even stranger with regard to Mr. Perry-Coon is that he goes from proffering that the Policy was in effect all along, but not written down (what?) to admitting that the Policy never existed. This sudden change in response all occurs between August and September of 2014, just as Mr. Perry-Coon alerts Petitioners that he will be leaving his post. It is as if he is coming clean and admitting the truth about the Policy (see email exhibits FF 14-12 and 14-31.

The twins, J and M, being disabled, were placed on SSI benefits after birth and, as a direct consequence, Medicaid, retroactively to birth, which guaranteed reimbursement of medical transportation retroactively to birth as well. (It is also worth noting that nobody ever informed the Petitioners of their right to transportation reimbursement at the County or State; no telephone calls, letters, or emails ever came. The Petitioners heard it through the grapevine from a neighbor they met fortuitously at a

grocery store one evening.  More than a half dozen telephone calls followed to find out

how to secure such reimbursement.  The DOH tries to keep it a secret they best they can.)

Following the initial lump sum retro reimbursement in 2012, it became difficult

for Petitioners to ascertain the specifics of what was becoming inaccurate

reimbursements, due in large page part to the sloppy reimbursement and incomplete

process conducted by MAS. [1]

For instance, MAS would simply remit a check made out in what had to be

characterized as a random amount, without any substantiation, breakdown, or

accompanying invoice to alert the recipients as to what specially the reimbursement was

earmarked, and for what date of travel. See, for example, two submission packets (#10

and #11) with accompanying receipts and remittance, appended hereto as **Exhibit DD**.

These are a sample of the 25 packets (not submitted so as to not overburden the court at

this time; available to be furnished upon request).  The summary of the packets can be

found at the end of the MAS briefs submitted at the hearings.  See **exhibit AA**).

Moreover, MAS failed to provide accompanying "hearing request notices" which

would allow Petitioners to exercise their rights to due process and challenge the decision

if he/she disagreed with the reimbursement. No explanation, simply a check!

---

[1] It should be noted that MAS has been the subject of Medicaid probes and sanctions as far back as 2010, with the DOH carefully monitoring MAS's expenses, which the DOH pays for (see https://cnycentral.com/news/local/syracuse-company-stung-by-medicaid-probe).  It should be no surprise that DOH's fiscal interests and relationship with MAS could result in increased reimbursement denial for its recipients, which is exactly what happened.  Beginning in 2014, the DOH awarded MAS with significant contract expansion (conveniently the same time that the mysterious Policy surfaced), and MAS's county coverage increased exponentially.  They went from a post office box to contracting nearly the entire state in about ten years.  The DOH is far more interested in watching MAS's expenses then ensuring that its clients are reimbursed correctly.

However, beginning in 2013, Petitioners did notice, however, that the reimbursement check stopped matching their receipt totals.  (See **Mayer v Wing,** 922 F. Supp. 902 (S.D.N.Y. 1996), which finds reduction or denial of services "*arbitrary and capricious where there was no medical improvement or change in circumstances.*)  After many unanswered inquiries throughout 2013 and into 2014 to both MAS and the DOH, Petitioners were finally instructed that the reimbursement was made according to "Policy." Please see **Exhibit D (from hearing exhibits) appended hereto**.

When Plaintiffs requested a copy of said "Policy," they were consistently rebuffed.  Finally, in August 2014, Plaintiffs received an e-mail from MAS CEO, Wayne Freeman ("Freeman"), stating that, "here is the Policy that you said did not exist." Please see **e-mail Exhibit FF 14-27**.  It should be mentioned that the Petitioners were informed by Mr. Perry-Coons prior to this policy being written (in July, 2014) that in fact, " **…there was no policy." See email Exhibit FF 14-12 appended hereto;** secondly, the Petitioners were able to corroborate this fact as they noticed on the Policy that it was just written, in July, 2014, merely one month before Freeman's disingenuous e-mail to the Petitioners.

What was uncovered in the "Policy" was alarming to Petitioners and explained some of the unlawful reimbursement they had been receiving for the previous two years or so.  It was filled with new, arbitrary and rigid limits on reimbursement, all of them in violation of both State and federal Medicaid Law because the Policy encroached upon the singular defining principle that is Medicaid, to wit: **while States may mandate certain limitations with regard to coverage, the specific but fluid needs of the individual**

**recipient must take precedent over any State guidelines with regard to limitation, i.e., "Medical Necessity" prevails.**

"States are required to cover any service that is medically necessary....**whether or not the services is covered under the State Plan**" and "...even if the agency does not otherwise provide for these services to other recipients or provides for them in a lesser amount, duration, or scope*" 42 U.S.C. § 1396d(r) [1905(r )*; see also *42 CFR § 441.57; 42 CFR § 431.53, 441.62 (a), 441.56(a)(2)(iv), 441.62 (b), and 440.170 (a) (i).*

The Petitioners, being surprised that such a Policy possibly could have been adopted by DOH, inquired as to its approval. But, what Petitioners learned after extensive FOIL investigations is that the "Policy" never went through the necessary channels to become part of the New York Medicaid Plan and, thus, implementation of this Policy was unlawful.

In order to become implemented within the State Medicaid Plan, any new Policy, or any change for that matter, must be approved by the federal Center for Medicaid and Medicare Services ("CMS"). Only after such approval can the State Plan then be amended to include any new changes or updates. **Again, please see Exhibit F from hearing regarding CMS, and amendments**.

The simple and incontrovertible fact is that this Policy never was submitted to CMS for approval; therefore, adoption under the State Medicaid Plan is unlawful. What also became obvious when perusing the new "Policy" was that it was most likely not submitted to CMS because the changes to the process were on their face unlawful and violated both State and federal Medicaid law and would never have been ratified by CMS in the first place.

For example, under Early Periodic Screening and Diagnostic Treatment ("EPSDT" or "Medicaid for Children", as to which it is referred), children cannot be held responsible for any cost-sharing expenses. Secondly, anyone within a household under 100% of the Federal Poverty Line ("FPL") (here, the Petitioners) cannot be held responsible; children or adults.   "Medicaid is prohibited from imposing co-payments, deductibles, co-insurance, and other fees on services for children" See N.Y. S.O.S. Law 367-a regarding payment exemptions; also 42 U.S.C. 1396e-1, and 1396o and 42 CFR, Sections 447.52 through 447.57.  Clearly, any expense necessary on a medical trip, whether it be a necessary meal, or even a tip, or the appropriate mileage reimbursement simply cannot be expected to come from the Petitioners.  It is simply a fiduciary responsibility, and the consequence of New York choosing to participate in Medicaid and accept federal dollars as a perquisite of that choice, that dictates reimbursement. Nonetheless, federal law must be followed, and it must be enforced.

So, the Policy was unlawful for two reasons: first, it was never approved by CMS as an amendment to the State Medicaid Plan, and DOH cannot show that it was, and when; and, secondly, the changes were in violation of Medicaid Law as they ignored federal mandate with regard to consideration of "medical necessity." To put it another way, without consideration of a recipient's unique medical and financial needs, which is the essence of Medicaid.

The New York State Transportation Plan ("NYSTP"), as part of the Medicaid Plan in general, has eight factors that determine necessity of travel expense coverage, of which "frequency of visit and medical condition" or medical necessity; and "continuity of medical care and undue financial hardship without reimbursement" are essential. See 18

10

NYCRR § 505.10 and **Administrative Directive 92 ADM-21, 6/2/92**. These two factors, among the others cited by NYSTP represent the ideal that distinguishes Medicaid from an insurance plan: **it exists solely to protect the most vulnerable and needy and rises up to the standards of need based on the recipient's unique medical needs**.

Thus, when a recipient calls MAS for pre-authorization and is approved, MAS is well aware of destination, and what it is for, affirming that the eight factors, or parts thereof, have satisfied the State's authorizing the trip and any necessary expenses associated with it!  MAS/DOH cannot turn around after the fact (particularly as they reimbursed in full for the same trips in 2011 and 2012) and suddenly limit reimbursement simply because they do not like how many medical appointments a certain recipient has to keep.

The new "Policy" suddenly in abrogation of the law now held the recipients responsible for many of their own expenses, in direct contradiction with federal EPSDT mandate. The new MAS Policy did not comply with the mandates which requires that recipients such as Petitioners' children receive the coverage they need without having to bear any of the expenses. Anything else is totally unlawful.

### THE FAIR HEARING DILEMMA

On March 15, 2018, nine (9) Fair Hearings were held (and one on October 5, 2018) to determine whether the Plaintiffs should be reimbursed for costs now refused to be reimbursed; the direct antithesis of what had transpired yet prior to 2013. **See Exhibit H, appended hereto, reflecting payment in full for submissions prior to 2013.**

The Petitioners, appearing *Pro Se* at these hearings proffered two arguments: one, that the basic inadequacy of the MAS notice was reason enough to reimburse the Plaintiffs.

The notices failed to explain the legal justification to withhold reimbursement, or to allow the Petitioners the recourse to challenge the decision.; no hearing options were included no did they cite regulations in their defense.  See *Greenstein by Horowitz v. Bane*, 833 F. Supp. 1054, 1070, 1076-1077 (S.D.N.Y. 1993) (***"If redress is not adequate, plaintiffs have been deprived of property without due process."***)  In addition, Defendants' Policy has not been implemented consistently. "`Patently inconsistent application of agency standards **to similar situations lacks rationality and is arbitrary**.'" *Vargas v. I.N.S.,* 938 F.2d 358, 362 (2d Cir.1991) (quoting *Contractors Transport Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir.1976)).

*Courts owe less deference to an agency interpretation of a regulation that is inconsistent with earlier and later pronouncements it has made, because "the [agency's] expertise ... to which we normally defer becomes dubious when the expert cannot make up its own mind. New York City Health and Hosp. Corp. v. Perales, 954 F.2d at 861-62; see also Catholic Medical Ctr., Inc. v. N.L.R.B., 589 F.2d 1166, 1174 (2d Cir.1978) (agency's unexplained decision in deviating from precedent "is archetypical of arbitrary and capricious behavior").*

From 2011 to 2013, Petitioners only received checks with a given amount, with no explanation or breakdown.  After much complaining by Petitioners, MAS began to send rejection notices with more explanation, but that which cited broad, specious regulations and then, in 2014, began to cite their own new Policy, which is NOT law or regulation, which is a fundamental and required aspect of due process.

*"Direct reimbursement is not limited to the Medicaid rate or fee in instances where agency error or delay caused the recipient to...pay for medical service that should have been paid for under the Medicaid program"*.  **State Admin. Directive 10 OHIP/ADM-9,18 NYCRR §360- 7.5(a)(3).**

*A very lengthy delay, which is not attributable to the private party's own actions, can be a due process violation if it...prejudices the.... ability to present his case."* (see **Sharma v Sobol**, 188 AD. 2d 833 (1992).

Thus, Petitioners were denied reimbursement, did not know what to do about it, and were not able to properly assess the deficiencies because they were only sent a check, which did not even correspond with a specific trip and what was being reimbursed and what was being denied. The deceptive vagueness of MAS kept the Petitioners in the dark, resulting in the inability to successfully argue the incorrect reimbursement, which went on for years and made it that much more difficult to challenge (so many trips, invoices, paperwork, receipts, etc.) when Petitioners finally did have their day in court at the hearings.

The second, that while the rejection notices began to show improvement **of clarity** in 2014 (only after Petitioners' repeated requests), the Petitioners were not being reimbursed adequately per federal Medicaid and State regulations, but rather based on arbitrary decision based on a new and unlawful Policy.

## APPOINTMENT OF ALJ GALLAGHER

One of the primary issues Petitioners had with the Fair Hearings was that the ALJ Gallagher, assigned by the Office of Administrative Hearings ("OAH") to preside over every hearing, outright **refused** to consolidate them, despite the fact that **every** hearing had one or more of the new Policy issues in controversy; either no reimbursement for invoice submission past 90 days; no meal reimbursement under specific appointment time or distance from home and if so, only partial reimbursement according to a self-created formula; no meal/parking tip reimbursement amount; and incorrect mileage reimbursement.

Consolidation of hearings would have provided relief for the Petitioners as they could have saved money (copies, ink, care for their children while at hearings, etc.) and

valuable time (including the repetition of preparation and organizing, sitting for multiple hearings).  The decision not to consolidate was arbitrary and capricious and while well within the purview of ALJ Gallagher's authority (the OTDA informed the Petitioners that Gallagher had the authority to consolidate), he elected otherwise and instead to hold ten (10) separate MAS hearings.

Secondly, Gallagher/Oto's astounding dismissal of the evidence presented at the Fair Hearings displayed an undermining of the law and a refusal to consider the facts as presented.  Unfortunately, due to Gallagher's refusal to consolidate, Petitioners are going to have to list each specific hearing and briefly mention where each decision is in violation of the law.

## RELIEF SOUGHT

1. Reversal of the Decisions in question which were arbitrary and capricious, without regard to Medicaid Law, and in abrogation of his duties.

2. Reimbursement for monetary damages incidental to that reversal, including medical travel reimbursement arising from parking costs, tolls, meals, tips, and mileage costs.

## JURISDICTION AND VENUE

3. The Supreme Court of New York State has jurisdiction under Section 7801, *et seq.* of the CPLR to review the decisions made by Respondents.

4. Venue is proper in Rockland County.

## STATEMENT OF FACTS

5.      In the fall of 2014 Petitioners began to notice that their reimbursement checks for medical travel was not accurate.

6.      They noticed this due to their complaints that their reimbursement checks were not accompanied by any breakdowns or explanations of payment-just a check.

7.      As Petitioners raised their complaints to the NYS Department of Health Transportation Unit Mr. Perry-Coon, reimbursements began to become a little clearer.  At least dates of travel were now accompanying the payments (if not the required reasons for rejections and cited regulations to support their denials), enough at least for Petitioners to figure out what was being denied.

8.      The first error the Petitioners noticed was that the law upon which that the Policy allegedly was premised (18 NYCRR § 540.6) to entirely deny late invoice submissions actually was based on a regulation designated for **"PROVIDERS"**, **not Medicaid recipients such as Petitioners.**

9.      Petitioner noticed this discrepancy as MAS's new "Policy" quoted 90 days to "receive" invoices, but their single reimbursement form quoted 90 days to "send" the invoice.  While the entire Policy is unlawful, it is cited here as an example of their inconsistent policy even when they create and administer it.

10.     When Petitioners looked closer into the regulation, they noticed that the law cited by MAS on its own Policy referred only to **PROVIDERS** as having 90 days, not **RECIPIENTS**.  Providers would include transportation companies and other for profit entities.  The Policy has nothing to do with Medicaid patients or recipients.  In fact, **see the Family Health Plus** Handbook (**exhibit GG**) which expressly states NO limit on time to submit for reimbursement.  (The Petitioners are members of the "third party

reimbursement program," which falls under the <u>Family Health Plus Premium Assistance</u> <u>Program</u>, where a Medicaid recipient has private insurance, and is reimbursed by Medicaid each month.  The third party program benefits the State, when the private insurance premium is cheaper than the managed care State options (this is not usually the case, but in cases with disabled children, managed care Medicaid insurance premiums, are more costly than private insurance because they upcharge for disabled children and private insurers cannot by law).

So, the recipient (Petitioners) get to keep their private insurance that they prefer and the State saves significant money on the monthly premiums.  But that does not mean the State can abuse this circumstance by failing to reimburse based on a statue of limitations (90 days to submit for reimbursement) that is specious and has nothing at all to do with Medicaid recipients.

11.     Petitioners were able to now assess that the same expenses were being denied each trip; If MAS received, and acknowledged receipt of the invoices within 90 days (which they would only do if the Petitioners sent their invoices certified mail; otherwise the invoices were commonly "misplaced" by MAS and never reimbursed), they still would reject a majority of the meal expense, the mileage reimbursement amount was incorrect, and all tips including meals and parking were denied.

12.     Until the Policy in question, MAS was reimbursing at the appropriate federal per diem rate for meals of $78 (per individual the attendant had their own $78 to spend-**see exhibit F1-F3 from hearing exhibits**).  With the implementation of their new "Policy", meal reimbursement became arbitrary and capricious, based on a baseless and haphazard formula, such as 25% for breakfast. Neither MAS nor the DOH could furnish

Petitioners with any federal or State regulation to justify these changes, and such inconsistent policy.

13.     Petitioners furnished MAS and the State with Doctors' prescriptions and letters of necessity, indicating M and J Maione, infant twins with federally recognized disabilities; *inter alia*, they possessed digestive issues which necessitated eating as necessary or, on demand, and not at specific time intervals per Policy. [2]

14.     MAS's "Policy" would only reimburse for a portion of the meal (and no longer the total amount) but only **if** the entire medical visit was either four hours in duration **OR** if the entire trip was over 90 miles each way.

15.     To illustrate how arbitrary and random this "Policy" is (and why it would never be supported by CMS), consider that a typical trip of 90 miles each way and the appointment (2-3 hours including checking in, paperwork, testing, etc.) could easily run in excess of seven hours!  But, MAS will not cover a meal if the medical trip is seven hours long according to their Policy.

16.     If the medical appointment is merely 40 miles from Petitioner's house, for example in mid- Manhattan, but which drive easily could take 2 ½ hours in each direction with traffic, parking and walking- not even including the visit-that meal would be rejected as well because of the truncated distance.

17.     This was a Policy created out of whole cloth either without much thought or with the abject intention to create excuses for denial.

18.     The Petitioners' pediatrician, a multiple Castle Connelly Award winning doctor, and consistent with the American Board of Pediatric Standards, recommended an

---

[2] One does not qualify for SSI benefits unless officially diagnosed as disabled.

eating schedule of a meal 5-6 times per day. But according to the State "Policy", depending on the medical visit, they are expected to go as long as ten hours without meal, which is in direct contravention of the law-and sound parenting. See 42 U.S.C. § 1396d(a) and 1396d(5)(5); 42 CFR § 431.53; 431.56(a)(2)(iv) and 441.62 (b) and 440.170 (a)(1).

19.     Petitioners' pediatric psychiatrist also detailed a letter of medical necessity regarding J and M's eating difficulties as it relates to their specific disabilities (GERD, bowel irritability, severe anxiety disorder, etc.) and prescribed eating on demand.  These instructions were furnished to MAS and DOH but disregarded, requiring the Petitioners held subject to follow the new, conjured Policy.

20.     The third aspect of the Policy which Petitioners brought to the attention of MAS/DOH when invoices improved enough to include itemization, was the State mileage reimbursement component of the Transportation Policy.

21.     Being reimbursed at the "IRS tax deductible rate", Petitioners informed MAS and DOH in 2015 that the rate was inapposite.  It should have been applied at the IRS "standard rate" for the following reason: The State Medicaid Plan reads in pertinent part that, "Payment of reimbursement for use of a personal vehicle of a volunteer driver or family member of a MA recipient will be made at the Internal Revenue Service's established rate for Standard Mileage" which is over 50 cents (close to the PVM or Personal Vehicle Mileage rate) per mile, with slight variation depending on the year in question.

22.     MAS has been reimbursing at the incorrect rate of about 24 cents per mile, which again, is the IRS tax deductible rate, and **has nothing to do with a pay rate**.

The escort or attendant of the infant (the parent in this case) is simply filling the role of any vendor that would receive income for the transport (and for much less).  Any third part transport AND an attendant would cost the DOH much more money than simply reimbursing the appropriate rate to the parent!

23.     What the DOH ignores here is that EPSDT/Medicaid is totally responsible for the medical care and concern of the child.  <u>A parent could be absent, ill, drug or alcohol dependent, disabled, working, or any other reason one may imagine that they could not accompany their child on a medical appointment</u>.  <u>Therefore, the State is responsible for the child</u>.  If a parent is willing to transport their child, then they must be reimbursed as an attendant, no different than an independent contractor" which explains the W-9s and the reference to parents as "independent contractors" in their very own <u>Non-Emergency Medical Transportation Booklet for Providers on page 9</u> ("NEMT") (also see **exhibit F** from hearings which exemplifies why Petitioners must be paid at the "standard" or POV rate established by the IRS.

24.     In fact, the local Department of Health understands this fact full well, as they reimburse parents at the appropriate rate for driving their children to and/or from special education pre-school provided by the State (again **see hearing exhibit F**). Moreover, 18 NYCRR §352.7 (f) states, "transportation……must be computed on a mileage basis at the same rate paid to employees of the social services district…".  While these regulations pertain to public assistance, the concept and purpose is the same: replacing and fulfilling the duties of the Medicaid bureau which is ultimately responsible for getting the child to and from medical appointments.

25.     Further, F37 and F54 from hearing exhibit F, are "official" excerpts of NYS SPA's or amendments to the State Medicaid Plan, and BOTH documents list mileage reimbursement "for use of a personal vehicle of a volunteer driver or family member of a recipient at the IRS's established rate for Standard Mileage." Absolutely no distinction is made between an in home member and an out of home member, period.

26.     Finally, MAS sends W-9s, taxable income, to the Petitioners because they **MUST** declare it as such. The bottom line is that it is income and despite what MAS or the DOH proffer, the IRS does **NOT** distinguish between in home and out of home driving rates, simply medical versus business, one being driving yourself, the other, driving somebody, else, anybody else, whether they are family, whether they live in your home or not. See <u>Stump v Miller (S.D. W. Va. Dec. 29, 1991)</u>: reimbursement provided to clients for travel costs at the same rare for **state** employees.

27.     The fourth and final consistent denial was for tips. Again, up until the Policy emerged, tips were reimbursed along with meals and parking.

28.     The Policy now included a denial to reimburse for tips. Proof of this is that standard New York State minimum wage (a fast food clerk at McDonalds for instance) is $2 higher per hour than that of a food server or waiter because it is expected that the patron will subsidize the waiter's salary. Therefore, tips are part of the meal expense just as are the tax and actual cost of the food and beverages. The same goes for parking attendants who make their living on tips. Why is the State trying to pass bona fide Medicaid expenses back to the recipient?

29.     The final aspect of reimbursement denial contained in the Policy appears to be denial for denial's sake, with no identifiable rationale. For instance, MAS denied

Petitioners on more than one occasion for submitting a hand written receipt from a pizza parlor.  For some reason, if the service provider (here, the Pizza parlor) does not use computerized cash registers, the Petitioner pays a penalty?

30.     The triteness of the MAS Policy manifested when it would deny if a toll receipt could not be produced, while the Petitioners proved they visited a doctor on that very day which necessitated going over the Tappan Zee Bridge (there literally is no other way to enter Westchester from Rockland aside from canoe).  This stands as a prime example of the MAS/ DOH transportation initiative with regard to the Policy: limit reimbursement as much as possible and deny the Medicaid recipient.

## PROCEDURAL HISTORY-THE FAIR HEARINGS

31.     Despite numerous requests by the Petitioners to OTDA-OAH to consolidate the MAS Fair Hearings, they refused (See email exhibit A5).  OAH's response was that only the ALJ had the power or discretion to consolidate fair hearings.

32.     On March 15, 2018, the Petitioners sat for eight (and one more on October 5, 2018) Fair Hearings ALL of which covered the same exact issues (the unlawfulness of the Transportation Policy as applied). Nonetheless, ALJ Gallaher refused to consolidate them and refused to justify his decision, though OTDA informed Petitioners that the ALJ had the right to do so.

## HEARING #6500974Y

33.     On page 11, ¶1, Gallagher/Oto write that "*the documents also do not support the contention that approximately $8,000 in additional expenses were submitted to the Agency for reimbursement and were not adjusted or accounted for.  The Record*

*does not contain unadjusted receipts for the time period totaling approximately $8,000."*
They also proffer that the *"testimony .....lacked specificity and was insufficient to establish they are owed any additional reimbursement."*

34.     First, this is wrong.  The ALJ's never reviewed the spreadsheets submitted by the Petitioners.  Had they done so, they would have offered opinions with some reference to the accounting, with Petitioners having submitted a precise, thorough spreadsheet, including EVERY trip taken with EVERY expense paid for-it couldn't have been more specific **(see exhibit AA, which included briefs submitted at hearings, including adjourned ones from the past and the spreadsheets with exact totals owed by MAS)**.  MAS's spreadsheet fails to include many trip dates and expense and was proved as to the fact that the Appellants have INVOICE NUMBERS given by MAS before any trip is ever even taken.    As a result, there can be no debate as to whether or not specific expenses were parted with by the Petitioners.  MAS never debated any invoice or pre-authorization number was given out or that a certain trip was not taken; only that they are not reimbursing certain expenses due to their Policy.

35.     Appellants are certain neither ALJ, nor the State, nor any accounting entity within the State reviewed and compared Appellants spreadsheet to the MAS one. If they had, it would have been easy to notice that the MAS spreadsheet failed to include many trips submitted by Petitioners.

36.     It is precisely MAS's prehistoric system of accounting (no digital uploading whatsoever) with agency representatives logging invoices by hand (and they often lose invoices; Appellants had TWO large packets of invoices lost by MAS) and

requiring originals by mail (although in 2017 they changed that policy finally) that leads

to insufficient reimbursement to the Petitioners.

37.     All Gallagher/Oto can do is refer to Petitioners hearing submissions as

"voluminous"; there is no specificity with regard to exhibits reviewed, the number or

name or page of any of the spreadsheets and receipts submitted by the Petitioners.  If the

ALJs reviewed and compared such spreadsheets there would be some kind of breakdown

x within the discussion portion of the decision pointing out where and why Petitioners

failed to make their case.  The simple fact is the ALJ's did not want to review and

compare the lengthy spreadsheets or administer the work to be properly done by the DOH

accounting department, but that is their duty and responsibility.  And furthermore, NO

duplicate submissions were EVER submitted to MAS by Appellants.  MAS claimed this

once before in 2015, and when challenged to prove their case, they were unable to do so.

It is unequivocal that MAS owes Appellants in excess of $8,000 from all trips for meal,

tip, toll and parking reimbursement and that does not include the incorrect mileage

reimbursement that has been made since 2011.

38.     Gallagher/Otto throw around the word "regulations" on page 11 of third

decision.  Which "regulations"?  There are no regulations that specifically limit expense

reimbursement.  As with all Medicaid patients, it is a case by case basis, defined by

medical necessity.  Children, under EPSDT are not responsible for ANY cost-sharing

expense nor are any members of a household which earns under %100 of the FPL, both

Appellant instances of the DOH and MAS are well aware.  If ..... medical necessity

dictates eating on demand, and MAS pre-authorizes the trip, aware of the Appellants

<u>medical conditions, then they cannot decide on the back end not to reimburse based on a</u> <u>general policy written for all</u>.

39.     Finally, On page 11 of the decision, Gallagher/Oto proffer that none of the standards for reimbursement are arbitrary or "whimsically applied", yet they admit themselves on the very same page that prior to the Policy going into effect, the Appellants (as indicated by submitted e-mail exhibits) were in fact reimbursed up to allowable federal and State guidelines (the $78 per diem meal rate for patient NOT including the attendant who also receives the same per diem rate) for meal reimbursement, regardless of distance travelled or time spent.  In short, from 2011 up until the creation of the Policy, the Petitioners were reimbursed for their submitted expense because they received prior authorization, which is how the system operates. Once Tim Perry Coon left office as head of transportation for the State, which coincided with MAS's spread throughout the State as DOH's main vendor, they began to abuse both federal and state Medicaid/EPSDT law.

### Hearing # 7124303R (3/15/18)

40.     Hearing # **7124303R i**ncluded transportation dates, 2/22/16, 4/11/16, 5/216, and 5/3/16.  Meal denial of $71.60 was upheld by Gallagher/Oto by nakedly referring to the "Policy" though they refused to determine the lawfulness of the Policy. Moreover, Petitioners claim the appointments were indeed over four hours and MAS provided NO evidence to the contrary yet denied anyway.  In fact, see email exhibit 14-50, submitted before Gallagher, to MAS manager Terry Pulaski ("Pulaski") from Petitioners on 10/29/14, where Petitioners counter all of the denials with regard to time

limitations (this, despite children's prescribed eating regimen), and establish that MAS is wrong about the appointment lengths, and it did NOT MATTER.  MAS never responded to the explanation or reimbursed accordingly.  So basically, whether an appointment is four hours or not, MAS will decide that it isn't.  While it is moot whether the appointment is four hours or not, the point remains that even if it were, MAS will decide that it wasn't.

41.     Gallagher/Oto upheld denial for 4/11/16 in the amount of $26.61 because receipt was not itemized.  Petitioners submitted the only receipt they were given.  If this is not an arbitrary and capricious policy, not sure what is (they had been reimbursed-prior to 2014- based on only a ledger and proof of appointment.  What difference does it make if the receipt is itemized?  And if MAS is concerned with reimbursing for alcohol or some other concern, they could simply have ASKED the Petitioners what they purchased and they would have learned that the Petitioners rarely drink alcohol and only on special occasions, and NEVER in the day and NEVER while driving anywhere, particularly when transporting their children to a medical appointment.  Again, as receipts were accepted prior to 2014, Petitioners were unaware of this requirement and were given NO chance to obtain an itemized receipt despite the Policy providing Medicaid claimants a chance to resubmit.

42.     Gallagher/Oto upheld denial of toll reimbursement for 4/11/16 and 4/27/16 despite Petitioner arguing NO other way to cross the TZ bridge to Westchester and MAS not affording the opportunity to send in receipt thereafter despite their own Policy proffering opportunity to resubmit.

43.     On page 22 of the Hearing notice, ¶3, Gallagher/Oto write, "the Agency submitted copies of the regulations and policies that it relied upon in making its determinations….." and refers to the "Policy" as that authority.  **The problem is the Policy is NOT a regulation** (as required by Hearing notices); and the reason that the denial notice does not cite any regulations is because there aren't any and the Policy is not based on any regulation rather, conjured by MAS and sanctioned by DOH.

## IT'S NOT MY JOB

44.     In the last ¶ on page 22, Gallagher/Oto write that the lawfulness of the Policy is "**beyond the jurisdiction of the Commissioner and cannot be addressed at an administrative hearing**."  Not ONCE at any point during any of the Hearings did ALJ Gallagher mention that the Policy was beyond the jurisdiction of his authority or that of the DOH.

45.     If the Commissioner of the DOH cannot determine the lawfulness of the Policy, who can?

46.     On page 23 Gallagher/Oto proffer that the Agency did not apply its policies arbitrarily; yet the entire Policy itself is arbitrary as evident on the very next paragraph of their decision on page 23 where Gallagher/Oto refer to the distance needed to drive in order to qualify for PARTIAL meal reimbursement (based on a totally arbitrary formula).  Gallagher/Oto point out that if the appointment time is not over four hours, the entire trip, including appointment time and travel, must be TEN hours in order for a child to earn meal reimbursement.  Ten hours?

47. On what medical basis did they arrive at that number?

48.     The MAS policy (see ¶3, pg. 23) actually states that "travel commencing later in the day does not automatically guarantee lunch expenses to be reimbursed as it is not unreasonable to eat a meal at home prior to traveling." Why does MAS assume that the patient is traveling from home to the particular appointment? Perhaps they are traveling from school or from another medical appointment. This is yet another example of arbitrary.

49.     This brings us to the final ¶ on page 23, where Gallagher/Oto writes that "Petitioners testified that their 7- year old children must be fed on demand due to their disabilities" (yet it fails to impact his decision).[3] While this is true, the ALJ clearly leaves out the important fact that Petitioners submitted letters of Medical Necessity from both their gastroenterologist and their psychiatrist. And again, medical necessity trumps any state provision, even if it was lawful, which it is not.[4]

50.     The fact that ALJ nonetheless denies reimbursement for the 4/11/16 trip because Petitioners failed to produce an itemized receipt says nothing about why prior and subsequent meals were denied where Petitioners presented acceptable receipts! Why does the ALJ fail to consider Medical Necessity on the other dates where "itemized" receipts were indeed submitted? MAS doesn't defend this gaping hole in their argument because there is no defense. (Also, why the requirement for the itemized meal receipt? MAS never explains their rationale).

---

[3] One of many glaring and stupefying errors of law in the Gallagher decisions; see Admin. Directive 92ADM-21, 6/2/92. Gallagher and Oto literally ignore the Record (VAST medical testimony and financial ledgers) –ex. paying zero deference to medical necessity of feeding regimen "as needed."

[4] **18 NYCRR § 513.7 (a) (b), 513.5 and 513.6** "…And if there is no clinical information or documentation conflicting with the opinion of the treating practitioner….the DOH **must approve the request as submitted.**" See *S.D. ex. Rel. Dickson v Hood*, 391 F.3d 581 (5th Cir. 2004).

51.     Finally, Gallagher/Oto discuss the mileage reimbursement issue (pg. 24) and again, clearly fail to understand the difference between the IRS tax deduction rate and the IRS rate for business self-drive reimbursement.  (Please see ¶ 17-20 of this Petition).

### HEARING #741244OJ (3/15/18)

52.     The decision mimics that of **#7124303R**.  Gallagher/Oto reject for meals, claiming "the Record  failed to establish that this particular appointment at issue exceeded four hours"; however, Petitioners did in fact state on the record that the appointment did last four hours.  Nonetheless, the duration of the appointment should be of no consequence, as the Policy remains unlawful AND medical necessity require the children to eat on demand.

53.     The same goes for the mileage dispute.  Appellants reiterate the proper rate must be at the "standard business rate."

### HEARING #7242566Z (3/15/18)

54.     On Page 13 of the "Discussion," Gallagher/Oto weigh the fact that the Apellants' reimbursement request was received more than 90 days after medical appointment.

55.     First, Gallagher/Oto fail to discuss the issue between the mandate to "send" within ninety days and "receive" within days (MAS had disbursed both mandates to its recipients).  At the time, MAS refused fax submissions; they demanded originals of the meal receipt, the toll, and the parking receipt (they later changed their policy and began accepting copies via fax or scan).  Originals required mailing and mailing requires expenses.

56.     Being that MAS twice lost Appellants submission packets, Appellants learned that they had to submit via priority or certified mail to assure receipt of their package as it was accompanied by a tracking method.  Strangely, MAS never lost the tracked packages, just the mail that could be lost and not tracked (a Micah Coger lost an entire packet of invoices of no less than twenty trips-see also emails with correspondence covering years of delay of processing by MAS).  Certified mail costs an additional expense, therefore, Appellants would wait until a number of medical appointments had passed in order to mail one large packet instead of many smaller ones in order to save money they really didn't have for such an expense.  This is noteworthy as MAS could have made an exception for submittals a day or two late here or there, particularly as the last visit or two in the packet was late, while the more recent submissions the packet were more timely.

57.     None of this should have any bearing anyway on the validity of the reimbursement as Gallagher/Oto are correct when they state in ¶6, pg. 13, "*the Appellant's parents are correct in that Section 540.6 (a)(1) refers to providers and would not be applicable to them.*"  Where they go very wrong is in the very next sentence when they defer to the Policy, which if one examines, refers back to the very regulation, (**540.6(a)(1)**) to support their Policy!  Thus, there is no rational way to support the Policy but discount the regulation as the regulation INSPIRED the policy.  Furthermore, and once again, Policy is not law nor is it a regulation.  In this case, it is any number of non-qualified, non-sanctioned individuals, overriding federal and State law that has no limitations (and certainly not 90 days) on how long a recipient has to submit a receipt for reimbursement.  MAS rejection must cite a REGULATION for support, not their Policy!

58.     And again, Gallagher/Oto misinterpret mileage reimbursement law.

### HEARING #7412432M (3/15/18)

59.     Gallagher/Oto deny both meal reimbursement from 5/23/16 for the same arbitrary 80 miles/4-hour rule and upheld the Policy mileage rate, despite Appellants proving the Policy is unlawful, and the decision is arbitrary, and not based on the facts or law associated with the claim.

### HEARING #741242M (3/15/18)

60.     Gallagher/Otto deny both meal reimbursement from 8/24/16 for the same arbitrary 80 mile/4-hour rule and upheld the Policy mileage rate, despite Appellants proving the Policy with regard to appointment time and distance is unlawful and arbitrary and ignores medical necessity, thus subverting federal and State law.  Moreover, the decision is arbitrary, and not based upon the facts or presiding law with regard to mileage reimbursement policy either, relying on a Policy not conceived of or ratified by lawmakers.

### HEARING #7242589J (3/15/18)

61.     This number involves transportation dates from 9/30/15, 11/10/15, 11/30/15, and 2/15/16 .

62.     Gallagher/Oto uphold MAS/DOH determination regarding the 90- day invoice submission limit, the appointment time/distance limit, tips, and the proper mileage reimbursement amount, arbitrarily disregarding well established Medicaid law, and medical necessity, the appropriate mileage reimbursement amount, and the fact that CMS approval was never granted for the new Policy.

63.     Gallagher/Oto's only justification for denial is that to determine the lawfulness of the Policy is *"beyond the jurisdiction of the Commissioner and cannot be addressed an an administrative hearing."*  No clarification is offered as to why it cannot be addressed at a hearing.

### HEARING #7242579K (3/15/18)

64.     Gallagher/Oto arbitrarily deny meal reimbursement for a trip on 9/14/15. They refer to the Policy's time/distance rule.

65.     Gallagher/Oto deny reimbursement for a trip on 10/28/15 because the claim was not received by MAS within 90 days.  They refer to the Policy, but ignore the regulation which has no limit on recipient submission time limits, which again, is included within the Policy.

66.     Gallagher/Oto uphold MAS denial or reimbursement for meals from trips on 2/26/16, 3/7/16, 3/14/16, 3/15/16, 3/23/16, 3/26/16, 4/7/16, 4/13/16, 4/18/16 and 4/29/16 because the distance to the visit was under 80 miles.  Gallagher/Oto had no evidence that any of the visits were under four hours, despite Appellants assertions that many of them were.  Moreover, that point is moot, as medical necessity trumps their Policy AND the policy is unlawful in its creation and implementation.

67.     Gallagher/Oto also deny tips from those same meals because the DOH/MAS policy refuses to cover meals.  The policy is unlawful.

68.     Gallagher/Oto uphold MAS/DOH's denial of reimbursement at the correct mileage rate for all trips.

### HEARING #7282812Q

69.     It is primary importance to mention here that Gallagher/Oto proffer (pg. 14, ¶ 1) that "the Appellant and his partner have already had a fair hearing on these issues." "The Social Services Law" (with respect to meal reimbursement) "and Regulations allow for the right to a 'fair hearing' on an issue, not multiple fair hearings." One must wonder how then, did ALJ Gallagher insist on separate fair hearings on the same issues and refuse to consolidate, yet within his very decision, refer to the very same prior hearings that the Appellants requested consolidation but were turned down? This is the very essence of an arbitrary and capricious decision!

70.     Anyway, Gallagher/Oto upheld the MAS decision regarding both meal and mileage reimbursement based on their Policy once again.

## HEARING #7292592R

71.     Gallagher/Oto uphold MAS decision to deny 2/15/16 and 11/30/15 trip for meal and tip reimbursement because the trip was under 80 miles. However, the appointments were in excess of four hours, and this fact was not disputed at the fair hearing. In fact, all denials by MAS based on the four-hour appointment time limit were assumptions. Every appointment in New York City was in excess of four hours including loading children, strollers and necessary supplies, driving time, parking, unloading children and strollers, walking, registering, examination and consultation. MAS had zero reason to assume otherwise.

72.     Gallagher/Oto once again uphold the unlawful mileage reimbursement rate for Appellant trips.

## APPLICABLE LAW

73.     Medicaid is a joint federal-state program established under the Medicaid Act which provides federal funding for state programs that furnish medical assistance and rehabilitation and other services to needy individuals. 42 U.S.C. §§ 1396–1396w-5; 42 C.F.R. §§ 430.0–456.725.

74.     States are not required to participate in the Medicaid program. If they do, they must conform to federal law and regulations in order to qualify for federal financial participation. 42 U.S.C. §§ 1396a, 1396c.

75.     See Fant v Stumbo, 552 F. Supp. 617 (W.D. KY 1982), Stump v Miller (S.D. W. Va. Dec. 29, 1991): reimbursement provided to clients for travel costs at the same rare for state employees.

76.     See Fant v Stumbo, 552 F. sup. 617 (W.D. Ky. 1982): state limitations of on the amount of trips could be reimbursed was invalid, arbitrary care to some recipients. Just as with Petitioners, and NYS Policy, with arbitrary meal reimbursement, ignoring medical necessity and based upon distance of appointment.

77.     Any state participating in the Medicaid program must adopt an approved State plan, and must administer the program through a "single state agency." 42 U.S.C. § 1396a (a)(5); 42 C.F.R. § 431.10(b)(1); State Plan Under Title XIX of the Social Security Act–Medical Assistance Program (March 10, 2011).

78.     New York has elected to participate in the Medicaid program, and the single state agency responsible for the administration of the Medicaid program in New York is DOH.  Soc. Serv. L. § 363-a (1); 1996 N.Y. Laws Ch. 474, §§ 233–248.

79.   This single state agency is permitted only to delegate certain functions (eligibility determinations, appeals) to certain entities (local districts), and is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(c), (e).  Yet, it appears MAS wrote the Policy! (see email exhibit FF 14-11).  Holly Ramsey of MAS, alerts Petitioners in May of 2014 (only two months before the Policy is dispersed) that "the letter" (what is believed to be the Policy) "is awaiting approval from NYS and once this is done it can be distributed."

80.   MAS is a privately-owned vendor of travel related services for a majority of New York counties, and is responsible for the day-to-day operations of Medicaid travel expense reimbursements, pursuant to the State plan developed and maintained by DOH. N.Y. Soc. Serv. Law § 61; 18 N.Y.C.R.R. § 501.1.

81.   DOH remains ultimately responsible to supervise the actions of its agents, including MAS, and to ensure that its agents comply with the federal and state statutes and regulations governing the Medicaid program. 42 U.S.C. § 1396a (a)(5); 42 C.F.R. §§ 431.10, 431.50, 435.903; N.Y. Soc. Serv. Law §§ 363-a (1).

82.   Federal law and regulations require a state's Medicaid program to provide Medicaid applicants and recipients with recourse to an administrative Fair Hearing when Medicaid benefits are denied, reduced, or terminated. 42 U.S.C. § 1396a (a)(3); 42 C.F.R. § 431.220.

83.   MAS sent denial notices from 2011 through 2016 without any itemization, description, or indicating recourse to further action.  (When determinations are made to deny, reduce, or terminate Medicaid, applicants and recipients must be given timely and

34

**adequate notice** of their right to a Fair Hearing. 42 U.S.C.§ 1396a(a)(3); 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c), 431.210; N.Y. Soc. Serv. Law § 22(12); 18 N.Y.C.R.R § 505.14(g)(3)(x).)

**Medicaid Appeal Rights under the United States and New York State Constitution**

84.     No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. Amend. XIV, § 1.

85.     At the bottom of page four of each hearing decision, is **18 NYCRR 540.6 (a)(1)**, which is the basis for MAS/DOH's denial of invoices/claims received after 90 days.  This regulation, while cited within the DOH "Policy" in question, has **NOTHING** to do with Medicaid recipients (merely providers), but is used by the ALJs as a reference (simply because it is contained within the Policy), yet at the same time, they admit that it has nothing to do with recipients.  How then, does the DOH use t he policy to govern the decision, while at the same time, admitting that it is inapposite.

86.     MAS manages all non-emergency Medicaid Transportation in Rockland County on behalf of DOH. It has arbitrarily created its own travel expense reimbursement policy for Medicaid recipients (the "Policy") which has not been properly reviewed and/or approved by NYSDOH officials in violation of **42 C.F.R. § 431.10 (e),** and which is not in conformity with the official New York Medicaid State Plan ("Plan"); and which is not in compliance with Title XIX of the Social Security Act ( "Medicaid Act" or the "Act") and the Federal regulations implementing it; and which has not been approved by CMS as required by the Act, the result of which is arbitrary and capricious reduction or

denial of proper travel expense reimbursements by New York State Medicaid recipients.

87.     DOH, for acquiescing with MAS' expense reimbursement denials, is in violation of the State Medicaid Plan. 18 NYCRR § 505.10 and State Administrative Directive 92 ADM-21 (dated 6/2/1992). The regulation outlines the eight criteria for granting pre-authorization for doctor visits and the specific trip requirements for recipients and attendants.

88.     The relevant criteria to Petitioners are "frequency of appointments, continuity of medical care, medical condition, undue financial hardship without reimbursement, and any other circumstance which may affect the recipient's ability to access care".   In Petitioners' case, attendant meal reimbursement to and from appointment and on occasion, siblings who must accompany the recipient.  The Petitioners have NEVER asked MAS to provide transport or an attendant to any of their children's appointments but could have.  The third party vendor system costs the State much more money than what the Petitioners are asking for back in reimbursement, which they are entitled to!

89.     These criteria allow for subjective and patient tailored pre-authorizations (which Petitioners and children **have received for each and every trip**), only to be denied after the fact, thus discouraging future trips to much needed specialists, including neurologists and surgeons (Petitioners' son for example has a large brain cyst of the third ventricle that requires close monitoring), varied specialists for daughter's cerebral palsy and son's autism, ADHD, and therapy of many kinds.

90.     18 NYCRR § 513.7 (a) (b) –*Determinations* and **513.5 and .6**-*Evaluation of Requests and Obligations and Responsibilities of the DOH).  These sections clearly*

outline what is required of the Agency and State concerning limitations of coverage with respect to DOH interpretation of the law, misguided as it were.  Regarding meal authorization, Petitioners' children suffer from various disabilities that affect their meal schedule, requiring meals on an as needed basis, not policy, such as GERD (reflux disease), chewing disabilities that impact speed and choking hazard, anxiety disorder, growth issues, stomach digestive disorder, etc.  They cannot be forced to eat according to a one-size-fits all travel schedule lest they unlawfully be required to pay for their own meals.  They must eat according to their needs for a variety of reasons and MAS/DOH- the State was/is well aware of these facts.

91.     Federal Medicaid law, 42 U.S.C.§ 1396d(r) [1905(r) of the Social Security Act, requires state Medicaid programs to provide EPSDT for recipients under 21 years of age.  **States are required to cover any service that is medically necessary….whether or not the service is covered under the State Plan" and "….even if the agency does not otherwise provide for these services to other recipients or provide for these services to other recipients or provides for them in a lesser amount, duration or scope.**  42 CFR § 441.57; See also 42 CFR § 431.53, 441.62 (a), 441.56(a)(2)(iv), 441.62 (b), and 440.170 (a) (1)).

92.     The role of the State is to make sure the full range of EPSDT services is available as well as to assure that families of enrolled children are aware of, and have access to, those services so as to meet the individual child's needs.  The broad scope of services enables the State to design a child health benefit to meet the individual needs of the children serviced by the Medicaid program.  Children's necessities must be more

fluid than adults considering their vulnerability, especially disabled children, considering their needs and limitations, and must be granted even more latitude.

93.     Every MAS Policy provision-and unfortunately supported by the State-undermines such treatment and philosophy from their unusually long wait times to be granted pre-authorization, to mail requirement (expensive considering weight of reimbursement invoice packets coupled with certified mail to track for fear of being lost which has occurred to Petitioners more than once) to denial of reimbursement, resulting in the discouragement of future necessary appointments.

94.     The unlawful MAS Policy has significant implication on the Petitioners. For example, in June of 2014 Petitioners had submitted a packet of receipts and a ledger for reimbursement to MAS/DOH Transportation Unit which contained the difference in outstanding reimbursement owed to Petitioners going back three years.

95.     Five months later, in late October 2014, Petitioners received an e-mail from Lani Rafferty ("Rafferty") of the State Medicaid Transportation Unit, indicating what had and had not be reimbursed to date with little explanation.

96.     On November 18, Plaintiffs sent Ms. Rafferty another e-mail (see email exhibit FF 14-61), making her aware that the packet they had sent in, which totaled approximately $8,000 in reimbursements, not including mileage, was not referenced in the correspondence sent to Petitioners by Ms. Rafferty in her October e-mail.

97.     Ms. Rafferty returned an e-mail that same day (**email exhibit FF 14-53, notifying Petitioners that the packet they had sent in would be addressed well before a Fair Hearing, should they request one.**

98.   A Fair Hearing was scheduled in the Summer of 2015.  However, the DOH failed to submit a hearing packet until the day of the hearing, resulting in an adjournment. This was in disregard to their earlier promise via e-mail that they would submit the packet prior to the hearing.

99.   Moreover, and more importantly, the account log promised earlier by Lani Rafferty outlining unreimbursed expenses was never sent to Petitioners; instead the packet sent to the hearing **included accounting for ONLY ONE doctor trip!**

100.   Following the adjournment, no hearing numbers were provided to Petitioners, and no rescheduling calls were returned to them for approximately another **year**. At that point a new hearing was set up which had to be adjourned due to a child's medical appointment scheduled during the same time.  Even though OTDA was well aware through numerous correspondences that Petitioner's children are disabled and their Parents' daily schedule often includes doctor visits, OTDA disregarded their pleas for better scheduling coordination and continued to send hearing notices for inconvenient to the Plaintiffs times.

101.   The Petitioners continued to bring their children to medical appointments and MAS continued to reduce or deny the reimbursement of their legitimate travel expenses, which in turn required more requests for Fair Hearings to be submitted by the Petitioners.

102.   MAS provides rejection notices for single trips and combined with the current OTDA fair hearing process, forces the Petitioners to schedule separate fair hearings for a single trip, or at best, for all rejections received within a 60 -day period, as an appellant may request a fair hearing for a rejection received within 60 days, but no

longer. So if an appellant wanted to schedule one fair hearing for all of the rejections he/she had received within the last six months, he could not because the statue of limitations for requesting a fair hearing only goes back 60 days. This process leads to MANY fair hearings over the same exact issues. OTDA is aware of this issue but refuses to engage it.

103.   This process resulted in an untenable situation where Petitioners potentially are compelled to attend dozens of Fair Hearings for individual receipts that can be for only few dollars each while trying to juggle a busy schedule of caring for, in this case, 3 children with disabling and chronic health conditions. The practical impossibility of attending all these Fair Hearings effectively denies the Petitioners due process protections in connection with exercising their rights under the Medicaid Law.

104.   In the summer of 2016, the Petitioners attended one of these single-receipt-in-dispute hearings and made the new ALJ aware of the unbearable burden they have to deal with and the impact it has on them. The Petitioners requested the ALJ rule that all MAS Fair Hearings be consolidated into one because the issues are identical. The ALJ claimed lack of authority to consolidate and suggested Petitioners contact OTDA to request such streamlining so that hearings could go forward, be heard, and adjudicated in a consolidated manner. Petitioners contacted OTDA and discussed the issue at length in the fall of 2016 with a Ms. Wong ("Wong"), a scheduling supervisor. No meaningful action was taken however as Petitioners were eventually instructed that only the presiding ALJ has that authority.

105.   Nearly a year passed and no progress was made on any coordination of Fair Hearings or even at a minimum for all MAS hearings to be scheduled for the same

day. Moreover, Petitioners contacted OTDA by mail numerous times before and after speaking with Ms. Wong (Mr. Lahey for one, former head officer at OTDA, among others), to no avail.

106.    On December 1, 2016, Plaintiffs sent a letter to OTDA Scheduling and Verification Units, Office of Administrative Hearings, requesting all transportation hearing numbers be heard together on the same day.  This letter request was completely ignored.

107.    On January 19, 2017, Plaintiffs also sent a letter to Ms. Wong in the Office of Administrative Hearings ("OAH" of OTDA) requesting consolidation.

108.    Without any regard to the Federal and State rules and regulations for reimbursement of out-of-pocket expenses related non-emergency medical transportation, MAS has created its own arbitrary and capricious Policy of reimbursement for meal expenses ranging from non-acceptance of hand written receipts (as if Plaintiffs could control that), to using percentage based reimbursements, to not reimbursing the attendant, to denials if appointment times and distance do not live up to their arbitrary minimums.

109.    This demand of submitting only print-out receipts and denial of any meal expense tips is unreasonable and serves only the purpose of denying the Petitioners reimbursement for valid expenses.

110.    MAS also completely denied reimbursement of reasonable meal and parking related tips.

111.    As a result of this unauthorized demand for print-out receipts and denial of reimbursements for meal expense tips, the Petitioners have suffered underpayments for

their travel meal and tip expense reimbursements since the end of 2012 to present time in the amounts of not less than $10,000 in meals and $5,000 for tips.

112.    Petitioners requested of a "Ms. Wong" at OAH scheduling that hearings "...be called together with the other trans. hearings, consolidated if possible where many issues are identical." This request was completely ignored and the Petitioners were never allowed to consolidate these fair hearings.   The two letters referenced above are just 2 examples of many more attempts made by the Plaintiffs since 2012 via letters, phone calls and emails to try to consolidate the fair hearings and exercise their right of a meaningful due process when challenging the reductions and denials of their expense reimbursements. As an example of an earlier attempt to resolve the issue, Petitioners sent a letter to Mark Lahey, Principal Hearing Officer at OTDA, on May 10, 2015 complaining about the due process for fair hearings #'s: 6500974Y, 6577046K, 6567056Z, and 6889115J.

113.    The current unworkable fair hearing process has also dissuaded the Petitioners from requesting more fair hearings for denied expense reimbursements because they would be forced to attend dozens more such fair hearings for individual expense receipts which would be impossible for them to do so.

114.    Plaintiffs have two young children with disabilities, and a third child, age six (now).  They have not had the time or the resources needed to attend hearing after hearing concerning the same exact issues, where the only difference is the date and the amount of money in dispute, nor should they be forced to expend all this valuable time which could be better used for taking care of their disabled children.

115.     The State Medicaid Plan reads as follows: "Payment of reimbursement for use of a personal vehicle of a volunteer driver or family member of a MA recipient will be made at the Internal Revenue Service's established rate for Standard Mileage" which is over 50 cents (close to the POV rate) per mile depending on the year in question. MAS has been reimbursing at the incorrect rate of about 24 cents per mile.

## FIRST CAUSE OF ACTION

116.  The Defendants have failed to provide proper reimbursement for mileage expenses for authorized Medicaid transportation services of their chronically ill children to medical appointments.

117.     Petitioner repeat(s) and realize(s) each and every allegation in paragraphs 1 through 116 as if fully set forth herein.

118.     Medicaid non-emergency medical transportation (NEMT) is an important benefit for beneficiaries who need to get to and from medical services but have no means of transportation. The Code of Federal Regulations requires States to ensure that eligible, qualified Medicaid beneficiaries such as the Plaintiffs have NEMT to take them to and from Providers. Most states, including New York, allow parents to provide such transportation for their children and reimburses them for the cost of these medically necessary trips (it is actually the promoted method by the State as being the most cost-effective method; less expensive for instance, than having to pay for transportation and an attendant to accompany the child, which is required under the State Plan).

119.     The Appellants have a right of action under Section 1983 as Medicaid recipients to enforce the Medicaid Act's requirement for their children to receive non-emergency medical transportation, for which they qualify due to their disabling and

chronic health conditions, and for their parents to be reimbursed the costs incurred while providing such transportation.

120.    In violation of the regulation prohibiting NYSDOH from delegating the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters, NYSDOH has allowed MAS to create with its own rate for reimbursement of personal vehicle mileage.

121.    MAS reimburses the Plaintiffs at the incorrect rate of about 24 cents per mile, which is the IRS tax deductible rate, when it should be reimbursing them at the POV rate of about 56 cents per mile (this rate varies slightly depending on the year) or even at the AAA recommended SUV rate of 75 cents per mile. The POV is the correct rate because it represents a replacement for Plaintiffs taking the bus, or other mode of MAS supplied transportation (just as the State does with parents who drive their children to pre-school in lieu of taking the bus).  In the latter case, parents are reimbursed at 57.5 cents per mile (using the 2015 rate for this example as it fluctuates each year) saving New York State the expense of bussing their children to school. Similarly, Petitioners save the New York State/MAS transportation expenses by taking their children to medical appointments.

122.    The POV rate is paid to Federal and State employees for use of their personal vehicles for business.  Given that MAS distributes pay stubs and "employee" W-9s (required to file as wage earners) to the people who receive mileage reimbursements, it essentially treats them as contractors or state employees and must reimburse them accordingly.

123.     MAS, as an arm of Medicaid, is responsible for getting each child to their

necessary appointments, no matter the involvement of the caretakers or parents.  It cannot

be assumed that the parents or caretakers will have the ability to transport their children

to medical appointments.  Thus, when parents or caretakers are willing to transport their

children, they are fulfilling a role (and substituting expenses) that MAS would otherwise

assume-via wages paid to their own transporter, and wear and tear on the vehicle-

according to federal Medicaid and EPSDT laws.

124.     Finally, the State Plan Amendment reads: *"Payment of reimbursement for*

*use of a personal vehicle of a volunteer driver or family member of a MA recipient will*

*be made at the Internal Revenue Service's established rate for Standard Mileage"* which

is over 50 cents (close to the POV rate) per mile depending on the year in question.  See

Fant v Stumbo, 552 F. Supp. 617 (W.D. KY 1982), Stump v Miller (S.D. W. Va. Dec. 29,

1991): reimbursement provided to clients for travel costs at the same rare for state

employees.

125.     As a result of the incorrect rate being used to reimburse the Plaintiffs for

personal vehicle mileage, they have suffered underpayments for their personal vehicle

mileage reimbursements since 2011 to present time in the amount exceeding $10,000

(Petitioners do not have an exact figure as it is ongoing, and MAS does the accounting

for mileage, using internal software to gauge mileage from one location to another;

however, it is in excess of $10,000).

**AND AS A SECOND CAUSE OF ACTION- ARTICLE 78 REVIEW OF DENIAL**

**OF REIMBURSENT FOR INVOICES RECEIVED AFTER 90 DAYS**

126.     Petitioner repeat(s) and realleg(s) each and every allegation in paragraphs 1 through 125 as if fully set forth herein.

127.     All doctor visit expenses submitted by the Appellants have been improperly denied by MAS if not RECEIVED within 90 days.

128.     This is explicitly inconsistent with the applicable regulation which states that the 90-day rule is applicable only to **providers** and the Appellants are actually parents of recipients of Medicaid and not Providers. MAS was notified of this fact multiple times by the Appellants over the years, but they continued to ignore it.

129.     Even though the 90-day rule is completely inapplicable to the Appellants as they are Medicaid recipients and not Providers, it has a built-in mechanism-such as confusion over a regulation- for even allowing providers to submit receipts past the 90-day limit if they have a reasonable excuse for the delay.  Such leeway has never been afforded Appellants.

130.     Despite ALJ Gallagher/Oto pointing to the fact, within their decisions, that the Appellants are correct about the law, they nonetheless defer to the "Policy," despite the inexplicable fact that the very Policy that they defer to cites the unlawful regulation as the reason to deny!

131.     This fact exhibits ALJ's failure to adhere to the law, as unequivocal is it may be, and instead, search for arbitrary and unreasonable rationale towards upholding an unlawful decision.

132.     As a result of this incorrectly applied rule by the Defendants, the Plaintiffs have suffered underpayments for any expense received after 90 days since the end of 2012 to present time in the amount of not less than $10,000.

**AND AS A THIRD CAUSE OF ACTION- ARTICLE 78 REVIEW OF IMPROPER**

**REIMBURSEMENT OF MEAL AND TIP EXPENSES IN VIOLATION OF**

**APPELLANTS' FEDERALLY SECURED RIGHT TO BE REIMBURSED FOR**

**OUT-OF-POCKET EXPENSES INCURRED FOR AUTHORIZED TRANSPORT**

**OF THEIR CHRONICALLY ILL CHILDREN TO MEDICAL APPOINTMENTS**

133.    Petitioners repeat and re-allege each and every allegation in paragraphs 1 through 132 as if fully set forth herein.

134.    Without regard for the Federal and State rules regulations for reimbursement of out-of-pocket expenses related non-emergency medical transportation, MAS has created its own arbitrary and capricious Policy of reimbursement for meal expenses ranging from non-acceptance of hand written receipts (as if Plaintiffs could control that), to using percentage based reimbursements, to not reimbursing the attendant, to denials if appointment times and distance do not live up to their arbitrary minimums , no matter if the minimums are so arbitrary that a four hour appointment can earn a recipient reimbursement, but a two hour appointment with a five hour drive time (for a total of 7HOURS) will not!

135.    Aside from the Policy being arbitrary, it is also unlawful, having not been submitted to CMS for approval and thus, added as an amendment to the State Medicaid Plan.

136.    Moreover, ALJ Gallagher and Oto dismiss the eight factors of reimbursement, two components of which are medical necessity and frequency of travel.

137.    The Appellant's children (as prescribed by their gastro-enterologist and psychiatrist) must eat on demand for health reasons, and such medical necessity, trumps any State Plan (and this Policy is not even IN THE STATE PLAN!

138.    As a result of this arbitrary demand for print-out or itemized receipts and denial of reimbursements for meal expense tips, the Plaintiffs have suffered underpayments for their travel meal and tip expense reimbursements since the end of 2012 to present time in the amounts of not less than $10,000 meals and approximately $5,000 for tips.

### AND AS A FOURTH CAUSE OF ACTION-DUE PROCESS VIOLATIONS

139.    Petitioner repeat(s) and reallege(s) each and every allegation in paragraphs 1 through 138 as if fully set forth herein.

140.    Beneficiaries' claims to services under the Medicaid Act are protected by the Due Process Clause of the U.S. Constitution. The two fundamental elements of the constitutionally required Medicaid appeals process are adequate notice of state agency actions and a meaningful opportunity for a hearing to review those decisions.

141.    MAS/DOH custom and practice of conducting fair hearings for expense reimbursement reductions and denials only on a receipt by receipt, trip by trip, basis results in dozens of unmanageable and practically impossible to attend hearings for the parents who are juggling a busy schedule of caring for 3 children with disabling and chronic health conditions.  The sheer volume of these medical trips, and associated paperwork without providing hearing consolidation denied the Plaintiffs an opportunity for fair hearing in violation of their rights under 42 U.S.C.§ 1396a(a)(3), the Due Process

Clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend.

XIV, § 1, and the New York State Constitution, N.Y. Const. Art. I, § 6.

142.     For years, the OTDA under the DOH ignored Appellant pleas for hearing

consolidation of the same issues, or same day scheduling for the hearings, requiring

Petitioners to have to manage in excess of ten different fair hearings on different days,

including travel, preparation, and seeking child care while Petitioners attended hearings.

143.     Moreover, OTDA under DOH refused to schedule hearings at convenient time for

Petitioners, while well aware of the numerous medical appointments for the children that

would pose a conflict.  Finally, in 2018, they began to coordinate hearing dates; however,

this problem could have been solved years earlier so Petitioners children could have gone

on receiving the care they needed.  Petitioners have exhausted credit and loans paying

these medical expenses on behalf of their children and as a result, appointments that

should have been made  have not been. **18 NYCRR 358-5.2** Scheduling. *(a) The fair*

*hearing will be held at a time and place convenient to the appellant as far as practicable.*

**(b) Priority scheduling…..***must be scheduled as soon as practicable after the request*

*therefor is made. In determining the date……. consideration must be given to the nature*

*and urgency of the appellant's situation, including any date before which the decision*

*must be issued…."* **358-3.2** *Priority in scheduling of your hearing and determination will*

*be provided when:(a) you are an applicant for emergency assistance to needy families*

*with children, emergency assistance to aged, blind or disabled persons" (such as*

*Plaintiffs who have been in desperate need of reimbursement to continue proper care.*

144.    Moreover, MAS invoices were unacceptably sparse for the first three years of Appellant claims.  They lacked any explanation or breakdown whatsoever, even which reimbursement was for which trip on which date; just a check for an amount.

145.    What resulted from MAS inadequate invoices and cataloguing and the delay/lack of consolidation and total disregard of Appellant request for scheduling input resulted in hearing conducted years after the fact, and stacks of invoices, receipts and numbers, making it that much more difficult to present a streamlined, easily comprehendible accounting history.  This is exactly what the DOH and MAS wanted; a review that is most difficult to review (it all started with their inadequate invoices and remittance procedure).

146.    Petitioners awaited FOIL results for more than TWO years, finally being informed by the State that no such application for amendment to the State Plan was made with regard to the new transportation Policy.  This substantial delay caused delay in fair hearings.

147.    Heidi Simi of DOH transportation assured Petitioners of clear accounting ledger a**head** of fair hearings (for Petitioner review, see email exhibit) only to not submit until the DAY OF the hearing, which again, resulted in lengthy adjournment.

148.    <u>All of the above issues of delay had negative and dangerous residual effects, resulting in fewer vital medical appointments scheduled over time-from allergist to geneticist to endocrinologist to gastroenterologist to pediatric neuro surgeon- as Petitioners could not afford the continued expenses without being reimbursed.  As a result, certain health problems and concerns have arisen and other continue to persist to</u>

this day, which may very well have been attenuated or solved years ago if the appointments could have been attended.

149.     See **42 C.F.R. § 440.130 (d),** defines necessary equipment and supplies as items that provide for "*maximum reduction of a physical or mental disability and restoration of a recipient to his best [possible functional level.*" In not being able to schedule many vital appointments, the DOH is ensuring Petitioners' children not be the best they can be.

150.     As one example of many, Petitioners' daughter, M, who had been diagnosed with neurofibromatosis, is now believed to potentially suffer from McCune-Albright Syndrome, a disease with growth and development implications that can be prevented with preemptive and early care.  The DOH, through their unlawful reimbursement process, has stymied the Petitioners' access to their federal right, complete EPSDT medical care, under Medicaid.

## CONCLUSION

The Plaintiffs assert violations, when they were not properly reimbursed for meals, mileage, and receipts submitted past 90 days, of their federal and state right to be reimbursed for out-of-pocket expenses incurred for authorized Medicaid services. This right is created because (1) reimbursement of such out-of-pocket expenses is intended to benefit the Petitioners so that they may continue to take the necessary medical trips to assess the children's ongoing needs and improve their conditions, (2) the provision for reimbursement of non-emergency medical transportation expenses contains sufficiently specific language so that this Court knows what to enforce; and (3) the provision creates a

binding obligation on NYSDOH and MAS to properly reimburse such expenses to the Petitioners.

A welfare entitlement is "property" protected by the Constitution, and qualified recipients require these benefits to obtain their "brutal needs" as once described by Mr. Justice Brennan, one of which is medical care. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).  The progeny of Goldberg is legion (Greenstein by Horowitz v. Bane, 833 F. Supp. 1054 (S.D.N.Y. 1993) but it is clear that a re-determined process depriving an applicant of medical care is a violation of due process.

*Hicks v. Colvin*, 214 F.Supp. 3d 627 (E.D. Ky. 2016).  And the denial of reimbursement is indeed "denial of these brutal need" that allow the Petitioners the ability to continue to go on the medical appointments they require, towards "amelioration" and proper development.  As of now, the Department of Health is denying Petitioners their Constitutional and State rights to appropriate and necessary care.

Medicaid non-emergency medical transportation (NEMT) is a vital benefit for beneficiaries who need to get to and from medical services but do not have either the means or the funds to access transportation. The Code of Federal Regulations requires States to ensure that eligible, qualified Medicaid beneficiaries such as the Plaintiffs have NEMT to take them to and from Providers.  Furthermore, the Petitioners have a right of action under Section 1983 as Medicaid recipients to enforce the Medicaid Act's requirement for their children to receive non-emergency medical transportation, for which they qualify due to their disabling and chronic health conditions, and for their parents to be reimbursed the costs incurred while providing such transportation.

Moreover, this applies as well to the parent's trips, as Medicaid is intended to consider the entire household (as something that affects one affects all), and thus, being under 100% of the FPL entitles them to reimbursement as well, regardless of whether they qualify for EPSDT.

In closing, ALJs Gallagher and Oto had all of the regulations, correspondence, and financial data/accounting to determine that MAS and DOH are serving their Medicaid recipients unlawfully, and are well aware of it, but sought out absurd excuses to circumvent their duties, going to the lengths of pretending they didn't have certain information to rule in Petitioners' favor, when they had more than enough.

While Appellants cannot say for sure, it appears to be another example of big business and government, scratching each other's backs: the DOH granting expanded control of the State to MAS in return for more stringent qualifiers for reimbursement, and thus, retaining money for their coffers that is NOT THEIRS and NEVER was.  The regulations dictate reimbursement unequivocally as the "Policy" is unlawful in a myriad of ways.

### PRIOR APPLICATION

Petitioners have not made a prior application for the relief requested herein.

### RELIEF REQUESTED

WHEREFORE, Petitioners respectfully requests that this Court issue an Order directing New York State to reimburse Petitioners for all submitted expenses that were either denied, misplaced, or failed to inventory from 2012 to current.  This can be easily ascertained by matching corresponding, PRE-AUTHORIZED trip number with the expenses submitted for such trip and assessing what was and what was not reimbursed. While the Petitioners' completed this duty through 2015 (though it should have been completed by accountants at DOH and MAS) and submitted days of accounting work before Gallagher/Oto, apparently the State never reviewed it-either at the hearing or thereafter.

(a)     Reimbursement of all unreimbursed and contested Petitioners' travel medical expenses from 2011 through current and ongoing and all associated fair hearing costs.  The total outstanding reimbursement as of 5.30.14 is no less than $15,571.82.  The running total is accruing since that date for trips taken after 5.30.14. The total owed from 5.30.14 until now is no less than $15,000;

(b)     Requiring the OTDA and the DOH to consolidate hearings of the same issues in the future;

(c)     Directing the Rockland County DSS and the DOH to apply "Direction Relative to Similar Cases", 18 NYCRR 358-6.3, so similar issues can be resolved without unnecessary fair hearings;

(b)     Awarding legal fees and other preparation costs in association with this article 78 in favor of Petitioners and against Respondents in an amount to be determined at the conclusion of this proceeding; and

(c)     Granting Petitioners such other and further relief as this Court deems just and proper.

Dated:        New York, New York
              June 21, 2019

                              Respectfully Submitted,


                              _____
                              [Scott Maione and Tasha Ostler-Pro-Se Petitioner]
                              87 Shetland Drive
                              New City, NY, 10956


TO:     New York State Department of Health
        Corning Tower
        Empire State Plaza,
        Albany, NY 12237

        Attorney General of New York State
        44 South Broadway
        White Plains New York 10601

## VERIFICATION

STATE OF NEW YORK          )
                               ) ss.:
COUNTY OF ROCKLAND  )

Scott Maione and Tasha Ostler, being duly sworn, depose and says:

We are the Petitioners, Scott Maione and Tasha Ostler in the above-captioned

action. We have reviewed the Petition herein and know the contents to be true to our own

knowledge, except as to those matters alleged on information and belief, and as to those

matters, we believe them to be true.

Dated:          New York, New York
                June 24, 2019

[DEPONENT]
SCOTT MAIONE

TASHA OSTLER

Sworn to before me on this
24th day of June, 2019

CHRISTINE A. SMITH
Notary Public - State of New York
No. 04SM6377940
Qualified in Rockland County
Commission Expires July 16, 2022

Notary Public

STATE OF NEW YORK
COUNTY OF ROCKLAND
SUBSCRIBED AND SWORN TO BEFORE ME
THIS 24 DAY OF June 2019.
NOTARY PUBLIC

CHRISTINE A. SMITH
Notary Public - State of New York
No. 04SM6377940
Qualified in Rockland County
Commission Expires July 16, 2022

55